

Velian Shipbrokers s.r.l.

ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014
MV TEO / NORDEN AS

(b) The Master or the Owners shall notify the Charterers or their agents and the Stevedores of any damage latest within 24 hours after damage has been discovered failing which the Charterers shall not be responsible.

(c) Stevedore damage affecting seaworthiness shall be repaired without any delay before the Vessel sails from the port where such damage was caused or discovered. Stevedore damage affecting the Vessel's trading capabilities shall be repaired prior to redelivery, failing which the Charterers shall be liable for resulting losses. All other damage which is not repaired prior to redelivery shall be repaired by the Owners and settled by the Charterers on receipt of Owners' supported invoice.

**Clause 64 – Taxes**
Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding taxes levied by the country of the flag of the Vessel or the Owners).

**Clause 65 – Trading Limits**
Trading Worldwide, always afloat within IWL, always via safe port/safe berth/safe anchorage, except; Iceland, Great Lakes, Siberia, Finland, Norway, Sweden, Denmark, Azov Sea during ice period, Abkhazia, Israel, Lebanon, Libya including Gulf of Sidra-Sirte, Syria, Turkish occupied Cyprus, Cambodia, Myanmar, North Korea, Sudan, CIS-Pacific ports, Iraq, Iran, Eritrea, Ethiopia, N+S Yemen, Somalia, Cuba, Haiti, Abkhazia, Angola, Cabinda, Congo, Equatorial Guinea, Gabon, Gambia, Nigeria, Guinea Bissau, Liberia, Sierra Leone, Ivory Coast, Zaire/Congo, Amazon river not above Trombetas, Up river not above San Lorenzo, Orinoco River not above Matanzas. Vessel not to trade or do passage directly between China and Taiwan and vice versa, also not to trade war and/or war like zones declared by Owner's underwriters, and vessel not to trade to countries which from time to time may be banned by the United Nations and/or the national authorities under which vessel is registered. Vessel to trade always via ice-free ports (St. Petersburg or similar ports are automatically excluded when ice-condition exist) and always excluding war/warlike/trapped/blocked zones, closed areas or any countries ports or places where embargo or sanctions or other prohibitions are imposed by the U.N or E.U and any international organizations.

Alaska allowed only if Red Dog and during summer period only. Owners can accept Charterers to call Hawk Inlet with the condition they provide Owners with proper information so as to prepare the vessel on time to call this port, latest 25 days prior vessel's arrival at the loading port. Otherwise as per Charter Party.

Murmansk during ice period (no ice in Murmansk year around ) provided no ice, otherwise as per charter party (i.e not allowed).
NIGERIA and IVORY COAST to be allowed provided Charterers hereby agree by way of modification of the Interclub New York Produce Exchange Agreement to assume direct responsibility for all claims for shortage of cargo in any port of call in NIGERIA and IVORY COAST. If such claims are presented or pursued Charterers will take over handling of same in lieu of Owners, and if security is requested, they will arrange to post same to the claimant's satisfaction, whilst vessel will remain on hire until such arrangements are finalized.



Velian Shipbrokers s.r.l.

**ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014**
**MV TEO / NORDEN AS**

If Charterers fail to comply with the above, they agree to indemnify Owners for all losses they suffer as a result.

Vessel not to be sub-chartered to companies based in Iran, Nigeria and Cuba or any other country, which may lead to subsequent boycott of the vessel. Vessel not to be ordered nor bound to enter any place where fever or epidemics are prevalent or to which the master, officers and crew are not bound to follow the vessel.

Vessel not to be employed for more than two(2) consecutive voyages on any Indian and/or Australian coastal trading and/or inter Persian Gulf/Arabian Gulf/Gulf of Oman trading in case vessel's cranes and grabs shall be used.

Vessel shall be allowed to sail Magellan straight during winter provided charterers arrange and pay all the customary/compulsory pilotages

I.N.L. (International Navigating Limits 1.11.03) as revised/amended on 1st November 2003. Charterers shall be allowed to trade vessel outside I.N.L. against payment of additional premium as per cp.

**Clause 66 - Superficial Inspection**
If Owners consent, Charterers have the option to carry out superficial inspection to the Vessel at any time of the period at their time and expense provided such inspection does not interfere to Vessel's normal operations including bunker survey.

**Clause 67 — War cancellation**
Either Owners or Charterers may cancel this Charter Party on the outbreak of war between (any two or more) People's Republic of China, Russia, United States of America, United Kingdom, Greece and/or the country of vessel's flag, which could affect the performance of this Charter. In any event, such cancellation shall take place after discharge of cargo at the destination.

It is understood that a 'war' means direct war or war like operation between these countries and does not include local hostilities or civil war where any of the above countries supports the opposing side.

**Clause 68 – Weather Routing**
Charterers and owners have the option to employ their own weather routing service to monitor weather conditions experienced during sea passages and assess the vessel's performance. Each party to pay their own costs for such services.
The Master will comply with charterers' weather routing services reporting procedures at all times and endeavour to follow charterers' or their routing services recommended route. However, the final choice of selecting the safest route will be the master's decision, providing it is justified.

The vessel's described speed and consumption is given in good faith and based upon:

a) good weather conditions, which are understood to mean winds of maximum Beaufort Force 4 (maximum 16 knts) and/or Douglas Sea State 3 (3-5 feet).No adverse currents and no swell and

b) fuels supplied during the currency of the charter meet requisite specifications (as described in the charter).



Velian Shipbrokers s.r.l.

**ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014**
**MV TEO / NORDEN AS**

In the event of major discrepancies, Charterers to produce a final report to support their claim, which together with owners' weather routing service's report (if appointed) and / or ship's log to be used to amicably settle a claim.

Any credit for bunkers under-consumed is to be calculated by comparing the actual consumption with the warranted consumption plus the 5% margin.

'About' on speed means 0.5 knot allowance and 'about' on bunkers consumption means 5% allowance both in Owners favour.

**Clause 69 - War Risk Insurance**
Basic premium for annual war risks insurance on hull and machinery and Officer/Crew always to be for Owners' account. Any additional premium, in respect of these risks solely arising from the vessel proceeding at the Charterers' request to areas designated as excluded areas by vessel's war risks Underwriters to be for the Charterers' account, however, not to exceed what would have been quoted or charged it the vessel was covered on the London market. Charterers have option to trade vessel war risk area with Owners' prior approval, which not to be unreasonably withheld. But extra war risk insurance premium including crew's war risk insurance bonus and special bonuses resulting from Charterers trade to be for Charterers' account.

Trading through Gulf of Aden:
Bimco piracy clause 2013, to apply with paragraph (a) and (b) deleted.

For each Gulf of Aden passage, charterers to pay for the cost of all piracy related expenses including the cost of the armed guards, such amount to be paid to owns bank acct prior embarkation of the armed guards. Armed guards shall be arranged by the owners. Owners to provide charterers with original vouchers for all piracy related expenses.

Direct routing via Indian Ocean:
Charterers option to instruct vessel to sail from Persian Gulf/West coast India range to South Africa/ East coast South Africa range and from East coast South Africa/South Africa range to West coast India/Persian Gulf range following shortest route always west of Madagascar, keeping a distance of min 300nmiles off Somalia coast with armed guards on board. Owners shall arrange for the armed guards. Armed guards will embark/disembark at Durban/Fujairah or pmo as the case may be. In case charterers exercise such option charterers to inform owners well in advance for owners to have sufficient time to arrange for the armed guards.

Prior embarkation of the armed guards charterers to reimburse to Owners all the piracy related costs (including cost of armed guards), always against original vouchers

Coastal routing Indian Ocean
Vessel to trade always outside JWC zones, always excluding any piracy declared zones subject to safe navigation of the vessel permit same.

In the event vessel is instructed to proceed to West coast India and/or Persian Gulf north bound, vessel to be routed to destination always via cape Comorin thereafter as close as possible off the West coast India/Pakistan/Iran coast, as the case may be, always subject to safe navigation of the vessel.

20



*Velian Shipbrokers s.r.l.*

**ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014**
**MV TEO / NORDEN AS**

Similarly, in the event vessel is instructed to sail southbound from Persian Gulf/West coast Indian ports, vessel will be routed to destination as close as possible off the West coast India/Pakistan/Iran coast, as the case may be, up to Cape Comorin always subject to safe navigation of the vessel.

Vessel not to be placed off-hire for any additional mileage travelled due to following any of above routings.

In case vessel is instructed to sail from West coast India towards Persian Gulf, charterers to pay along with next hire payment the cost of coverage of kidnap + ransom, extra war risk insurance, due to vessel's above routing.

Similarly if vessel is instructed to sail from Persian Gulf towards West coast India, charterers to pay together with next hire payment the cost of coverage of kidnap + ransom, extra war risk insurance, due to vessel's above routing. Always against original voucher.

Owners confirm vessel may call Lagos/Warri point under the terms/conditions of the cp.

**Clause 70 - Layup**
The Charterers shall have the liberty to order the laying-up of the vessel at a safe berth or port for any period of this charter. In the event of such lay-up, Owners shall promptly take step to effect all possible economies in operation costs if so required by Charterers. The Owners will estimate all such savings including (but not limited to) reductions in insurance and manning costs. If the vessel is laid up, the charter hire shall be reduced by the amount of any savings actually made by the Owners during the laying up period.

Charterers shall bear any expenses related to re-activation of the vessel. Owners shall not be penalized for reduction of speed due to marine growth after laying-up and bottom cleaning if required, shall be held at Charterers' time and expenses.

Charterers to give sufficient notice of their intention in this respect to enable Owners to make the necessary arrangements.

**Clause 71 – Hire Details Period**
Hire : USD       per day pro rata including overtime for first 11/13 months.
      USD       daily for optional period.

First hire amount & Bunker on delivery value to be paid within 3 banking days after delivery and receipt Owners' invoice by e-mail or fax, thereafter every 15 days in advance.

Owners' banking details: to be advised.

**Clause 72 - Separation**
If artificial separation is required for loading different cargoes/qualities in the same holds, then the cost and time required for installing/building will be for Charterers' account. Owners/Vessel will not be responsible for any mixtures/contamination of different cargoes/qualities. Charterers to arrange at their time and expense removal / discharge/disposal of all materials for artificial separation.

21



Velian Shipbrokers s.r.l.

ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014
MV TEO / NORDEN AS

**Clause 73 – Drydocking**
Drydocking only in case of emergency.

**Clause 74 – BIMCO Hull Fouling Clause for Time Charter Parties**
(a) If, in accordance with Charterers' orders, the Vessel remains at or shifts within a place, anchorage and/or berth for an aggregated period exceeding:

(i) 20 days in a Tropical Zone or Seasonal Tropical Zone*; or

(ii) 25 days outside such Zones*

any warranties concerning speed and consumption shall be suspended pending inspection of the Vessel's underwater parts including, but not limited to, the hull, sea chests, rudder and propeller.

(b) In accordance with sub-clause (a), either party may call for inspection which may be arranged jointly by Owners and Charterers and undertaken at Charterers' risk, cost, expense and time.

(c) If, as a result of the inspection either party calls for cleaning of any of the underwater parts, such cleaning shall be undertaken by the Charterers at their risk, cost, expense and time in consultation with the Owners.

(i) Cleaning shall always be under the supervision of the Master and, in respect of the underwater hull coating, in accordance with the paint manufacturers' recommended guidelines on cleaning, if any. Such cleaning shall be carried out without damage to the Vessel's underwater parts or coating.

(ii) If, at the port or place of inspection, cleaning as required under this Sub-clause (c) is not permitted or possible, or if Charterers choose to postpone cleaning, speed and consumption warranties shall remain suspended until such cleaning has been completed.

(iii) If, despite the availability of suitable facilities and equipment, Owners nevertheless refuse to permit cleaning, the speed and consumption warranties shall be reinstated from the time of such refusal.

(d) Cleaning in accordance with this clause shall always be carried out prior to redelivery. If, nevertheless, Charterers are prevented from carrying out such cleaning, the parties shall, prior to but latest on redelivery, agree a lump sum payment in full and final settlement of Owners' costs and expenses arising as a result of or in connection with the need for cleaning pursuant to this clause.

(e) If the time limits set out in Sub-clause (a) have been exceeded but the Charterers thereafter demonstrate that the Vessel's performance remains within the limits of this Charter Party the vessel's speed and consumption warranties will be subsequently reinstated and the charterers' obligations in respect of inspection and/or cleaning shall no longer be applicable.

**Clause 75 - Putting Back**
Should the Vessel deviate or put back during a voyage for a reason which causes hire to be suspended under this Charter Party, hire shall cease to be payable from the commencement of such deviation until the time when the Vessel is again ready to resume her service from a position



**Velian Shipbrokers s.r.l.**

**ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014**
**MV TEO / NORDEN AS**

not less favorable to the Charterers than that at which the deviation commenced, provided always that due allowance shall be given for any distance made good towards the Vessel's destination and any bunkers saved. However, should the Vessel be driven into port or anchorage by stress of weather or by any cause for which the Charterers are responsible under this Charter Party the Vessel shall remain on hire and all costs thereby incurred shall be for the Charterers' account.

**Clause 76 – Ice**
a) The Vessel shall not be obliged to force ice neither push ice nor to follow ice breaker.
(b) The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights, lightships, markers or buoys have been or are about to be withdrawn by reason of ice; nor where on account of ice there is, in the Master's sole discretion, a risk that, in the ordinary course of events, the Vessel will not be able safely to enter and remain at the port or area or to depart after completion of loading or discharging. If, on account of ice, the Master in his sole discretion considers it unsafe to proceed to, enter or remain at the place of loading or discharging for fear of the Vessel being frozen in and/or damaged, he shall be at liberty to sail to the nearest ice-free and safe place and there await the Charterers' instructions.
(c) Any delay or deviation caused by or resulting from ice shall be for the Charterers' account and the vessel shall remain on-hire.
(d) Any additional premiums and/or calls required by the Vessel's underwriters due to the Vessel entering or remaining in any icebound port or area, shall be for the Charterers' account.

**Clause 77 - Selling Option**
Owners have the option of selling the vessel subject to Charterers' approval of new Owners/Managers which not to be unreasonable withheld and transfer of the remaining Time Charter hire period to new Owners under same Charter Party terms and conditions.

The Charterers shall reply within three (3) working days after receiving Owners' notice of selling the vessel.

**Clause 78 – BIMCO Bunker Clauses**
*Bunker Quality and Liability*
(a) The Charterers shall supply fuels of the agreed specifications and grades. The fuels shall be of a stable and homogeneous nature and suitable for burning in the Vessel's engines or auxiliaries and, unless otherwise agreed in writing, shall comply with ISO standard 8217:2010 or any subsequent amendments thereof.

(b) The Charterers shall be liable for any loss or damage to the Owners or the Vessel caused by the supply of unsuitable fuels and/or fuels which do not comply with the specifications and/or grades set out in sub-clause (a) above, including the off-loading of unsuitable fuels and the supply of fresh fuels to the vessel. The Owners shall not be held liable for any reduction in the Vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences arising as a result of such supply.
Specifications of fuel to be :
IFO RMG 380 AS PER ISO 8217:2010
MDO DMA OR DMB AS PER ISO 8217:2010

Bunker specs as per ISO 8217-2005 is also accepted and allowed.

*Bunkering Operations and sampling*



**Velian Shipbrokers s.r.l.**

**ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014**
**MV TEO / NORDEN AS**

a) The Chief Engineer shall co-operate with the Charterers' bunkering agents and fuel suppliers during bunkering. Such cooperation shall include connecting/disconnecting hoses to the vessel's bunker manifold, attending sampling, reading gauges or meters or taking soundings, before, during and/or after delivery of fuels.

(b) During bunkering a primary sample of each grade of fuels shall be drawn in accordance with IMO Resolution MEPC.96 (47) Guidelines for the Sampling of Fuel Oil for Determination of Compliance with MARPOL 73/78 Annex VI or any subsequent amendments thereof. Each primary sample shall be divided into no fewer than seven (7) samples; one sample of each grade of fuel shall be retained on board for MARPOL purposes and the remaining samples of each grade distributed between the Owners, the Charterers and the bunker suppliers.

(c) The Charterers warrant that any bunker suppliers used by them to bunker the Vessel shall comply with the provisions of Sub-clause (b) above.

(d) Bunkers of different grades, specifications and/or suppliers shall be segregated into separate tanks within the Vessel's natural segregation. The Owners shall not be held liable for any restriction in bunker capacity as a result of segregating bunkers as aforementioned.

*Fuel Testing Programme*
Should the Owners participate in a recognised fuel testing programme one of the samples retained by the Owners shall be forwarded for such testing. The cost of same shall be borne by the Owners and if the results of the testing show the fuel not to be in compliance with ISO 8217:2010, or any subsequent amendment thereof, or such other specification as may be agreed, the Owners shall notify the Charterers and provide a copy of the report as soon as reasonably possible.

In the event the Charterers call into question the results of the testing, a fuel sample drawn in accordance with IMO Resolution MEPC.96(47) Guidelines for the Sampling of Fuel Oil for Determination of Compliance with Annex VI of MARPOL 73/78 or any subsequent amendments thereof, shall be sent to a mutually agreed, qualified and independent laboratory whose analysis as regards the characteristics of the fuel shall be binding on the parties concerning the characteristics tested for. If the fuel sample is found not to be in compliance with the specification as agreed in the paragraph above, the charterers shall meet the cost of this analysis, otherwise same shall be for the Owners' account.

**Clause 79 – BIMCO - Bunker Fuel Sulphur Content Clause**
(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone. The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes. The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).
(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:
(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

24



**Velian Shipbrokers s.r.l.**

ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014
MV TEO / NORDEN AS

(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone. Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

**Clause 80 – BIMCO - Bunker Quality Control Clause**
(1) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and auxiliaries and which conform to the specification(s) mutually agreed under this Charter. (2) At the time of delivery of the Vessel the Owners shall place at the disposal of the Charterers, the bunker delivery note(s) and any samples relating to the fuels existing on board. (3) During the currency of the Charter the Charterers shall ensure that bunker delivery notes are presented to the Vessel on the delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the Vessel's bunkering manifold and sealed in the presence of competent representatives of the Charterers and the Vessel. (4) The fuel samples shall be retained by the Vessel for 90 (ninety) days after the date of delivery or for whatever period necessary in the case of a prior dispute and any dispute as to whether the bunker fuels conform to the agreed specification(s) shall be settled by analysis of the sample(s) by mutually agreed fuels analyst whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s). (5) The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines or auxiliaries the Owners shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences.

**Clause 81 – Seaworthy Trim**
Charterers shall leave the Vessel in seaworthy trim and with cargo on board safely stowed to Master's satisfaction between loading berths/ports and between discharging berths/ports, respectively; any expenses resulting there from shall be for Charterers' account and any time used shall count.

**Clause 82 - Responsibility**
Deleted.

**Clause 83- ISM**
From the date of coming into force of the International Safety Management(ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and 'the Company' (as defined by the ISM code) shall comply with the requirements of the ISM Code. Upon request the owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account."

25



**Velian Shipbrokers s.r.l.**

ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014
MV TEO / NORDEN AS

**Clause 84 – BIMCO ISPS/MTSA Clause For Time Charter Parties 2005**
The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).
(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).
(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.
(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:
"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".
(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.
(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance
with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.
(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**Clause 85 – Hamburg Rules**
Neither the Charterers nor their agents shall permit the issue of any Bill of Lading, Waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the Owners or on the Charterers' behalf or on behalf of any sub-Charterers) incorporating the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague / Visby Rules.

Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

**Clause 86 - Privacy**
The fixture to be kept strictly private and confidential.



Velian Shipbrokers s.r.l.

ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014
MV TEO / NORDEN AS

**Clause 87 – New Regulations/BIMCO Clauses**
In the event of any new regulation or any new applicable BIMCO Clauses from the date of fixture up to redelivery of vessel same to be mutually agreed.

**Clause 88 – BIMCO Piracy Clause for Time Charter Parties 2013**
(a)Deleted.

(b) Deleted.

(c) If the Owners consent or if the Vessel proceeds to or through an Area exposed to the risk of Piracy the Owners shall have the liberty:
(i) to take reasonable preventative measures to protect the Vessel, crew and cargo including but not limited to re-routeing within the Area, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel and/or deploying equipment on or about the Vessel (including embarkation/disembarkation).
(ii) to comply with the requirements of the Owners' insurers under the terms of the Vessel's insurance(s);
(iii) to comply with all orders, directions, recommendations or advice given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group (including military authorities) whatsoever acting with the power to compel compliance with their orders or directions; and
(iv) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;
and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by the Vessel proceeding as aforesaid, save to the extent that such claims are covered by additional insurance as provided in sub-clause (d)(iii).
(d) Costs
(i) If the Vessel proceeds to or through an Area where due to risk of Piracy additional costs will be incurred including but not limited to additional personnel and preventative measures to avoid Piracy, such reasonable costs shall be for the Charterers' account. Any time lost waiting for convoys, following recommended routeing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account and the Vessel shall remain on hire;
(ii) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers;
(iii) If the Vessel proceeds to or through an Area exposed to the risk of Piracy, the Charterers shall reimburse to the Owners any additional premiums required by the Owners' insurers and the costs of any additional insurances that the Owners reasonably require in connection with Piracy risks which may include but not be limited to War Loss of Hire and/or maritime K&R.
(iv) All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.
(e) If the Vessel is attacked by pirates any time lost shall be for the account of the Charterers and the Vessel shall remain on hire.
(f) If the Vessel is seized by pirates the Owners shall keep the Charterers closely informed of the efforts made to have the Vessel released. The Vessel shall remain on hire throughout the seizure and the Charterers' obligations shall remain unaffected, except that hire payments shall cease as



Velian Shipbrokers s.r.l.

**ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014**
**MV TEO / NORDEN AS**

of the ninety-first (91st) day after the seizure until release. The Charterers shall pay hire, or if the Vessel has been redelivered, the equivalent of Charter Party hire, for any time lost in making good any damage and deterioration resulting from the seizure. The Charterers shall not be liable for late redelivery under this Charter Party resulting from the seizure of the Vessel.
(g) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of the Charter Party, this Clause shall prevail.

**Clause 89 – Charter Party Provision for U.S. Freight Tax**
Notwithstanding anything else contained in this Charter Party, the tax liability of Owners on the gross hire set forth in this Charter Party or any part thereof , which tax is imposed as a result of the provisions of the United States Tax Reform Act 1986, as amended from time to time, and set forth at Section 887 of the Internal Revenue Code of the United States, including any regulations applied by the U.S. Internal Revenue Service in respect of such tax, on cargoes delivered to or lifted from ports in the United States, shall be paid/ reimbursed by Charterers; and furthermore, Owners shall not be required to seek exemption from said tax, even if they qualify for such exemption.

**Clause 90 – BIMCO U.S. Census Bureau Mandatory Automated Export System (AES) Clause for Time Charter Parties**
(a) If the Vessel loads cargo in any US port or place, the Charterers shall comply with the current US Census Bureau Regulations (15 CFR 30) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:
(i) Have in place a SCAC (Standard Carrier Alpha Code);
(ii) Have in place an ICB (International Carrier Bond);
(iii) Provide the Owners with a timely confirmation of (i) and (ii) above; and
(iv) Submit a export ocean manifest by AES (Automated Export System) to the US Census Bureau and provide the
Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Census Bureau Regulations (15 CFR 30) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.



Velian Shipbrokers s.r.l.

**ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014**
**MV TEO / NORDEN AS**

### Clause 91 - BIMCO U.S. Security Clause for Time Chartering

If the Vessel calls in the United States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures: Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence.

### Clause 92 – BIMCO- U.S. Customs-Trade Partnership Against Terrorism (C-TPAT)

The Charterers have voluntarily signed the C-TPAT Agreement with the U.S. Customs Service. The Owners, Master and Crew will use reasonable efforts to assist the Charterers to comply with their obligations under the C-TPAT Agreement. However, under no circumstances shall the Owners, Master and Crew be liable for any delays, losses or damages howsoever arising out of any failure to meet the requirements of the C-TPAT Agreement signed by the Charterers.

The Charterers agree to indemnify and hold the Owners, Master and Crew harmless for any claims made against the Owners, Master and Crew or for any delays, losses, damages, expenses or penalties suffered by the Owners arising out of the C-TPAT Agreement signed by the Charterers.

### Clause 93 - BIMCO EU Advance Cargo Declaration Security Clause for Time Charter Parties 2012

(a) If the Vessel loads cargo in any EU port or place destined for a port or place outside the EU ("Exported") or loads cargo outside the EU destined for an EU port or place or passing through EU ports or places in transit ("Imported"), the Charterers shall, for the purposes of this Clause, comply with the requirements of the EU Advance Cargo Declaration Regulations (the Security Amendment to the Community Customs Code, Regulations 648/2005; 1875/2006; and 312/2009) or any subsequent amendments thereto and shall, in their own name, and in their time and at their expense:
(i) Have in place an EORI number (Economic Operator Registration and Identification);
(ii) Provide the Owners with a timely confirmation of (i) above as appropriate; and
(iii) Where the cargo is being:
1. Exported: Submit, or arrange for the submission of, a customs declaration for export or, if a customs declaration or
a re-export notification is not required, an exit summary declaration; or
2. Imported: Submit, or arrange for the submission of, an entry summary declaration.
Unless otherwise permitted by the relevant customs authorities, such declarations shall be submitted to them electronically.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should vsuch failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

### Clause 94 - BIMCO North American Advance Cargo Notification Clause for Time Charter Parties

(a) If the Vessel loads or carries cargo destined for the US or Canada or passing through US or Canadian ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or the Canada Border Services Agency regulations (Memorandum D3-5-2) or any



Velian Shipbrokers s.r.l.

**ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014**
**MV TEO / NORDEN AS**

subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:
(i) Have in place a SCAC (Standard Carrier Alpha Code)/Canadian Customs Carrier Code;
(ii) For US trade, have in place an ICB (International Carrier Bond);
(iii) Provide the Owners with a timely confirmation of (i) and (ii) above as appropriate; and
(iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs or by ACI (Automated Commercial Information) to the Canadian customs, and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.
(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

**Clause 95 – BIMCO - Stowaways Clause For Time Charter**
a) (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.
(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.
(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel. (b) (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the Vessel shall be off hire.
(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

**Clause 96 – BIMCO War Risks Clause - (Code name: CONWARTIME 2013)**
(a) For the purpose of this Clause, the words:



Velian Shipbrokers s.r.l.

**ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014**
**MV TEO / NORDEN AS**

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported:
war, act of war, civil war or hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy and/or violent robbery and/or capture/seizure (hereinafter "Piracy"); acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the government of any state or territory whether recognised or not, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or may become dangerous to the Vessel, cargo, crew or other persons on board the Vessel.

(b) The Vessel shall not be obliged to proceed or required to continue to or through, any port, place, area or zone, or any waterway or canal (hereinafter "Area"), where it appears that the Vessel, cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be exposed to War Risks whether such risk existed at the time of entering into this Charter Party or occurred thereafter. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or may become dangerous, after entry into it, the Vessel shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade as set out in Sub-clause (a), or to proceed to an Area where it may be subject to search and/or confiscation by a belligerent.

(d) If the Vessel proceeds to or through an Area exposed to War Risks, the Charterers shall reimburse to the Owners any additional premiums required by the Owners' insurers and the costs of any additional insurances that the Owners reasonably require in connection with War Risks.

(e) All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first. (f) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an Area that is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(g) The Vessel shall have liberty:
(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag the Vessel sails, or other government to whose laws the Owners are subject, or any other government of any state or territory whether recognised or not, body or group whatsoever acting with the power to compel compliance with their orders or directions;
(ii) to comply with the requirements of the Owners' insurers under the terms of the Vessel's insurance(s);
(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;



Velian Shipbrokers s.r.l.

**ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27ᵗʰ MARCH 2014**
**MV TEO / NORDEN AS**

(iv) to discharge at any alternative port any cargo or part thereof which may expose the Vessel to being held liable as a contraband carrier;
(v) to call at any alternative port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment, detention or similar measures.
(h) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers
within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice. All costs, risk and expenses for the alternative discharge shall be for the Charterers' account.
(i) The Charterers shall indemnify the Owners for claims arising out of the Vessel proceeding in accordance with any of the provisions of Sub-clauses (b) to (h) which are made under any bills of lading, waybills or other documents evidencing contracts of carriage.
When acting in accordance with any of the provisions of Sub-clauses (b) to (h) of this Clause anything is done or not
done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

**Clause 97 – BIMCO Slow Steaming Clause for Time Charter Parties**
(a) The Charterers may at their discretion provide, in writing to the Master, instructions to reduce speed or RPM (main engine Revolutions Per Minute) and/or instructions to adjust the Vessel's speed to meet a specified time of arrival at a particular destination.
(i) Slow Steaming – Where the Charterers give instructions to the Master to adjust the speed or RPM, the Master shall, subject always to the Master's obligations in respect of the safety of the Vessel, crew and cargo and the protection of the marine environment, comply with such written instructions, provided that the engine(s) continue(s) to operate above the cut-out point of the Vessel's engine(s) auxiliary blower(s) and that such instructions will not result in the Vessel's engine(s) and/or equipment operating outside the manufacturers'/designers' recommendations as published from time to time.
(b) At all speeds the Owners shall exercise due diligence to ensure that the Vessel is operated in a manner which minimises fuel consumption, always taking into account and subject to the following:
(i) The Owners' warranties under this Charter Party relating to the Vessel's speed and consumption;
(ii) The Charterers' instructions as to the Vessel's speed and/or RPM and/or specified time of arrival at a particular destination;
(iii) The safety of the Vessel, crew and cargo and the protection of the marine environment; and
(iv) The Owners' obligations under any bills of lading, waybills or other documents evidencing contracts of carriage issued by them or on their behalf.
(c) For the purposes of Sub-clause (b), the Owners shall exercise due diligence to minimise fuel consumption:
(i) when planning voyages, adjusting the Vessel's trim and operating main engine(s) and auxiliary engine(s);
(ii) by making optimal use of the Vessel's navigation equipment and any additional aids provided by the Charterers, such as weather routing, voyage optimization and performance monitoring systems; and



Velian Shipbrokers s.r.l.

**ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014**
**MV TEO / NORDEN AS**

(iii) by directing the Master to report any data that the Charterers may reasonably request to further improve the energy efficiency of the Vessel.
(d) The Owners and the Charterers shall share any findings and best practices that they may have identified on potential improvements to the Vessel's energy efficiency.
(e) **For the avoidance of doubt, where the Vessel proceeds at a reduced speed or with reduced RPM pursuant to Sub-clause (a), then provided that the Master has exercised due diligence to comply with such instructions, this shall constitute compliance with, and there shall be no breach of, any obligation requiring the Vessel to proceed with utmost and/or due despatch (or any other such similar/equivalent expression).
(f) **The Charterers shall ensure that the terms of the bills of lading, waybills or other documents evidencing contracts of carriage issued by or on behalf of the Owners provide that compliance by Owners with this Clause does not constitute a breach of the contract of carriage. The Charterers shall indemnify the Owners against all consequences and liabilities that may arise from bills of lading, waybills or other documents evidencing contracts of carriage being issued as presented to the extent that the terms of such bills of lading, waybills or other documents evidencing contracts of carriage impose or result in breach of the Owners' obligation to proceed with due despatch or are to be held to be a deviation or the imposition of more onerous liabilities upon the Owners than those assumed by the Owners pursuant to this Clause.

**Clause 98 - BIMCO Sanctions Clause for Time Charter Parties**
(a) The Owners shall not be obliged to comply with any orders for the employment of the Vessel in any carriage, trade or on a voyage which, in the reasonable judgment of the Owners, will expose the Vessel, Owners, managers, crew, the Vessel's insurers, or their re-insurers, to any sanction or prohibition imposed by any State, Supranational or International Governmental Organisation.

(b) If the Vessel is already performing an employment to which such sanction or prohibition is subsequently applied, the Owners shall have the right to refuse to proceed with the employment and the Charterers shall be obliged to issue alternative voyage orders within 48 hours of receipt of Owners' notification of their refusal to proceed. If the Charterers do not issue such alternative voyage orders the Owners may discharge any cargo already loaded at any safe port (including the port of loading). The Vessel to remain on hire pending completion of Charterers' alternative voyage orders or delivery of cargo by the Owners and Charterers to remain responsible for all additional costs and expenses incurred in connection with such orders/delivery of cargo. If in compliance with this Sub-clause (b) anything is done or not done, such shall not be deemed a deviation.

(c) The Charterers shall indemnify the Owners against any and all claims whatsoever brought by the owners of the cargo and/or the holders of Bills of Lading and/or sub-charterers against the Owners by reason of the Owners' compliance with such alternative voyage orders or delivery of the cargo in accordance with Sub-clause (b).
(d) The Charterers shall procure that this Clause shall be incorporated into all sub-charters and Bills of Lading issued pursuant to this Charter Party.

**Clause 99 - OFAC**
Notwithstanding any other provision in the Charterparty, Owners and Charterers warrant that neither they nor the vessel is owned, beneficially owned or controlled by persons or entities which are or may be blacklisted by US Treasury Dept Office of Foreign Assets Control (OFAC), nor subject to sanctions by US, EU, UN or other governmental authorities.
In the event of the Vessel, its cargo, and/or crew being subjected to any arrest, seizure, sanctions, delays, discrimination, blacklisting or any other difficulties whatsoever arising from the nationality



**Velian Shipbrokers s.r.l.**

**ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014**
**MV TEO / NORDEN AS**

and/or citizenship of Owners, its crew or the Vessel's flag, or of Charterers, then the party responsible shall be liable for hire, bunkers consumed and all fines, costs and expenses incurred as a result. In the event of any charter hire payment being seized, delayed, impounded or otherwise impeded in any manner whatsoever by US, EU, UN or other governmental authorities then the hire is deemed paid and Owners may not exercise their right of withdrawal and terminate the charterparty. If at any time it becomes known that Owners are in breach of warranty then Charterers shall be entitled to terminate this Charter party at any time thereafter. Termination of the charterparty in accordance with this clause is without prejudice to and shall not affect any rights, accrued or otherwise, that either party may have against the other.

**Clause 100 - BIMCO U.S. Anti-Drug Abuse Act 1986 Clause for Time Charters**
(a) In pursuance of the provisions of the U.S. Anti-Drug Abuse Act 1986, or any re-enactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel. Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account and the Vessel shall remain on hire. Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense put up bail to secure release of the Vessel. The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the Vessel's personnel.
(b) In pursuance of the provisions of sub-clause (a) above, the Owners and the Charterers warrant that they shall both become signatories to the Sea Carrier Initiative Agreement on signing this Charter Party or on delivery of the Vessel under this Charter, whichever is the earlier, and will so remain during the currency of the Charter.
Attached Clauses pursuant to Clause 60

**BIMCO - New Jason Clause**
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the goods, Shippers, Consignees or owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods. If a salving ship or ships is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or owners of the goods to the Carrier before delivery

**BIMCO - Both-to-Blame Collision Clause**
If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will



**Velian Shipbrokers s.r.l.**

ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014
MV TEO / NORDEN AS

indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying ship or her Owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying Vessel or Carrier. The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

**BIMCO – General Average Clause**
General Average shall be adjusted, stated and settled according to the York-Antwerp Rules 1994 in London unless another place is agreed in the Charter. Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew.

**BIMCO – General Clause Paramount**
The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 25 August 1924 ("the Hague Rules") as amended by the Protocol signed at Brussels on 23 February 1968 ("the Hague-Visby Rules") and as enacted in the country of shipment shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of whether such legislation may only regulate outbound shipments.
When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this Contract save where the Hague Rules as enacted in the country of shipment or if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this Contract.
The Protocol signed at Brussels on 21 December 1979 ("the SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatorily or by this Contract.
The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or while the cargo is in the charge of another carrier, or with respect to deck cargo and live animals

**USA Clause Paramount**
This Bills of Lading shall have effect subject to the provisions of the Carriage of Goods, by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its right and immunities or an increase of any of its responsibilities or liabilities under said act, If any terms of this Bill of Lading is repugnant to said Act to any extent, such terms shall be void to that extent, but no further.

**Canadian Clause Paramount**
This bills of Lading so far as it relates to the carriage of goods by water, shall have effect, subject to the provisions of the Water Carriage of Goods, Act 1936, enacted by the Parliament of the dominion of Canada, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any terms of this Bill of Lading by repugnant to said Act to any extent, such terms shall be void to that extent, but no further.

35



Velian Shipbrokers s.r.l.

**ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27th MARCH 2014**
**MV TEO / NORDEN AS**

## BIMCO - ARBITRATION CLAUSE
Dispute Resolution Clause English Law, London Arbitration
(a) This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause. The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.
The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party

referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement. Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator. In cases where neither the claim nor any counterclaim exceeds the sum of USD 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b) Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract. In the case of a dispute in respect of which arbitration has been commenced under the above, the following shall apply:-
(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.
(ii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case
the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.
(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.
(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.
(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.
(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.



*Velian Shipbrokers s.r.l.*

**ADDITIONAL CLAUSES TO CHARTER PARTY DATED 27ᵗʰ MARCH 2014**
**MV TEO / NORDEN AS**

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration. (Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.)


**End**


**SIGNED OWNERS**

.............................................................


**SIGNED CHARTERERS**

.............................................................

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
DAEBO INTERNATIONAL SHIPPING : 
CO., LTD., :
                 :
             Plaintiff, :
                 :        12 CV 4750 (PAE)
     v. :
                 :
AMERICAS BULK TRANSPORT LTD., :
AMERICAS BULK TRANSPORT :
(BVI) LTD., PHOENIX BULK CARRIERS :
(US) CORP., PHOENIX BULK :
CARRIERS LTD., PHOENIX BULK :
CARRIERS (BVI) LTD., :
ALLSEAS LOGISTICS BERMUDA :
LTD. a/k/a BERMUDA ALLSEAS :
LOGISTICS LTD. a/k/a ALLSEAS :
LOGISTICS LTD., and BULK OCEAN :
SHIPPING COMPANY (BERMUDA) :
LTD. a/k/a BULK OCEAN SHIPPING :
LTD., :
                 :
             Defendants. :
-----------------------------------------------------X

### DECLARATION OF MR. HONG-IL MOON
### IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

    Mr. Hong-Il Moon being duly sworn under the penalty of perjury of the laws of the United States pursuant 28 U.S.C. § 1746 declares as follows:

    1.     I am over the age of 18 and understand the obligations of an oath.

    2.     I am the Team Manager of Legal Affairs & Insurance Team of Daebo International Shipping Co., Ltd. ("Daebo International"). My office is located in 7 Floor, Dongwon Building, #15, Saemunan-Ro 3-gil, Jongro-Gu, Seoul 110-759, Korea. I have held this position since 2010.



3.      On January 5, 2010, Daebo Shipping Co., Ltd. ("Daebo Shipping") merged with Daebo International.  As of this date, Daebo Shipping was no longer in existence and transferred all of its assets, liabilities, and rights and duties to Daebo International.

4.      Prior to this date, Daebo Shipping and Daebo International were separate companies.

5.      In their motion to dismiss, the Defendants state that the pleadings filed in *Navios International Inc. v. Daebo Int'l Shipping Co. Ltd.,* 09 Civ. 1632 (LBS)(S.D.N.Y.) are evidence that Daebo Shipping and Daebo International maintained that they were separate and distinct corporate entities.  Prior to the date of the merger, when these pleadings were filed, this was correct – Daebo Shipping and Daebo International were separate and distinct corporate entities. Following the January 5, 2010 merger, Daebo Shipping ceased to exist and was merged with Daebo International.

6.      A true and correct copy of the Plan and Agreement of Merger between Daebo Shipping and Daebo International is attached hereto as Exhibit "1."

7.      A true and correct copy of Daebo International's Certificate of Incorporation is attached hereto as Exhibit "2."  The Certificate states on page 2 that Daebo International "Merged with Daebo Shipping Co., Ltd."

8.      The foregoing is true and correct under the penalty of perjury of the laws of the United States pursuant to 28 U.S.C. § 1746.

Dated:  October 26, 2012
        Seoul, Korea

Hong-Il Moon

2

# 합 병 계 약 서

대보인터내셔널쉬핑 주식회사(이하 "갑"이라 한다)는 대보해운 주식회사(이하 "을"이라 한다)를 합병하기 위하여 다음과 같이 계약을 체결한다.

제 1조 "갑"은 "을"을 합병하여 "갑"은 존속하고, "을"은 해산한다.

제 2조 ① "갑"은 합병에 의하여 그 발행하는 주식의 총수를 183,824주 증가하여 383,824주로 한다. 다만, "갑"과 "을"의 협의 하에 변경할 수 있다.
② 전항의 증가하는 주식은 전부 기명식 액면보통주식으로 하고, 1주당 액면금액을 5,000원으로 한다.

제 3조 "갑"은 합병시 기명식 액면보통주 183,824주를 발행하고, 합병기일 현재 "을"의 주주명부에 기재된 주주에 대하여 그가 소유하는 "을"의 주식 1주당 "갑"의 주식 0.183824주의 비율로 교부한다. 다만, "갑"과 "을"의 협의 하에 변경할 수 있다. 또한, 단주가 발생하는 때에는 합병기일 후 합병비율 산정시 평가한 금액을 현금으로 해당주주에게 지급한다.

제 4조 "갑"은 합병으로 자본금 919,120,000원을 증가한다. 그러나 준비금에 관하여는 합병기일에 있어서의 "을"의 자본상태에 따라 "갑", "을"의 협의 하에 이를 변경할 수 있다.

제 5조 "갑"과 "을"은 2009년 11월 27일 각각 주주총회를 소집하여 본 계약서의 승인 및 합병에 따른 필요한 사항에 대한 제반절차를 수행한다. 다만, 합병절차의 진행에 따라 필요한 때에는 "갑", "을"의 협의에 의하여 기일을 변경할 수 있다.

제 6조 합병기일은 2009년 12월 31일로 한다. 다만, 합병절차의 진행에 따라 필요한 경우에는 "갑", "을"의 협의하에 이를 변경할 수 있다.

- 1 -

제 7조 ① "을"은 2009년 12월 31일 현재의 재산목록, 대차대조표 기타 동일 현재의
계산서를 기초로 하여 그 자산, 부채 및 권리의무 일체를 합병기일에
"갑"에게 인계한다.

② "을"은 전항 기일부터 합병기일에 이르기까지 자산, 부채의 변동에
대하여 따로 계산서를 첨부하여 그 내용을 "갑"에게 제시하여 확인을
받아야 한다.

제 8조 "갑"과 "을"은 본 계약 체결 후 합병기일에 이르기까지 선량한 관리자의
주의의무로 업무를 집행하고 모든 재산을 관리운영을 하여야 하며, 또 그
재산 및 관리의무에 중대한 영향을 주는 행위를 하는 경우에는 사전에
"갑"과 "을"이 협의하여 합의한 대로 이를 실행하여야 한다.

제 9조 "갑"은 전3조에서 발행하는 주식에 대하여 이익배당금의 기산일로서 합병
기일을 기준일로 한다.

제10조 "갑"은 "을"의 종업원 전원을 합병기일에 있어서 갑의 종업원으로서
인수한다. 다만, 근속연수는 "을"의 계산방식에 따른 연수를 통산하기로
하고 기타 자세한 내용에 대하여는 "갑", "을"의 협의 하에 정하기로 한다.
또한 을의 근로조건과 취업규칙 등은 갑과 같이 변경하기로 한다.

제11조 합병에 의하여 새로 "갑"의 임원으로 되는 임원은 제5조에 의한 갑의
합병승인총회에서 선임키로 한다. 다만, 본 조에 의하여 선임되는 임원의
임기의 시기는 합병기일로 한다.

제12조 "갑"은 "을"의 임원 중 합병 후 "갑"의 임원으로 취임하지 않는 임원에
대하여는 퇴직위로금을 합병보고총회의 승인을 얻어 지급할 수 있다.

제13조 본 계약 체결 후 합병기일까지 사이에 천재지변 기타사유로 인하여 "갑" 또는
"을"의 재산 및 경영상태에 중대한 변동이 발생하거나 숨은 중대한 하자가
발견되었을 때에는 "갑"과 "을"이 협의하여 합병조건을 변경하거나 본

- 2 -

계약을 해약할 수 있다.

제14조 본 계약은 제5조에, 규정하는 "갑"과 "을"의 주주총회의 승인을 얻은 때 그
       효력이 발생하고 법령에 정하는 관계관청의 승인을 얻지 못한 때에는 그
       효력을 상실한다.

제15조 "을"의 해산에 관한 비용은 전부 "을"이 부담한다.

제16조 본 계약에 규정된 내용 이외의 합병에 관한 필요사항은 본 계약의 취지에
       따라 "갑"과 "을"이 협의하여 이를 결정하기로 한다.

       본 계약의 성립을 증명하기 위하여 본 계약서 2통을 작성하여 "갑"과 "을"의
대표자가 각자 기명날인하여 각 1통씩 보관한다.

 

2009년  10월  26일


       (갑) 서울특별시 종로구 당주동 128-27
       대보인터내셔널쉬핑 주식회사
       대 표 이 사   노 재 영

       (을) 서울특별시 종로구 당주동 128-27
       대 보 해 운   주 식 회 사
       대 표 이 사   김 창 중

- 3 -

## PLAN AND AGREEMENT OF MERGER

Subject to the terms and conditions of this Agreement, the Daebo International Shipping Co., Ltd. (herein sometimes referred to as the "Surviving Company") shall merge with the Daebo Shipping Co., Ltd. (the "DSC").

Article I

The Daebo International Shipping Co., Ltd. shall be the Surviving Company in the merger and shall continue its existence as a corporation. The separate corporate existence of the DSC shall cease.

Article II

① By the merger, the total number of shares issued of the Surviving Company shall be increased by 183,824 shares to 383,824 shares. However, the number may change subject to negotiations between the Surviving Company and the DSC.

② All shares issued by the Surviving Company in the preceding clause shall be common stock in registered nominative form, denomination KRW 5,000.

Article III

① As of the merger, the Surviving Company shall issue 183,824 shares of common stock in registered nominative form. For shareholders of record on the effective date of the merger, each share of the DSC shall be converted into the right to receive 0.183824 of a share of common stock of the Surviving Company. However, the exchange ratio may change subject to negotiations between the Surviving Company and the DSC. For fractional shares, the Surviving Company will pay a cash amount calculated in accordance with the merger rate.

Article IV

By the merger, the capital of the Surviving Company shall be increased by KRW 919,120,000. As for the reserved, the amount may change subject to negotiations between the Surviving Company and the DSC, depending on the financial status of the DSC as of the merger date.

- 1 -

**Article V**

On November 27, 2009, the Surviving Company and the DSC shall each hold a general shareholders' meeting to approve this merger agreement and precede necessary procedures relevant to the merger. Under certain circumstances, the date may change subject to negotiations between the Surviving Company and the DSC.

**Article VI**

The date of the merger is December 31, 2009, whereby under certain circumstances, the date may change subject to negotiations between the Surviving Company and the DSC.

**Article VII**

① On the date of the merger, the DSC shall transfer all of its assets, liabilities, and rights and duties to the Surviving Company, based on the DSC's financial status as of December 31, 2009.

② In the case of changes in the DSC's financial status, occurred from the date in the preceding clause to the date of the merger, the DSC shall attach separate statements to inform and obtain approval from the Surviving Company for the changes.

**Article VIII**

From the signed date of this Agreement until the date of the merger, the Surviving Company and the DSC shall act in good faith in carrying out their duties and managing the property. Actions that have substantial impact on the property and duties shall be executed only after the Surviving Company and the DSC negotiate and reach an agreement.

**Article IX**

Dividends of stock set forth in Article III shall be paid out on the date of the merger.

**Article X**

The Surviving Company shall take over all employees of the DSC at the date of the merger. However, years of service shall be calculated according to the regulation of the DSC, and any

- 2 -

other details shall be negotiated. Employment regulations and working conditions of the DSC shall also be modified under the agreement with the Surviving Company.

Article XI

The newly hired executives of the Surviving Company, as a result of the merger, shall be appointed at the general shareholders' meeting of the Surviving Company set forth in Article V. However, the appointment of executives pursuant to this Article shall be made on the date of the merger.

Article XII

With the approval at the merger announcement meeting, the Surviving Company shall pay retirement bonus to retiring executives of the DSC.

Article XIII

In the case of natural disaster or other unforeseen events, occurring from the signed date of this Agreement until the date of the merger, that result in substantial changes to property and financial status of the Surviving Company or the DSC, or in the case of substantial flaws, amendment or termination shall be effective under the agreement between the Surviving Company and the DSC.

Article XIV

This agreement shall be effective upon the approval of shareholders of general meetings stated in Article V, and shall be invalidated without the approval of government offices and agencies concerned with law.

Article XV

The DSC shall pay all expenses incurred in connection with the DSC's dissolution.

Article XVI

Any other necessary details (relevant to the merger) not included in this Agreement shall be

agreed upon negotiations between the Surviving Company and the DSC.

Two notarized copies of the Agreement (each signed and sealed by the two CEOs) are provided, whereby the Surviving Company and the DSC each keeps a copy.

October 26, 2009

(a) Jongno-gu Dangju-dong, Seoul, 128-27
Daebo International Shipping Co.,LTD.
CEO     J.Y.NHO

(b) Jongno-gu Dangju-dong, Seoul, 128-27
Daebo Shipping Co., Ltd.
CEO    C.J.KIM

- 4 -

[제41호서식]   공증인가 법무법인 대 종   서울 종로구 당주동 160
(변호사회관 303호)
[공증부 736-6604]

Registered No. 2012  - 3809

# NOTARIAL CERTIFICATE

## DAE JONG LEGAL CORPORATION

160, Dang Joo-Dong, Jong Ro-Ku,

Seoul, Korea



210mm×297mm(보존용지(1종) 70g/m²)

Trans/Corporate Register(Daebo International)

**Corporate Register (including obliteration)**

| Registration No. | 384053 |
|---|---|
| Record No. | 110111-3840538 |

| Name | Daebo International Shipping Co., Ltd. |
|---|---|
| Principal Office | 128-27, Dangju-dong, Jongro-gu, Seoul, Korea |

(omitted)

| Value per Share | KRW 5,000 |
|---|---|

| Total Shares to be issued | 20,000,000 shares |
|---|---|

| Total Shares issued and Types and its respective amount | Paid in Capital |
|---|---|
| Total Shares issued     383,824 shares<br>Common shares     383,824 shares | KRW1,919,120,000 |

**Purposes of Business:**

1.   Business for transportation of overseas cargoes;
2.   Business for international shipping agencies;
3.   Business for forwarding of transportation of overseas cargoes;
4.   Business for vessel management
5.   Business for forwarding of multi-modal transportations;
6.   Business for trading;
7.   Subsidiary businesses related to the above.

| Registered Directors |
|---|
| (omitted) |
| Director   Mr. C. J. Kim 520623-1\*\*\*\*\*\*<br>Appointed on 1 January 2010          Registered on 5 January 2010 |
| Director   Mr. J. Y. Rho 501004-1\*\*\*\*\*\*<br>Appointed on 1 January 2010          Registered on 5 January 2010 |
| Director   Mr. H. K. Park 560709-1\*\*\*\*\*\* |

| Appointed on 1 January 2010 | Registered on 5 January 2010 |
|---|---|
| Auditor   Mr. Y. S. Cho 650702-1****** | |
| Appointed on 1 January 2010 | Registered on 5 January 2010 |
| Representative Director Mr. C. J. Kim 520623-1****** | |
| Appointed on 4 January 2010 | Registered on 5 January 2010 |

**Note**

(omitted)

1. Merger

Merged Daebo Shipping Co., Ltd which was located at 128-27, Dangju-dong, Jongro-gu, Seoul, Korea

Registered on 5 January 2010

(omitted)

| Date of Incorporation of the Company | 14 February 2008 |
|---|---|

| Reason for Opening of Registry Record and Date: | |
|---|---|
| Incorporation | 14 February 2008 |

We hereby certify the genuineness of the contents of this certificate.

17 August 2012

Central Administration office for Registered information, /
Korean Supreme Court Administration Bureau

# 등기사항전부증명서(말소사항포함)[제출용]

| 등기번호 | 384053 |
|---|---|
| 등록번호 | 110111-3840538 |

| 상 호 | 대보인터내셔널쉬핑 주식회사 | |
|---|---|---|
| 본 점 | 서울특별시 종로구 당주동 128-27 동원빌딩 6층 | |
| | 서울특별시 종로구 당주동 128-27 | 2009.11.09 변경<br>2009.11.23 등기 |

| 공고방법 | 서울특별시내에서 발행하는 일간 매일경제신문에 게재한다. | |
|---|---|---|
| | 이 회사의 공고는 회사의 인터넷 홈페이지(http://www.daebo.co.kr)에 한다. 다만, 전산장애 또는 그 밖의 부득이한 사유로 회사의 인터넷 홈페이지에 공고를 할 수 없는 때에는 서울특별시내에서 발행되는 매일경제신문에 게재한다. | 2012.03.23 변경<br>2012.03.26 등기 |

| 1주의 금액   금 5,000 원 | |
|---|---|

| 발행할 주식의 총수 ~~800,000 주~~ | |
|---|---|
| 20,000,000 주 | 2009.01.16 변경<br>2009.01.19 등기 |

| 발행주식의 총수와<br>그 종류 및 각각의 수 | 자본의 총액 | 변 경 연 월 일<br>등 기 연 월 일 |
|---|---|---|
| 발행주식의 총수   ~~200,000 주~~<br>  ~~보통주식     200,000 주~~ | ~~금 1,000,000,000 원~~ | |
| 발행주식의 총수   383,824 주<br>  보통주식     383,824 주 | 금 1,919,120,000 원 | 2010.01.05 변경<br>2010.01.05 등기 |

| 목 적 |
|---|
| 1. 해상화물운송업<br>2. 국제해운대리업<br>3. 해상화물운송주선업<br>4. 선박관리업<br>5. 복합운송주선업<br>6. 무역업<br>7. 각 호에 관련된 부대사업일체 |

| 임원에 관한 사항 |
|---|
| ~~이사 노재영 501004-1******~~<br>  ~~2009 년 12 월 31 일 사임    2010 년 01 월 05 일 등기~~ |
| ~~이사 김창중 520623-1******~~<br>  ~~2008 년 12 월 26 일 사임    2008 년 12 월 26 일 등기~~ |
| ~~이사 임봉호 570121-1******~~<br>  ~~2008 년 12 월 30 일 사임    2009 년 01 월 02 일 등기~~ |

---

[인터넷 발급] 문서 하단의 바코드를 스캐너로 확인하거나, 인터넷등기소(http://www.iros.go.kr)의 발급확인 메뉴에서 발급확인번호를 입력하여 위·변조 여부를 확인할 수 있습니다. 발급확인번호를 통한 확인은 발행일부터 3개월까지 5회에 한하여 가능합니다.

0000525043157014880321110120610189DABPEBC1F819670917 1 발행일:2012/08/17       발급확인번호 0535-AAMY-XYSV

- 1/6 -

| 등기번호 | 384053 |
|---|---|

| 감사 조영섭 650702-1****** | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2009 년 12 월 31 일 사임 | 2010 년 01 월 05 일 등기 |

대표이사 노재영 501004-1****** 서울특별시 서초구 서초동 1446-11 현대슈퍼빌 디-1401
　　　　2009 년 12 월 31 일 사임　　　2010 년 01 월 05 일 등기

이사 박정자 381205-2******
　　　　2008 년 12 월 26 일 취임　　　2008 년 12 월 26 일 등기
　　　　2009 년 12 월 31 일 사임　　　2010 년 01 월 05 일 등기

이사 오자은 540607-2******
　　　　2008 년 12 월 30 일 취임　　　2009 년 01 월 02 일 등기
　　　　2009 년 12 월 31 일 사임　　　2010 년 01 월 05 일 등기

사내이사 김창중 520623-1******
　　　　2010 년 01 월 04 일 취임　　　2010 년 01 월 05 일 등기

사내이사 노재영 501004-1******
　　　　2010 년 01 월 04 일 취임　　　2010 년 01 월 05 일 등기

사내이사 박형규 560709-1******
　　　　2010 년 01 월 04 일 취임　　　2010 년 01 월 05 일 등기

감사 조영섭 650702-1******
　　　　2010 년 01 월 04 일 취임　　　2010 년 01 월 05 일 등기

대표이사 김창중 520623-1****** 서울특별시 강남구 대치동 511 한보미도맨션 207-906
　　　　2010 년 01 월 04 일 취임　　　2010 년 01 월 05 일 등기

## 기 타 사 항

1. 명의개서대리인
　　명의개서대리인의 상호 및 본점소재지
　　주식회사 국민은행
　　서울특별시 중구 남대문로2가 9-1
　　　2009 년 01 월 16 일 설치　　2009 년 01 월 19 일 등기
1. 이익에 의한 주식 소각
　　1) 회사는 이사회의 결의로 발행주식총수의 100분의 20 범위 내에서 주주에게 배당할 이익으
　　로 주식을 소각할 수 있다.
　　2) 이 규정에 의한 주식의 소각은 회사가 자기주식을 취득하여 소각하는 방법으로 한다.
　　　2009 년 01 월 16 일 신설　　2009 년 01 월 19 일 등기
1. 흡수합병
　　서울특별시 종로구 당주동 128-27 대보해운 주식회사를 합병
　　　　　　　　　　　　　　　　　2010 년 01 월 05 일 등기

## 신 주 인 수 권 부 사 채

대보해운 주식회사 제 1 회 무기명식 이권부 사모 무보증 분리형 신주인수권부사채
　　< 2010 년 01 월 05 일 합병으로인한승계　　2010 년 01 월 05 일 등기 >
　　< 2010 년 11 월 30 일 기간만료　　2010 년 12 월 01 일 등기 >
1. 본사채는 신주인수권부사채임.
1. 주식인수권의 행사로 인하여 발행할 주식의 발행가액 총액

| 등기번호 | 384053 |
|---|---|

금 40억 (금4,000,000,000)원
   < 2010 년 01 월 05 일 합병으로인한승계   2010 년 01 월 05 일 등기 >
   < 2010 년 11 월 30 일 기간만료   2010 년 12 월 01 일 등기 >

1. 각 신주인수권부사채의 금액
10억원권 2매(넘버 1-2), 5천만원권 39매(넘버 3-41), 1천만원권 5매(넘버 42-46)
   < 2010 년 01 월 05 일 합병으로인한승계   2010 년 01 월 05 일 등기 >
   < 2010 년 11 월 30 일 기간만료   2010 년 12 월 01 일 등기 >

1. 각 신주인수권부사채의 납입금액
각 사채권면금액의 100파센트
   < 2010 년 01 월 05 일 합병으로인한승계   2010 년 01 월 05 일 등기 >
   < 2010 년 11 월 30 일 기간만료   2010 년 12 월 01 일 등기 >

1. 신주인수권부사채의 총액
금 0원
   < 2010 년 01 월 05 일 합병으로인한승계   2010 년 01 월 05 일 등기 >
   < 2010 년 11 월 30 일 기간만료   2010 년 12 월 01 일 등기 >

1. 각 신주인수권부사채에 부여된 신주인수권의 내용
사채의 종류 : 무기명식 이권부 사모 무보증 분리형 신주인수권부사채
본 사채의 신주인수권증권을 소지한 자는 다음 각 호의 조건에 따라 당사의 기명식 보통주식을 인수할 수 있다.
(1) 신주인수권행사조건
가. 신주인수권행사비율 : 신주인수권증권 권면금액(2이상의 신주인수권증권으로 신주인수권을 행사하는 경우에는 그 권면금액의 합산금액)을 아래 나. 항의 신주인수권 행사가액으로 나눈 주식수의 100%를 행사주식수로 하되, 1주 미만의 단수주에 해당하는 금액은 주권 교부시 당사 또는 당사가 지정하는 금융기관에서 현금으로 지급하며, 단수주 대금의 해당기간 이자는 지급하지 아니한다. 단, 신주인수권증권 권면금액의 일부에 대한 신주인수권행사는 할 수 없다.
나. 신주인수권 행사가액("행사가액") : 87,039원
다. 행사가액 조정 :
1) 신주인수권행사를 하기 전에 당사가 주식분할, 당초의 행사가액을 하회하는 발행가액으로 전환사채 또는 신주인수권부사채를 발행하거나, 유상증자(유상증자의 1주당 발행가액이 조정 전 행사가액을 하회하는 경우에 한한다) 또는 무상증자, 주식배당, 준비금의 자본전입 등을 함으로써 주식을 발행하는 경우에는 다음과 같이 행사가액을 조정한다. 단, 유상증자를 병행 실시하는 경우, 유상증자의 1주당 발행가액이 조정 전 행사가액을 상회하는 때에는 유상증자에 의한 신발행주식수는 행사가액 조정에 적용하지 아니하고 무상증자에 의한 신발행주식수만 적용한다

조정 후 행사가액 = 조정 전 행사가액 X {A +(B X C/D)} / (A + B)
A : 기발행주식수
B : 신발행주식수
C : 1주당 발행가액
D : 시가
다만, 위 산식 중 "기발행주식수"는 당해 조정사유가 발생하기 직전일 현재의 발행주식 총수로 하며, 전환사채 또는 신주인수권부사채를 발행할 경우 "신발행주식수"는 당해 사채 발행시 전환가액으로 전부 주식으로 전환되거나 당해 사채 발행시 행사가액으로 신주인수권이 전부 행사

---



| 등기번호 | 384053 |
|---|---|

될 경우 발행될 주식의 수로 한다. 또한, 위 산식 중 "1주당 발행가액"은 주식분할, 무상증자, 주식배당의 경우에는 영(0)으로 하고, 전환사채 또는 신주인수권부사채를 발행할 경우에는 당해 사채발행시 전환가액 또는 행사가액으로 하며, 위 산식에서 "시가"라 함은 상장법인의 경우 당해 발행가액 산정의 기준이 되는 기준주가 또는 이론권리락 주가(유상증자 이외의 경우에는 조정사유 발생전일을 기산일로 계산한 기준주가)로 하고, 비상장법인의 경우 당해 조정사유 발생일 직전의 본 사채의 행사가액을 시가로 하되 다만 공모에 의하여 주식을 발행한 경우에는 그 공모가액을 시가로 한다. 위와 산식에 의한 조정 후 행사가액의 원단위 미만은 절사한다.

2) 합병·자본의 감소 등에 의하여 행사가액의 조정이 필요한 경우에는 당해 합병 또는 자본의 감소 직전에 신주인수권이 행사되어 전액 주식으로 인수되었더라면 신주인수권 권리자가 가질 수 있었던 주식수를 그 가치 또는 그 이상으로 계산되는 방법으로 행사가액을 조정한다.

3) 위 제1)항 또는 제2)항에 따른 행사가액 조정 이외에도 당사자가 본 사채 발행후 그 주권을 증권선물거래소에 상장한 때에는 그 공모가액의 100%에 해당하는 가격과 직전 행사가액 중 낮은 가격으로 행사가액을 조정하며 그 상장일(이하 "상장일") 이후 신주인수권행사기간 만료일 이전까지 상장일로부터 매 3개월마다 행사가액을 조정하되, 행사가 조정일을 기준일로 하여 소급한 최근 1개월, 1주일, 최근일을 산술평균한 가격과 최근일 종가 중 높은 가액이 기존의 행사가격을 하회할 경우 행사가액을 그 높은 가액으로 조정하기로 한다. 다만 이에 따라 산출된 가액이 직전 행사가액보다 높은 경우에는 직전 행사가액을 조정된 행사가액으로 보며, 본 호에 의한 행사가액의 조정은 상장일에 조정된 행사가액의 100분의 70미만으로 될 수는 없다.

4) 위 1) 내지 3)에 의하여 조정 행사가액에 주식의 액면가 이하일 경우에는 액면가를 행사가액으로 하며, 상장일 이후에는 각 신주인수권부사채에 부여된 신주인수권의 행사로 인하여 발행할 주식의 발행가액의 합계액은 각 신주인수권부사채의 발행가액을 초과할 수 없다.

(2) 신주인수권행사로 인하여 발행할 주식의 종류 : 지명식 보통주식

(3) 신주인수대금의 납입 : 현금 납입 또는 사채대용 납입 중 선택가능

9. 사채권 및 신주인수권증권의 분할 금지 : 발행일로부터 1년간 그 분할은 인정되지 아니한다

< 2010 년 01 월 05 일 합병으로인한승계　　2010 년 01 월 05 일 등기 >
< 2010 년 11 월 30 일 기간만료　　2010 년 12 월 01 일 등기 >

1. 신주인수권을 행사할 수 있는 기간
발행일(2005년 12월 14일) 이후 1개월이 경과한 날의 익일(2006년 1월 15일)로부터 2010년 11월 30일 까지로 한다.

< 2010 년 01 월 05 일 합병으로인한승계　　2010 년 01 월 05 일 등기 >
< 2010 년 11 월 30 일 기간만료　　2010 년 12 월 01 일 등기 >

### 주식매수선택권

1. 일정한 경우 주식매수선택권을 부여할 수 있다는 뜻
회사는 주주총회의 특별결의로 발행주식 총수의 100분의 10 범위 내에서 주식매수선택권을 부여할 수 있으며, 증권거래법 제189조의4 제3항의 규정에 따라 발행주식총수의 100분의 10 범위 내에서 이사회의 결의로 주식매수선택권을 부여할 수 있다. 이 경우 주식매수선택권은 경영성과 또는 주가지수 등에 연동하는 성과연동형으로 부여할 수 있다. 다만, 벤처기업육성에 관한 특별조치법 제16조의3 규정에 의한 기술 및 경영능력을 갖춘 자로서 대통령령이 정하는 자 및 대학 또는 대통령령이 정하는 연구기관에게도 주식매수선택권을 주주총회의 특별결의에 의하여 부여할 수 있다. 단, 이사회 결의로 주식매수선택권을 부여한 경우 그 부여 이후

| 등기번호 | 384053 |
|---|---|

소집되는 주주총회의 승인을 얻어야 한다.
1. 주식매수선택권의 행사로 발행하거나 양도할 주식의 종류와 수
  1) 주식매수선택권의 행사로 기명식보통주식(또는 기명식우선주식)을 발행하거나, 기명식보통주식(또는 기명식우선주식)인 자기주식을 교부하며 또는 주식매수선택권의 행사가격과 시가와의 차액을 현금 또는 자기주식으로 교부할 수 있다.
  2) 주식매수선택권을 행사할 주식의 1주당 행사가격은 다음 각 호의 가격이상이어야 한다. 주식매수선택권을 부여한 후 그 행사가격을 조정하는 경우에도 또한 같다.
  1. 새로이 주식을 발행하여 교부하는 경우에는 다음 각목의 가격 중 높은 금액
  가. 주식매수선택권의 부여일을 기준으로 증권거래법 시행령 제84조의9 제2항 제1호의 규정을 준용하여 평가한 당해 주식의 시가
  나. 당해 주식의 권면액
  2. 위 1호 이외의 경우에는 제1호 가 목의 규정에 의하여 평가한 당해 주식의 시가
1. 주식매수선택권을 부여받을 자의 자격요건
  1) 주식매수선택권의 부여의 대상자는 회사의 설립, 경영, 해외영업 또는 기술혁신 등에 기여하거나 기여할 수 있는 회사의 임직원 및 증권거래법 시행령 제84조의6 제1항이 정하는 관계회사의 임직원으로 한다. 다만, 회사의 이사에 대하여는 이사회의 결의로 주식매수선택권을 부여할 수 없다.
  2) 위 1)의 규정에도 불구하고 증권거래법상의 최대주주·주요주주 및 그 특수관계인에게는 주식매수선택권을 부여할 수 없다. 다만, 당해 법인 및 증권거래법 시행령 제84조의6 제1항이 정하는 관계회사의 임원이 됨으로써 특수관계인에 해당하게 된 자(그 임원이 계열회사의 비상근임원인 자를 포함한다)에게는 주식매수선택권을 부여할 수 있다.
  3) 임원 또는 직원 1인에 대하여 부여하는 주식매수선택권은 발행주식 총수의 100분의 10을 초과할 수 없다.
1. 주식매수선택권의 행사기간
  1) 주식매수선택권은 이를 부여하는 주주총회 결의일로부터 2년이 경과한 날로부터 3년 이내에 행사할 수 있다.
  2) 주식매수선택권을 부여 받은 자는 이를 부여하는 결의일로부터 2년 이상 재임 또는 재직하여야 행사할 수 있다. 다만 주식매수선택권을 부여 받은 자가 그 결의일로부터 2년 내에 사망하거나 정년으로 인한 퇴임 또는 퇴직 기타 본인의 귀책사유가 아닌 경우 주식매수선택권을 행사할 수 있다.
1. 일정한 경우 이사회결의로 주식매수선택권의 부여를 취소할 수 있다는 뜻
  다음 각 호에 해당하는 경우에는 이사회의 결의로 주식매수선택권의 부여를 취소할 수 있다.
  1. 당해 임,직원이 주식매수선택권을 부여 받은 후 임의로 퇴임하거나 퇴직한 경우
  2. 당해 임,직원이 고의 또는 과실로 회사에 중대한 손해를 초래하게 한 경우
  3. 회사의 파산 또는 해산 등으로 주식매수선택권의 행사에 응할 수 없는 경우
  4. 기타 주식매수선택권 부여계약에서 정한 취소사유가 발생한 경우
  2009 년 01 월 16 일 설정    2009 년 01 월 19 일 등기

| 회사성립연월일 | 2008 년 02 월 14 일 |
|---|---|

| 등기기록의 개설 사유 및 연월일 | |
|---|---|
| 설립 | 2008 년 02 월 14 일 등기 |



이 증명서는 등기기록의 내용과 틀림없음을 증명합니다. [다만, 신청이 없는 지점 · 지배인에 관한 사항의 기재를 생략하였습니다]

서기 2012년 08월 17일

법원행정처 등기정보중앙관리소          전산운영책임관

* 실선으로 그어진 부분은 말소(변경,경정)된 등기사항입니다. * 등기사항증명서는 컬러로 출력 가능함.
[인터넷 발급] 문서 하난의 바코드를 스캐너로 확인하거나, 인터넷등기소(http://www.iros.go.kr)의
발급확인 메뉴에서 발급확인번호를 입력하여 위 · 변조 여부를 확인할 수 있습니다.
발급확인번호를 통한 확인은 발행일부터 3개월까지 5회에 한하여 가능합니다.

발급확인번호 0535-AAMY-XYSV

0000525043157014880321101206101B9DABFEBC1F819670917 1 발행일:2012/08/17

- 6/6 -

[제45호서식]  공증인가 법무법인 대 종

서울 종로구 당주동 160
(변호사회관 303호)
[공증부 736-6604]

| | |
|---|---|
| 위 번역문은 원문과 상위없음을 서약합니다. | I swear that the attached translation is true to the original. |
| 2012. 8. 17. | Aug. 17. 2012. |
| 서약인 송헌 ㊞ | Signature |

등부 2012 년 제 3809 호

인 증

Registered No.   2012 – 3809
Notarial Certificate

위 송헌 은

본 공증인의 면전에서 위 번역문이
원문과 상위없음을 확인하고 서명
날인 하였다.

2012 년 8 월 17 일 이 사무소에서
위 인증한다.

Song Heon

 personally
appeared before me, confirmed
that the attached translation is
true to the original and subscribed
his (her) name.

This is hereby attested on this
17th day of  Aug, 2012
at this office.

공증 법 무 법 인 대 종
인가
소속 서울중앙지방검찰청
주소 : 서울특별시 종로구 당주동 160

DAE JONG LEGAL CORPORATION

Seoul Central District Prosecutors'
Office
160, Dang Joo-Dong, Jong Ro-Ku,
Seoul, Korea

공증담당변호사

Lawyer in charge

JUNG BONG HYUN

This office has been authorized
by the Minster of Justice, the
Republic of Korea, to act as
Notary Public Since
February  21st.  1986
under Lawyers Act Article 31.

210mm×297mm(보존용지(1종) 70g/m²)



*[Translation]*

## Certificate of Entire Registered Items (including Deleted(Cancelled) Items) - Vessel

[Vessel] M.V. Daebo Trader of Jeju City, Jeju Special Province (39056 tons)

Identification No.2201-2008-500002

[Description]

(Vessel Particulars)

| No. | Filing Date | Vessel Particulars | Reasons for Registration and Other Matters |
|---|---|---|---|
| 1 | January 4, 2008 | Type and Name of Vessel: M.V. Daebo Trader<br><br>Port of Registry: Jeju City, Jeju Special Province<br><br>Material of Vessel: Steel<br><br>GRT: 39056Tons<br><br>Type and Number of Engine: 1 Diesel Engine<br><br>Type and Number of Propeller: 1 Screw Propeller<br><br>Date of Launching: November 27, 2001<br><br>Date of Acquisition of Nationality : January 3, 2008 | |

[Part A]

(Matters regarding Ownership)

| Priority No. | Purpose of Registration | Filing Date | Reasons for Registration | Right-Holder and Other Matters |
|---|---|---|---|---|
| 1 | Preservation of Ownership Title | No. 9 on January 4, 2008 | | Owner: Shinhan Capital Co., Ltd. 135011-0034400<br><br>530-1 Gojan-dong, Danwon-gu, Ansan-si, Gyeonggi-do |

1

*[Translation]*

| 1-1 | No. 1 Change of Particulars Registered Title Holder | | October 31, 2011 Road Name Address | Address of Shinhan Capital Co., Ltd.: 17 Danggok-ro (Gojan-dong), Danwon-gu, Ansan-si, Gyeonggi-do; Date of Codicil: November 7, 2013 |

**[Part B]**

(Matters on Mortgage and Leasehold Interest)

| Priority No. | Purpose of Registration | Filing Date | Reasons for Registration | Right-Holder and Other Matters |
|---|---|---|---|---|
| 1 | (1) Creation of Kun-Mortgage | No. 10 on January 4, 2008 | January 4, 2008 Kun-Mortgage Agreement | Total Claim Amount: USD 31,512,000; Debtor: Daebo Shipping Co., Ltd. 128-27 Dangju-dong, Jongno-gu, Seoul; Kun-Mortgagee: Shinhan Bank Co., Ltd. 110111-0012809 120 Taepyeongno 2-ga, Jung-gu, Seoul (Gwanghwamoon Central Corporate Banking Branch) |
| 1-1 | No. 1 (1) Change of Particulars Registered Title Holder | No. 27 on January 20, 2010 | February 6, 2009 Change of Name | Correspondent Branch of Shinhan Bank Co., Ltd.: Gwanghwamoon Corporate Banking Centre |
| 1-2 | No. 1 (1) Change of Kun-Mortgage | No. 28 on January 20, 2010 | January 5, 2010 Merger of Company | Debtor: Daebo International Shipping Co., Ltd. 128-27 Dangju-dong, Jongno-gu, Seoul |
| 1 | (2) Establishment of Kun-Mortgage | No. 10 on January 4, 2008 | January 4, 2008 Kun-Mortgage | Total Claim Amount: USD 23,634,000; Debtor: Daebo Shipping Co., Ltd. |

2

*[Translation]*

| 1-3 | No. 1 (2) Change of Kun-Mortgage | No. 29 on January 20, 2010 | Agreement | | 128-27 Dangju-dong, Jongno-gu, Seoul ~~Kun-Mortgagee: Korea Exchange Bank Co., Ltd. 1101110672538~~ 181 Euljiro 2-ga, Jung-gu, Seoul (Gwanghwamoon Branch) |
|-----|----------|----------|-----------|---|------|
| | | | January 5, 2010 Merger of Company | | Debtor: Daebo International Shipping Co., Ltd. 128-27 Dangju-dong; Jongno-gu, Seoul |

--- No more statement hereafter: ---

Fees at 1,200 received

Competent Registry Office:   Registry Office of Jeju District Court /
Issuing Registry Office:   Jungbu Registry Office of Seoul Central District Court

It is hereby certified that the contents of this registry is identical to those of the registry record.

Date:   February 17, 2015

Central Registered Information Office of the Ministry of Court Administration

Computer Operation Official *[Official Seal affixed]*

* Portions that have been stricken out represent those items that have been deleted.
* Parts B and C that contain no registered item have been omitted.

The barcode at the bottom of the document can be confirmed by scanner or by entering issuance confirmation numbers at the issuance confirmation menu of the internet registration center (http://www.iros.go.kr) to confirm the matter of forgery or falsification. Confirmations through the issuance confirmation numbers are limited to up to 5 times for a period of 3 months from the issuance date.

3

*[Translation]*

Issuance No. 220201110012050230100851715LJ0000347BOG30249061112
Issuance Confirmation No.: ALLIL–NFPM–0028
Date of Issuance: February 17, 2015

4

# Sea-web – Class Share Fleet List Report by Group Owner

## Daebo Shipping Co Ltd (0658566)

7th Floor, Dongwon Building, 128-27, Dangju-dong, Jongno-gu, Seoul, 110-759, South Korea.

### Existing Fleet Summary

| Class Society | Ships | Total GT | % Share |
| --- | --- | --- | --- |
| not known | 2 | 4,099 | 1.91% |
| KR | 6 | 180,903 | 84.15% |
| NK | 1 | 29,987 | 13.95% |
| Totals | 9 | 214,989 | 100.00% |

### New Construction Fleet Summary

No 'New Construction Fleet' details as 'Group Owner'

### Existing Fleet Details

| LR/IMO | Shipname | Ship Type | Status | Built | GT | DWT | Class | Cls Status | Flag |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 7114563 | BRONZE BELL | General Cargo Ship | In Service/Commission | 1971-05 | 2,998 | 6,020 | | | Korea, South |
| 9610561 | DAEBO GLADSTONE | Bulk Carrier | In Service/Commission | 2013-12 | 44,102 | 81,399 | KR | In Class | Panama |
| 9590046 | DAEBO LUMUT | Bulk Carrier | In Service/Commission | 2011-08 | 44,102 | 81,444 | KR | In Class | Panama |
| 9240031 | DAEBO MASAN | General Cargo Ship | In Service/Commission | 2001-06 | 9,235 | 11,885 | KR | In Class | Korea, South |
| 9596492 | DAEBO NEWCASTLE | Bulk Carrier | In Service/Commission | 2011-12 | 44,102 | 81,398 | KR | In Class | Panama |
| 9230153 | DAEBO TRADER | Bulk Carrier | In Service/Commission | 2002-02 | 39,056 | 73,870 | KR | In Class | Korea, South |
| 9143960 | KOBEE | Passenger Ship | In Service/Commission | 1994-11 | 306 | 31 | KR | In Class | Korea, South |
| 9405502 | MAEMI PIONEER | Bulk Carrier | In Service/Commission | 2007-02 | 29,987 | 53,505 | NK | In Class | Panama |
| 9184512 | NEW AIRPORT No. 3 | Passenger Ship | In Service/Commission | 1997-12 | 1,101 | 722 | | | Korea, South |

Copyright Lloyd's Register – Fairplay. All Rights reserved.



EXHIBIT F

**New Construction Fleet Details**

No 'New Construction Fleet' details as 'Group Owner'

Copyright Lloyd's Register - Fairplay. All Rights reserved.

Exhibit A - 0000002