**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:                                                          CHAPTER 15

**DAEBO INTERNATIONAL SHIPPING**              Case No. 15-10616 (MEW)
**CO., LTD.,**

　　Debtor in a Foreign Proceeding

---

### MEMORANDUM OF LAW IN OPPOSITION TO THE DAEBO FOREIGN REPRESENTATIVE'S MOTION FOR AN ORDER TO VACATE THE RULE B ATTACHMENTS OF SHINHAN'S PROPERTY

---

**HOLLAND & KNIGHT LLP**

Warren E. Gluck
31 West 52nd Street
New York, NY 10019
Tel:　(212) 513-3200
Fax:　(212) 385-9010
warren.gluck@hklaw.com

*Attorneys for SPV 1, LLC, Jaldhi Overseas PTE. Ltd., Richardson Stevedoring & Logistics Services, Inc. and Lark Shipping S.A.*

# Table of Contents

**Page**

**PRELIMINARY STATEMENT** ............................................................................. 1

**FACTS** ............................................................................................................... 6

**POINT I:  THE MARITIME ALTER EGO AND FRAUDULENT TRANSFER CLAIMS
ARE NOT THE EXCLUSIVE PROPERTY OF DAEBO** .................................... 7

*A.  KOREAN LAW GOVERNS THE EXCLUSIVITY ANALYSIS* ........................................ 7

*B.  THE VEIL PIERCING CLAIMS ARE NOT THE EXCLUSIVE PROPERTY OF THE DAEBO ESTATE
UNDER KOREAN LAW* ................................................................................. 9

    *i. Daebo Has Improperly Conflated the Veil Piercing and Fraudulent Transfer Claims* ...... 9

    *ii.  The Veil Piercing Claims are Not Stayed or Within the Exclusive Control of Daebo or
the Foreign Representative under Koeran Law* .................................................. 10

*C.  EXCLUSIVITY PRESUPPOSES AND REQUIRES CAPABILITY, WHICH DAEBO LACKS HERE* .... 11

    *i.  Neither the Fraudulent Transfer Claims nor the Veil Piercing Claims at Issue Can be
Brought Under Korean Law* ......................................................................... 11

    *ii.  The Fraudulent Transfer and Veil Piercing Claims at Issue Can only Be Brought Under
the United States Maritime Law* ................................................................... 12

    *iii.  Daebo Does Not Have Admiralty Subject Matter Jurisdiction to Bring the Claims and
Cannot Invoke Admiralty Law* ..................................................................... 13

*D.  DAEBO HAS FORFEITED AND WAIVED ANY RIGHT OF EXCLUSIVITY* ................................. 14

*E. SCHIMMELPENNINCK IS DISTINGUISHABLE AND INAPPLICABLE, THE SHINHAN CLAIMS ARE
PARTICULARIZED TO MARITIME CREDITORS AND PROSECUTION OF THEM WILL NOT
INTERFERE WITH OR DIMINISH THE DAEBO ESTATE* ............................................. 17

*F.  FOREIGN LAW BASED CLAIM EXCLUSIVITY IS INCOMPATIBLE WITH INTERNATIONAL
MARITIME COMMERCE AND CONTRARY TO THE FUNDAMENTAL PUBLIC POLICY OF THE
UNITED STATES* ........................................................................................ 19

**POINT II: THERE IS ADMIRALTY SUBJECT MATTER JURISDICTION TO
SUPPORT THE SUBJECT CLAIMS** .............................................................. 23

**POINT III:  THE ATTACHMENT SHOULD NOT BE VACATED BECAUSE DAEBO
LEASED THE VESSEL** ................................................................................. 26

i

**_A.  KOREAN LAW GOVERNS THE SCOPE OF THE CHAPTER 15 STAY AND DOES NOT PROTECT
DAEBO'S LEASED INTEREST IN THE VESSEL_** ........................................................................ 27

**_B.  THE RULE B CLAIMANTS' SECURED CLAIMS AGAINST SHINHAN ARE CONSTITUTIONALLY
PROTECTED PROPERTY RIGHTS AND SHOULD NOT BE VACATED_** .............................................. 29

**_C.  APPLICATION OF THE 1522 BALANCING TEST REQUIRES EITHER DENIAL OF THE MOTION
OR DIRECTING DAEBO TO POST A BOND FOR THE VALUE OF THE SHINHAN CLAIMS (THE
STATUS QUO)_** .................................................................................................................... 32

**POINT IV: DAEBO'S ESTOPPEL ARGUMENT IS MERITLESS** ................................. 35

**POINT V: DAEBO'S "FUTILITY" ARGUMENT DEFIES FACT AND LOGIC** ........... 38

**CONCLUSION** ........................................................................................................ **39**

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adler v. Pataki,*
　　185 F.3d 35, 1999 U.S. App. LEXIS 16687 (2d Cir. N.Y. 1999) ..........................................36

*Ahcom, Ltd. v. Smedning,*
　　623 F.3d 1248 (9th Cir. 2010) ...........................................................................................8

*Atlanta Shipping Corp. v. Chem Bank,*
　　818 F.2d 240 (2d Cir. 1987)...............................................................................................25

*Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.,*
　　85 F.3d 44 (2d Cir. 1996)...............................................................................12, 21, 30

*Bergesen A/S v. Lindholm,*
　　760 F.Supp. 976 (D. Conn 1991) ......................................................................................20

*British Marine PLC v. Aavanti Shipping & Chartering Ltd.,*
　　2013 U.S. Dist. LEXIS 164398, 2014 AMC 360, 2013 WL 6092821
　　(E.D.N.Y. 2013)................................................................................................................24

*CAE Indus. Ltd., et al. v. Aerospace Holdings Co., et al.,*
　　116 B.R. 31 (S.D.N.Y. 1990)..............................................................................................31

*Caplin v. Marine Midland Grace Trust Co.,*
　　406 U.S. 416 (1972).............................................................................................................7

*Cargill, Inc. v. Sabine Trading & Shipping Co.,*
　　756 F.2d 224 (2d Cir. 1985) (N.Y. C.P.L.R. 6201(1)) .....................................................29

*Cent. Hudson Gas Elec. Corp. v. Empresa Naviera Santa S.A.,*
　　56 F.3d 359 (2d Cir. 1995).................................................................................................30

*Chan v. Society Expeditions,*
　　123 F.3d 1287 (9th Cir. Wash. 1997) ...............................................................................24

*Chan v. Society Expeditions,*
　　123 F.3d 1297 (9th Cir. 1997) ..........................................................................................22

*Charlot v. Ecolab, Inc.,*
　　2014 U.S. Dist. LEXIS 183119 (E.D.N.Y. Dec. 12, 2014) ...............................................36

*Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC,*
    851 F. Supp. 2d 504 (S.D.N.Y. 2012)..........................................................20, 22, 24

*Constellation Energy Commodities Group Inc. v. Transfield ER Cape Ltd. (in
    Liquidation) and Transfield ER Limited,* 10 CV 4434 (SHS) (S.D.N.Y. July
    29, 2011) ...................................................................................................................20

*Cornships Navigation Limited v. Britannia Bulk Plc et al,*
    08 cv 9605 (S.D.N.Y.) .............................................................................................20

*Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB,*
    773 F.2d (2d Cir. 1985)............................................................................................28

*Desjardins v. Van Buren Community Hosp.,*
    37 F.3d 21, 1994 U.S. App. LEXIS 28309 ...............................................................36

*E.I. Du Pont De Nemours & Co. v. Fine Arts Reprod. Co., et al.,*
    No. 93 Civ. 2462(KMW), 1995 WL 312505 (S.D.N.Y. May 22, 1995)...................31

*Ebin v. Kangadis Family Mgmt,*
    No. 14-cv-1324, 2014 WL 4638700 (S.D.N.Y. Sept. 28, 2014) ...............................31

*Elton Leather Corp. v. First Gen. Res. Co.,*
    529 N.Y.S.2d 769 (1st Dep't 1988) .........................................................................29

*Epperson v. Entertainment Express, Inc.,*
    242 F.3d 100 (2d Cir. 2001)......................................................................................10

*Ermis Management Co. Ltd. v. United California Discount Corp.,*
    07-cv-01021 (D.N.V. August 3, 2009) ...............................................................24, 26

*Farenco Shipping Co., Ltd v. Farenco Shipping Pte Ltd.,*
    2012 A.M.C. 2900 (E.D.La. 2012) ...........................................................................14

*Fertilizantes Fosfatados Mexcanos S.A. v. Chen,*
    1992 WL 204394 (S.D.N.Y. 1992)............................................................................26

*Flame S.A. v. Freight Bulk Pte Ltd.,*
    39 F. Supp. 3d 769 (E.D.Va. 2014) ..........................................................................26

*Glory Wealth Shipping Pte Ltd. v. Industrial Carriers Inc., Diamant Co. Ltd., et.
    al,*
    08-cv-8425 (S.D.N.Y.) (RJH)...................................................................................20

*Golden Horn Shipping Co. v. Volans Shipping Co.,*
    2014 U.S. Dist. LEXIS 157277, 2015 AMC 187 (S.D.N.Y. 2014).........................24

*Greenwich Marine, Inc. v. S.S. Alexandria*,
  339 F.2d 901 (2d Cir. 1965) (Marshall, J.) ...........................................................13

*Gucci America Inc. v. Duty Free Apparel, Ltd.*,
  328 F. Supp. 2d 439 (S.D.N.Y. 2004).................................................................31

*Gulf Offshore Logistics LLC v. Seiran Exploration & Production Co. LLC*,
  2014 WL 2215747 (E.D.La. May 28, 2014)....................................................2, 17

*Henry v. Daytop Village, Inc.*,
  42 F.3d 89 (2d Cir. 1994)..................................................................................36

*In re Atlas Shipping A/S*,
  404 B.R. 726 (Bankr. S.D.N.Y. 2009).................................................................28

*In re Carlos Rivera, Inc.*,
  130 B.R. 377 (D.P.R. 1991)...............................................................................29

*In re Commodore Int'l Ltd.*,
  262 F.3d 96 (2d Cir.2001).................................................................................15

*In re Crazy Eddie Sec. Litig.*,
  104 B.R. 582 (E.D.N.Y. 1989) ..........................................................................32

*In re Culmer*,
  25 B.R. 621 (Bankr. S.D.N.Y. 1982)..................................................................28

*In re Daewoo Logistics Corp.*,
  461 B.R. 175 (Bankr. S.D.N.Y. 2011)..............................................................8, 27

*In re Delco Oil*,
  599 F.3d 1255 (11th Cir.2010) ..........................................................................34

*In re Faifield Sentry Ltd.*,
  768 F.3d 239 (2d. Cir. 2014).................................................................................5

*In re Giordano*,
  188 B.R. 84 (D.R.I. 1995)..................................................................................29

*in re Holborn Oil Trading Ltd. v. Interpol Bermuda Ltd.*,
  774 F. Supp. 840 (S.D.N.Y. 1991) ....................................................................26

*In re The International Banking Corp. B.S.C.*,
  439 B.R. 614 (Bankr. S.D.N.Y. 2010)......................................................... passim

*In re Ionosphere Clubs, Inc.*,
  17 F.3d 600 (2d Cir. 1994)...................................................................................9

*In re Korea Line Corp.*,
    11-10789 ...............................................................................................................34

*In re Korea Line Corp.*,
    11-10789 (Bankr. S.D.N.Y.) .................................................................................28

*In re M/V RICKMERS GENOA Litigation*,
    643 F. Supp. 2d 553 (S.D.N.Y. 2009)............................................................12, 21

*In re Milovanovic*,
    357 B.R. 250 (Bankr. S.D.N.Y. 2006)..................................................................28

*In re Qimonda*,
    737 F.3d 14 (4th Cir. 2013) .............................................................................4, 32

*In re Quail Travel Group., S.A.*,
    13-21971 (RAM) (Bankr. S.D.Fla)........................................................................20

*In re. S.I. Acquisition*,
    817 F.2d 1142 (5th Cir. 1987) .............................................................................18

*In re Schimmelpenninck*,
    183 F.3d 347 (5th Cir. 1999) ...............................................................17, 18, 19

*In re STN Enterprises*,
    779 F.2d 901 (2d Cir.1985)....................................................................................15

*In re Transcolor Corp.*,
    296 B.R. .......................................................................................................8, 9, 11

*In re Transfield ER Cape Ltd.*,
    10-16270 (Bankr. S.D.N.Y.) .................................................................................28

*In re Treco*,
    240 F.3d 148 (2d Cir. 2001)..................................................................................30

*In re Vienna Park Props.*,
    976 F.2d 106 (2d Cir.1992)...................................................................................34

*In re Vitro S.A.B. de CV*,
    701 F.3d 1031 (5th Cir. 2012) ....................................................................4, 31, 32

*ITC Entertainment v. Nelson Film Partners*,
    714 F.2d 217 (2d Cir. 1983)..................................................................................29

*Itel Containers International Corp. v. Atlanttrafik Express Serv. Ltd. et al.*,
    909 F.2d 968 (2d Cir. 1990)..................................................................................20

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
    513 U.S. 527 (1995) ........................................................................................14

*Kalb, Voorhis & Co. v. American Financial Corp.*,
    8 F.3d 130 (2d Cir. 1993) ................................................................................8

*Kommanditselskab Supertrans v. O.C.C. Shipping Inc.*,
    79 B.R. 535 (S.D.N.Y. 1987) ........................................................................26

*Larios v. Victory Carriers, Inc.*,
    316 F.2d 63 (2d Cir. 1963) ............................................................................12

*Levesque v. Kelly Communication, Inc., et al.*,
    164 B.R. 29 (S.D.N.Y. 1994) ........................................................................31

*Loving Saviour Church v. U.S.*,
    556 F. Supp. 688 (D.S.D. 1983) ....................................................................9

*MSC Mediterranean Shipping Co. v. Metal Worldwide, Inc.*,
    884 F. Supp. 2d 1277, 2012 U.S. Dist. LEXIS 112561 (S.D. Fla. 2012) ..............24

*Norfolk Southern Railway Co. v. Kirby*,
    543 U.S. 14 (2004) ........................................................................................14

*Northern Tankers (Cyprus) Ltd. v. Backstrom et al.*
    901 F.Supp72 (1995) .....................................................................................20

*Oldendorff Carriers GMBH &Co., KG v. Grand China Shipping (Hong Kong)
    Co. Ltd.*, No. C-12-074, 2012 U.S. Dist. LEXIS 188347, 2012 WL 3260233
    (S.D. Tex. July 2, 2012) .................................................................................24

*Ost-W.-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc.*,
    160 F.3d 170 (4th Cir. 1998) ...................................................................22, 24

*Parkraod Corp. v. China Worldwide Shipping Co. Ltd.*,
    2005 WL 135034 (S.D.N.Y. 2005) ...............................................................30

*Peacock v. Thomas*,
    516 U.S. 349 (1996) ................................................................................10, 25

*Polar Shipping Ltd. v. Oriental Shipping Corp.*,
    680 F.2d 627 (9th Cir. 1982) .........................................................................20

*Ripley v. Mulroy, et al.*,
    80 B.R. 17 (E.D.N.Y. 1987) .........................................................................32

*Sequoia Prop. & Equip. Ltd. P'ship v. U.S.*,
    No. CV-F 97-5044, 1998 WL471643, at *4 (E.D. Cal. June 4, 1998) ......................9

*Shearson Lehman Hutton, Inc. v. Wagoner*,
   944 F.2d 114 (2d Cir.1991)..................................................................................7

*Seiran Exploration & Production Co. LLC*, 71 Collier Bankr. Cas.2d 1597
   (E.D.La. May 28, 2014) ......................................................................................2

*St. John's Univ., N.Y. v. Bolton*,
   757 F. Supp. 2d 144 (E.D.N.Y. 2010) ...............................................................36

*St. Paul Fire & Marine Ins. Co. v. PepsiCo. Inc.*,
   884 F.2d 688 (2d Cir. 1989)...............................................................................8

*Staronet Shipping Ltd. v. N. Star Navigation Inc.*,
   659 F.Supp. 189 (S.D.N.Y. 1987) .....................................................................30

*Swift & Co. v. Compania Caribe*,
   339 U.S. 684 (1950).........................................................................13, 23, 25

*Talen's Landing, Inc. v. M/V Venture, II*,
   656 F.2d 1157 (5th Cir. 1981) ....................................................................22, 24

*Teachers Ins. & Annuity Ass'n v. Butler*,
   803 F.2d 61 (2d Cir. 1986).................................................................................31

*TMT Bulk Co. Ltd. v. Transfield ER Cape Ltd., et. al*,
   10 cv 5110 (SDNY) (JSR) ................................................................................20

*U.K. Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.*,
   485 F.Supp. 2d 399 (S.D.N.Y. 2007).............................................................12, 21

*UNUM Corp. v. United States*,
   886 F. Supp. 150, 1995 U.S. Dist. LEXIS 6371 (D. Me. 1995) ............................37

*Variable–Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc., et al.*,
   945 F.Supp. 603 (S.D.N.Y. 1996) .....................................................................31

*Vaughan v. Atkinson*,
   369 U.S. 527 (1962)...........................................................................................13

*Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*,
   825 F.2d 709 (2d. Cir. 1987)..............................................................................28

*Vitol S.A. v. Primrose Shipping Co. Ltd.*,
   708 F.3d 527 (4th Cir. 2013) .............................................................................22

*Wajilam Exps. (Singapore) Pte, Ltd. v. ATL Shipping Ltd.*,
   475 F. Supp. 2d 275, 2006 U.S. Dist. LEXIS 77033, 2006 AMC 2744
   (S.D.N.Y. 2006) .................................................................................................24

*Williams v. Pfeffer*,
   117 F. Supp. 2d 331 (S.D.N.Y. 2000) ...................................................................................10

*Williamson v. Recovery Ltd. P'ship*,
   542 F.3d 43 (2d. Cir. 2008) ....................................................................................22, 24

*Zamora v. Bodden*,
   395 Fed. Appx 118 (5th Cir. 2010) ...................................................................................25

## STATUTES

11 U.S.C. 304 ...........................................................................................................................17

11 U.S.C. 363 .............................................................................................................................5

11 U.S.C. 365(n) .........................................................................................................................4

11 U.S.C. 1506 ..........................................................................................................................32

11 U.S.C. 1519 ............................................................................................................................6

11 U.S.C. 1522 ................................................................................................................. *passim*

11 U.S.C.
   § 363(e) ....................................................................................................................34

## OTHER AUTHORITIES

CPLR § 5225 ..............................................................................................................................10

Fed. R. Civ. P. 8(d)(2) ...............................................................................................................36

Fed. R. Civ. P. 8(d)(3) ...............................................................................................................36

Rule 8(e)(2) of the Federal Rules of Civil Procedure ...............................................................36

H.R.Rep. No. 109–31(I), at 108 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88 ..........................27

Rule E(5)(a) ................................................................................................................................1

1.      Claimants SPV 1 LLC ("**SPV**"), Richardson Stevedoring & Logistics Services, Inc. ("**Richardson**"), Jaldhi Overseas Pte. Ltd. ("**Jaldhi**"), and Lark Shipping S.A. ("**Lark**") (collectively, the "**Rule B Claimants**") respectfully submit this memorandum of law in opposition to the motion of Foreign Representative Chang-Jung Kim ("**Foreign Representative**") of Daebo International Shipping Co., Ltd. ("**Daebo**" or the "**Foreign Debtor**") to vacate the maritime attachment of non-debtor Shinhan Capital Co. ("**Shinhan**")'s property, the vessel M/V Daebo Trader ("**Vessel**"), and the special bond ("Bond"), posted pursuant to Supplemental Rule E(5)(a) and the order of this Court, which serves as substitute security for the maritime alter ego and fraudulent transfer claims against non-debtor Shinhan ("**Motion**").

## Preliminary Statement

2.      The Foreign Debtor's Motion to vacate the attachment of non-debtor Shinhan's property should be denied.

3.      To be clear, the Rule B Claimants attached the Daebo Trader pursuant to Rule B before any Chapter 15 proceeding was filed in the United States by Daebo. This was done even before Daebo's rehabilitation application was accepted in Korea. Neither the Vessel nor the collateral for the Bond is owned by Daebo. Rather, Shinhan, a non-debtor, third-party bank, owns both. Korean law does not prohibit seizures of vessels in respect of claims against a vessel's owner, including but not limited to veil piercing claims, even if the vessel is leased by a debtor in Korean rehabilitation proceedings. Pursuant to the Bond Agreement, the Bond which is the subject of this motion serves as security and *quasi in rem* jurisdiction for the Rule B Claimants' claims against Shinhan only.

4.      Maritime actors (including those represented by counsel for Daebo in this case) have pursued veil-piercing-predicated maritime claims against non-debtor-alter-egos in contemplation of, and in response to, foreign shipping insolvencies for decades. No foreign debtor or alter-ego has ever

*argued* that the foreign debtor has the exclusive right to bring these claims, let alone *prevailed*.[1]    No Court has vacated a maritime attachment of a non-debtor's property in respect of a claim against a non-debtor, even when the property was leased by a debtor.  Accordingly, Daebo's contention that "[t]he vacatur relief requested here has previously been granted" is untrue.  Daebo is requesting extraordinary and unprecedented relief.

5.    There should also be no mistake that via its Motion, Daebo seeks to extinguish the Rule B Claimants' claims against Shinhan and eviscerate Rule B Claimants' secured creditor status with respect to Shinhan.

6.    In support of its Motion, Daebo effectively makes five arguments:

    a)    Daebo has the exclusive right to prosecute the Subject Claims, and the Rule B Claimants' prosecution of these claims will disrupt the integrity of the Korean proceeding;

    b)    Whereas the direct maritime claims against Daebo are stayed, there is no admiralty jurisdiction to support the alter-ego and fraudulent transfer claims against Shinhan;

    c)    The Attachment should be vacated based upon Daebo's leased interest in the Vessel;

    d)    The Rule B Claimants should be estopped from prosecuting the attachment of Shinhan's property, because <u>prior</u> to amendment of the Rule B Claimants' claims, which occurred well-before the Chapter 15 filing and the Bond Agreement, the Rule B Claimants set forth an alternate theory of liability directly against Daebo;

    e)    The Shinhan claims are allegedly "futile" because the creditors' claims against Daebo will be administered in the Korean Bankruptcy proceeding and because the Shinhan claims have no merit.

7.    As set forth in detail herein, <u>none</u> of these arguments succeed:

• First, the maritime alter ego and fraudulent transfer claims at issue are not and should not be the exclusive property of Daebo and will not disrupt the integrity of the Korean proceeding because:

---

[1]The only domestic maritime alter-ego case on point found that an alter-ego action was not stayed where, as here, the alter ego action would not ultimately impact the collective recovery of the other creditors.  *See Gulf Offshore Logistics LLC v. Seiran Exploration & Production Co. LLC,* 71 Collier Bankr. Cas.2d 1597 (E.D.La. May 28, 2014).

     i. Korean law governs the exclusivity analysis,

     ii. the veil-piercing claims are not exclusive property of the Daebo estate under Korean law,

     iii. the concept of exclusivity <u>presupposes</u> capability, which Daebo lacks here because it cannot invoke admiralty jurisdiction,

     iv. Daebo has no intention of bringing the claims – it has forfeited and waived any right of exclusivity by virtue of its collusion with Shinhan,

     v. Execution against the property of Shinhan will not harm the Daebo estate, rather it will help the estate by reducing Daebo's liability and will not result in a preference because the claims may only be brought by maritime creditors, and

     vi. The unprecedented relief sought by Daebo would create destructive, unworkable, value-destroying precedent in the vast majority of maritime cases, including this one;

- Second, admiralty jurisdiction exists regardless of whether there is *quasi in rem* jurisdiction or stayed proceedings against the primary obligor in the United States;

- Third, Daebo's argument based on its leased interest in the vessel fails because:

     i. Korean law does not protect leased property in respect of claims against the property's owner,

     ii. the United States Bankruptcy Code, including chapter 15, protects both the Rule B Claimants' secured interests and claims against Shinhan and precludes the vacatur relief Daebo seeks, and

     iii. even if the relief could be granted, the Rule B Claimants would be entitled to sufficient protection in the form of a bond in the amount of their claims against Shinhan – the status quo;

- Fourth, Daebo's estoppel argument is meritless – the precise alter-ego and veil piercing theories at issue here were presented to the New Orleans Court; and

- Fifth, Daebo's futility argument ignores the Louisiana Court's decision, defies logic and reason, and serves to underscore the weakness of Daebo's overall Motion.

8.     In addition to legal arguments that simply do not "hold water," Daebo supplies two false narratives. First, Daebo presents a narrative where international comity and foreign debtors' interests must always and necessarily prevail over competing interests. The second narrative portrays

Rule B Claimants as greedy creditors who are attempting to gain a leg up on <u>similarly situated</u> creditors in the Korean proceeding.  Neither of these narratives ring true.

9.    Concerning the first narrative, throughout much of its brief Daebo disingenuously pretends that the relief it seeks in this action is routine.  However, on page 35 of its 40 page brief, it concedes that "[t]o the extent vacatur impacts the Rule B plaintiffs' dependent claims against Shinhan, it is merely a necessary price of doing comity."

10.    Yet, the three most recent, circuit-level Chapter 15 decisions that analyze the "price of comity" all undermine Daebo's position.  They demonstrate that a <u>balance</u> must be struck between comity and competing interests.  Moreover, this balance will often weigh in *favor* of creditors' interests and *against* the blind application of comity.

11.    In *In re Vitro S.A.B. de CV*, 701 F.3d 1031, (5th Cir. 2012) ("*Vitro*")*,* the Fifth Circuit held that a Mexican reorganization plan which sought to enforce a non-consensual, non-debtor release to third party guarantors could not be confirmed in the United States because doing so would violate the clear policy against non-debtor releases. [2]  Yet, destruction of the Rule B creditors' claims against Shinhan is precisely the impermissible outcome Daebo seeks here.[3]

12.    Moreover, fundamental public policy or not, simply because Chapter 15 theoretically authorizes relief, does not mean that relief may be granted without sufficient protection to creditors. In *In re Qimonda,* 737 F.3d 14 (4th Cir. 2013), after describing the balancing test pursuant to 11 U.S.C. 1522 as mandatory, the Fourth Circuit upheld conditioning the relief sought by the foreign representative by making 11 U.S.C. 365(n) directly applicable, and thereby declined to permit a

---

[2] It is particularly relevant that the guarantors in *Vitro* were affiliates of the debtor, so the argument that such releases were necessary to that restructuring was far more significant than a release of Shinhan is to Daebo's restructuring here.

[3] *Vitro* distinguishes *Shimmelpeck*. The Rule B Claimants' treatment concerning *Schimmelpeck's* inapplicability to this case is detailed later in this brief.

foreign representative to use German law that would have eviscerated the protections granted to United States intellectual property holders.

13.     In *In re Faifield Sentry Ltd.,* 768 F.3d 239 (2d. Cir. 2014)*,* the Second Circuit held that even though a British Virgin Islands court had approved an asset sale by the (BVI incorporated) foreign debtor, because the situs of that asset (a right to payment) was in the United States, the Chapter 15 Bankruptcy Court could not extend comity to the BVI Court's determination, but rather, had to independently determine whether to approve the asset sale pursuant to 11 U.S.C. 363.[4]

14.     Given the foregoing, it is clear that the "price of comity" can be and often is too high. This is the case here, where Daebo seeks to destroy the Rule B Claimants' secured interest in the veil piercing and fraudulent transfer claims against Shinhan that Daebo cannot and has no intention of bringing against property (the bond) not owned by Daebo.

15.     Turning to Daebo's flawed preference narrative, the Rule B Claimants (plus AMS) are not attempting to get a leg up on other creditors.  The maritime alter ego and fraudulent transfer claims are available only to maritime creditors in the United States.  The attachment of the Vessel was well-publicized and any maritime creditor that wanted to file a claim did so. The Rule B Claimants are working together and represent all of the maritime creditors that are interested and willing to pursue liability against Shinhan.  Meanwhile, the bond is sufficient to cover all of the Rule B Claimants' claims as stated in their complaints, and Korean law would not prohibit the vessel seizure in question.

16.     Rather, for reasons that will be revealed during discovery, the Foreign Representative is using the limited resources of the Daebo estate in an attempt to insulate Shinhan from liability. Insulating Shinhan from liability is not a legitimate purpose of Daebo. Indeed,  Daebo gains nothing legitimate from the vacatur of the attachment of Shinhan's Bond.

---

[4] As such, *Fairfield* counsels that any decision not to bring a United States claim against Shinhan's property in the United States in respect of may require approval by this Court.

17.     That there is something very wrong with this picture, and especially with the relationship between Daebo and Shinhan, has not escaped the attention of the New Orleans Court. Granting Daebo's Motion will simply result in the senseless destruction of value.  For all of these reasons, and as explicated below, Daebo's Motion should be denied.

## FACTS

18.     This Court is very familiar with the facts underlying this dispute and the statement of facts submitted in connection with the Rule B Claimants' opposition to Daebo's emergency motion to vacate the attachment of the Vessel pursuant to 11 U.S.C. 1519, D.E. 18, is incorporated herein by reference.

19.     Since that time, the Vessel has been released in accordance with a Bond Agreement and Bond Order entered by this Court (D.E. 38).  Pursuant to the Bond Order, Shinhan posted a bond in the amount of $3.85 million in the consolidated New Orleans actions securing "the Rule B Plaintiffs' alter ego and fraudulent transfer claims in the Rule B actions against [Shinhan], including that as a matter of maritime equity principles, the TRADER should be considered property against which the Rule B Claimants' claims may be enforced, notwithstanding the TRADER's registered ownership by Shinhan" ("**Bond**").

20.     The Bond is sufficient to secure all of the Rule B Claimants' claims as set forth the current complaints in the consolidated New Orleans actions.

21.     Another important development since the provisional hearings before this Court is that Shinhan submitted an additional motion to vacate the attachment and the claims against it in New Orleans.  That motion expressly included the judicial estoppel argument made here ("**Shinhan Vacatur Motion**").

22.     During the course of the Shinhan Vacatur Motion briefing, the New Orleans Court issued an order requesting supplemental briefing on various issues, including clarification concerning

the Rule B Claimants' claims against Shinhan predicated on the maritime equitable principles of piercing the corporate veil and fraudulent transfer ("**Supplemental Briefing Order**").  A copy of the Supplemental Briefing Order, dated April 8, 2015 is attached hereto as Exhibit A.

23.     In response to the Supplemental Briefing Order the Rule B Claimants submitted a supplemental brief which presented to the New Orleans Court the precise maritime equitable principles of piercing the corporate veil and fraudulent transfer against Shinhan that were and are presented to this Court ("**Rule B Claimants' Supplemental Brief**").   A copy of the Rule B Claimants' Supplemental Brief  is attached hereto as Exhibit B.

24.     After this, the New Orleans Court issued an order denying the Shinhan Vacatur motion and finding that the Rule B Claimants had established not merely *prima facie* claims against Shinhan but also "probable cause" to establish the liability of Shinhan and support the maritime attachment of Shinhan's vessel based upon the maritime equitable principles of piercing the corporate veil and fraudulent transfer as set forth in the Rule B Claimants' Supplemental Brief. ("**Shinhan Denial Order**"). A copy of this order has already been submitted to this Court [D.E. 39].

25.     Additionally, the Rule B Claimants submit to this Court the declaration of former Korean Bankruptcy Judge Chiyong Rim, dated July 16, 2015, ("**Rim Declaration**") which sets forth principles of Korean law relevant to the Rule B Claimants' opposition to Daebo's Motion.

## POINT I:  THE MARITIME ALTER EGO AND FRAUDULENT TRANSFER CLAIMS ARE NOT THE EXCLUSIVE PROPERTY OF DAEBO

### A.  *Korean Law Governs The Exclusivity Analysis*

26.     In the domestic context, a bankruptcy trustee (or debtor in possession) stands in the shoes of the bankrupt company and has standing to bring any suit that the bankrupt corporation could have instituted if it had not petitioned for bankruptcy.  *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434 (1972); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 117 (2d

Cir.1991).  *See also Ahcom, Ltd. v. Smedning,* 623 F.3d 1248, 1250 (9th Cir. 2010) (internal citations

and quotations omitted).

27.     When a trustee has standing to assert a claim, that standing is exclusive. But it is <u>state</u>

<u>law</u> that determines whether a claim belongs to the trustee or to the creditor. *Id.* (citing *Butner v.*

*United States,* 440 U.S. 48, 54-55 (1979) and *St. Paul Fire & Marine Ins. Co. v. PepsiCo. Inc.,* 884

F.2d 688, 700 (2d Cir. 1989).  Accordingly, in *Achcom,* where the corporation whose veil was to be

pierced was a California corporation, California law applied. *See also Kalb, Voorhis & Co. v.*

*American Financial Corp.,* 8 F.3d 130, 132 (2d Cir. 1993) (New York law).

28.     Moreover, when a court determines that a state does not provide a debtor corporation

or trustee with a particular cause of action, that cause of action cannot be exclusive to the

debtor/trustee.  *See generally Achcom* 623 F.3d 1252; *Transcolor Corp.,* 296 B.R. 343, 361 (Bankr.

D.Md. 2003).

29.     Here of course, Daebo is a Korean entity in Korean insolvency proceedings so Korean

law applies to determine whether the alter ego and fraudulent transfer claims are exclusive to Daebo

and its Foreign Representative.  This result is also in keeping with the purpose and function of Chapter

15 as an ancillary proceeding pursuant to which foreign insolvency regimes are effectuated in the

United States.  *See In re Daewoo Logistics Corp.*, 461 B.R. 175, 178 (Bankr. S.D.N.Y. 2011)

(maritime Chapter 15 case holding that the United States law stay is co-extensive with the Korean

law stay) ("*Daewoo*"); *In re The International Banking Corp. B.S.C.,* 439 B.R. 614, 621 (Bankr.

S.D.N.Y. 2010) (applying Bahrain law concerning attachments' validity and denying motion to vacate

attachments) ("*TIBC*").

30.     Most importantly, and of particular relevance to this case, the law of the debtor's place

of incorporation must be utilized because in order for a claim to be exclusive. The relevant trustee (or

foreign trustee, custodian or liquidator) must be <u>capable</u> of bringing the claim in order for the claim

to be exclusive to the trustee, or else the bar to creditors' bringing a given action instead would simply amount to the purposeless destruction of value. *See, e.g., Transcolor Corp.,* 296 B.R. 343, 361 (Bankr. D.Md. 2003) ("[t]he answer to the question of whether a cause of action to pierce the corporate veil of a corporation in bankruptcy belongs to the bankruptcy trustee as property of the estate or whether it belongs to creditors of the corporation as holders of claims against the bankruptcy estate determines who has standing to sue" *citing In re Ionosphere Clubs, Inc.,* 17 F.3d 600, 607 (2d Cir. 1994) and holding that the right to pierce the corporate veil was not exclusive to the debtor under Maryland law because Maryland law did not permit such action).

## B.  The Veil Piercing Claims are not the Exclusive Property of the Daebo Estate Under Korean Law

### i. Daebo Has Improperly Conflated the Veil Piercing and Fraudulent Transfer Claims

31.     In its Motion, Daebo contends that under Korean law, the Foreign Representative has exclusive control over both the veil-piercing claims and the fraudulent transfer claims asserted by the Rule B Claimants.  However, the only way that Daebo can support this argument is by disingenuously arguing that the asserted alter ego and fraudulent transfer claims are indistinguishable and the same. (Daebo Br. At 14, n7)[5].

32.     Daebo's position is flat-out wrong under both United States and Korean law, as well as the Shinhan Denial Order, which expressly upholds both the alter ego "and" fraudulent transfer claims.   *See* Shinhan Denial Order at 16.

33.     Alter ego and fraudulent transfer are separate and distinct causes of action, with separate elements and separate remedies.[6]  An action to pierce the corporate veil is one where liability

---

[5] It is also worth noting Daebo's expert does not state this, and does not state that veil-piercing causes of action are the exclusive property of the debtor.

[6] Alter ego and fraudulent transfer are separate and distinct causes of action.  *Loving Saviour Church v. U.S.,* 556 F. Supp. 688, 690 (D.S.D. 1983). ("Two distinct lines of analysis are helpful in resolving the issue in this case: A) the fraudulent conveyance theory, and B) the alter ego theory."); *Sequoia Prop. & Equip. Ltd. P'ship v. U.S.,* No. CV-F 97-

for a creditor's claim is shifted to a third party (much like a guarantee). By contrast, an action for fraudulent transfer is a negational action whereby property that was transferred by a debtor a third party is restored to the debtor (but there is no transfer of liability).

34.    In this vein, any recovery that is available from a fraudulent transferee is limited to the amount transferred, while the recovery available from an alter ego in an veil piercing action is the same as the primary's obligator's liability.

35.    The distinction between veil piercing and fraudulent transfer actions is fundamental and forms the basis for why in the non-maritime judgment enforcement context, federal subject matter jurisdiction (to enforce federal judgments) extends to causes of action based upon fraudulent transfer but not to causes of action to pierce the corporate veil. *Peacock v. Thomas*, 516 U.S. 349, 357-59 (1996) (no subject matter jurisdiction to hold non-party liable or create new liability to a third party); *Epperson v. Entertainment Express, Inc.*, 242 F.3d 100, 106 (2d Cir. 2001) (same, interpreting *Peacock*)[7].

36.    The situation is the same under Korean law, as more fully set forth in the Rim Declaration. Under Korean law, fraudulent transfer and veil-piercing are separate and distinct causes of action, with different requirements and different remedies. *See generally,* Rim Declaration ¶¶ 7-21.

*ii.  The Veil Piercing Claims are Not Stayed or Within the Exclusive Control of Daebo or the Foreign Representative under Koeran Law*

37.    As set forth in significant detail in the Rim Declaration, the Foreign Representative does not even have the ability, much less the exclusive right, to assert veil-piercing claims under

_____

5044, 1998 WL471643, at *4 (E.D. Cal. June 4, 1998) ("The fraudulent conveyance, alter ego and nominee theories are discrete, despite the similar factual basis necessary to establish each theory").

[7] *See also Williams v. Pfeffer*, 117 F. Supp. 2d 331 (S.D.N.Y. 2000) (dismissing judgment creditor's alter ego claims in proceedings brought under CPLR § 5225 against judgment debtor's parent corporation where no independent basis for subject matter jurisdiction existed, finding that district court could not exercise ancillary jurisdiction over non-parties that were not directly liable on the judgment).

Korean law.  Rim Declaration ¶¶ 15-18 ("the Rule B Claimants' alter ego or veil piercing claims are not stayed by virtue of Daebo's bankruptcy under Korean law.  The Rule B Claimants' veil piercing claims are not the exclusive property of the Foreign Representative, and the Foreign Representative has no standing to even assert the veil piercing claims under Korean law").

### C.  Exclusivity Presupposes and Requires Capability, Which Daebo Lacks Here

38.     As noted above, the very concept of exclusivity requires a finding that a debtor (or trustee) has the capability to assert the claims at issue.  Clearly that is not the case in Korea, where there is no authority, precedent, or statute by which a company (as opposed to its creditors) may pierce its own corporate veil.

39.     However, as set forth in this section, there is another fundamental problem with Daebo's exclusivity argument that is specific to the particular veil-piercing claims and fraudulent transfer claims at issue.  Under the facts of this case, the claims can only be brought under United States maritime law.   The situation is at least analogous to one where the trustee is precluded from bringing a claim by virtue of the doctrine of *in pari delicto*.  *See In re Transcolor Corp.,* 296 B.R. at 367.

40.     But Daebo and the Foreign Representative cannot invoke United States maritime law because its claims would necessarily lack maritime subject matter jurisdiction.   Accordingly, regardless of whether the claims at issue are exclusive under Korean law, because Daebo lacks the capability to bring the claims in the United States, they cannot be exclusive to Daebo.

### i.  Neither the Fraudulent Transfer Claims nor the Veil Piercing Claims at Issue Can be Brought Under Korean Law

41.     As set forth above and in the Rim Declaration, Korean law does not support the veil-piercing and fraudulent transfer claims at issue here.  *See* Rim Declaration ¶¶ 26-28.

11

*ii. The Fraudulent Transfer and Veil Piercing Claims at Issue Can only Be Brought Under the United States Maritime Law*

42.      It is beyond doubt that all of the Rule B Claimants have admiralty subject-matter jurisdiction with respect to their underlying claims as they all arise from the provision of maritime services or breaches of charter party agreements and veil piercing claims against third parties arising from maritime claims sound in admiralty.   Moreover, the New Orleans Court held that maritime veil piercing law applies to this case in the Shinhan Denial Order.

43.      As Courts across the country have noted, due to the "unique corporate arrangements that exist in the maritime industry," federal maritime law has adopted "unique rules" governing corporate liability.   This is true in all maritime cases and applies even to non-maritime actors that are parties in maritime cases, "irrespective of whether corporate entities expected, *ex ante,* that their corporate relationship would be scrutinized in a maritime action." *In re M/V RICKMERS GENOA Litigation*, 643 F. Supp. 2d 553, 557 (S.D.N.Y. 2009) (multiple citations omitted); *see also Navalmar (U.K. Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.,* 485 F.Supp. 2d 399, 404 (S.D.N.Y. 2007) *Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.,* 85 F.3d 44 (2d Cir. 1996)) (noting special equitable need to permit piercing the corporate veil in a "world of shifting assets, numerous thinly capitalized subsidiaries, flags of convenience and flows of currencies").

44.      Moreover, instead of hard and bright line preventative rules, like statutes of limitations and "elements," maritime courts utilize "laches" and "factors." *See Larios v. Victory Carriers, Inc.*, 316 F.2d 63, 66 (2d Cir. 1963) (when the suit has been brought after the expiration of the state limitation period, a court applying maritime law asks why the case should be allowed to proceed; when the suit, although perhaps long delayed, has nevertheless been brought within the state limitation period, the court asks why it should not be").

45.      Thus, even when a maritime cause of action does satisfy rigid time requirements or elements that satisfy similar actions under Korean law (or state law), that does not mean that the

action fails. Ultimately, the test for piercing the corporate veil in admiralty is an equitable one. "Equity is no stranger in admiralty; admiralty courts are, indeed, authorized to grant equitable relief." *Vaughan v. Atkinson*, 369 U.S. 527, 530 (1962) (citing *Swift & Co. v. Compania Caribe*, 339 U.S. 684, 691-92 (1950)). *Greenwich Marine, Inc. v. S.S. Alexandria,* 339 F.2d 901, 905 (2d Cir. 1965) (Marshall, J.), "[t]he inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district court sitting as an admiralty judge…"

46.    Here, as the Rule B Claimants readily stated in their papers in response to the second motion to vacate filed by Shinhan in New Orleans, while the facts of this case do not implicate the traditional alter-ego factors and the lease in question unquestionably took place seven years ago, the claims nevertheless pass muster under the equitable principles of maritime law. *See generally,* Shinhan Vacatur Denial Order.

### iii.  Daebo Does Not Have Admiralty Subject Matter Jurisdiction to Bring the Claims and Cannot Invoke Admiralty Law

47.    Whereas the application of United States maritime law is a pre-requisite for bringing the alter-ego and fraudulent transfer claims against Shinhan, any party that cannot invoke United States maritime law as the basis for the alter-ego and fraudulent transfer claims is not capable of bringing those claims.

48.    In this case, it is clear that the Foreign Representative is not capable of invoking admiralty jurisdiction, and therefore is not capable of bringing the fraudulent transfer and alter ego claims against Shinhan at issue.

49.    The inability of a foreign liquidator to invoke maritime jurisdiction for fraudulent transfer and alter ego claims, even when some or all of the debtor's creditors have claims against the debtor that sound in admiralty, is nothing new.  The Eastern District of Louisiana, the same jurisdiction where the Vessel was attached here, has expressly held that foreign representatives cannot

13

invoke the Court's admiralty jurisdiction in respect of foreign bankruptcy claims. *Farenco Shipping Co., Ltd v. Farenco Shipping Pte Ltd.*, 2012 A.M.C. 2900, 2902 (E.D.La. 2012).

50.    With the exception of certain statutory causes of action and regulatory matters that are not germane here, only maritime contracts, maritime torts, and indemnity causes of action sound in admiralty. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527 (1995) (maritime torts); *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 23-24 (2004) (maritime contracts).

51.    Like veil-piercing causes of action arising from admiralty claims, there is maritime jurisdiction over indemnity causes of action arising from maritime claims.  With this in mind, the British Virgin Islands Liquidator of Farenco Shipping Co., Ltd., filed a Rule B action in the Eastern District of Louisiana arising from foreign-law alter ego and fraudulent transfer claims in the wake of an $80 million fraud on an indemnity theory whereby the foreign debtor breached its maritime contracts with its creditors because the debtor could not pay under those contracts due to the actions of the fraudulent transferees and alter egos.  The theory was rejected by the New Orleans Court on the ground that foreign law-based alter ego and fraudulent transfer claims could not support admiralty subject matter jurisdiction.  *Farenco Shipping Co., Ltd v. Ferenco Shipping Pte Ltd.*, 2012 A.M.C. 2900, 2902 (E.D.La. 2012).

52.    Accordingly, it is clear that even if the Foreign Representative wanted to or had standing under Korean law to assert alter ego and fraudulent transfer claims, the Foreign Representative could not invoke the admiralty law and admiralty jurisdiction necessary for those claims to be successful.

## D.  Daebo Has Forfeited and Waived Any Right Of Exclusivity

53.    Daebo claims that "it is the foreign representative who will consider whether the lease should be avoided or not, and in so doing the foreign Representative will consider merits… and the

cost/benefit analysis of bringing such a claim for the benefit of all rehabilitation creditors." (Br. At 4).

54.     But Daebo has no interest in or capability of bringing the claims, and Daebo has no interest in the Bond securing the Shinhan claims or the collateral that supports it. Meanwhile the costs of Daebo's litigation in this Chapter 15 will exceed the costs of pursuing the veil-piercing and fraudulent transfer action in New Orleans[8].

55.     Given that the relief Daebo seeks is discretionary and subject to an 11 U.S.C. 1522 balancing test (as described below) the actual motivation of Daebo in seeking to destroy the Rule B Claimants' claims and security interest against Shinhan is highly relevant here.

56.     The Rule B Claimants will present evidence that in the time period immediately prior to Daebo's rehabilitation filing through to the present, Daebo has wrongfully conducted its affairs in a manner directly contrary to the interests of most of its creditors, including the Rule B claimants, in a baffling effort to shield Shinhan from liability.

57.     At a minimum, the evidence will reveal that Daebo and Shinhan have entered into an express or implied agreement whereby Daebo has agreed not to pursue any claims against Shinhan. *See, e.g., In re STN Enterprises*, 779 F.2d 901, 904–05 (2d Cir.1985) (recognizing the standing of a creditors' committee to pursue a debtor's cause of action against a third-party where the trustee or debtor in possession unjustifiably fails to bring the action, and the committee first obtains court approval); *In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir.2001).

58.     As noted by Daebo's Korean law expert Mr. Lim, if "Petitioner has not waived the right to assert a revocation or negational act against Shinhan… Unless and until [Daebo] clearly

---

[8] Turning to the now-moot, theory by which the Vessel could be legally re-characterized as Daebo's property, why was Daebo so eager to forego the opportunity to bring the entire value of the vessel -- millions of dollars— into the Daebo estate? The decision is particularly incomprehensible given that United States Courts will not hesitate to invalidate a mortgage that a vessel owner such as Shinhan purports to grant to itself, as Shinhan did here in this case.

signals to the Korean Bankruptcy Court that it is waiving such right [to bring the Shinhan claims], all such avoidance actions against Shinhan remain in the exclusive control of [Daebo]."   (para 10)

59.    Discovery in respect of this issue, which will enable the Korean Court to and/or this Court to determine whether to authorize the creditors to pursue any formerly exclusive claims Daebo may possess or direct Daebo to pursue those claims has already begun.

60.    The Rule B Claimants have, *inter alia,* requested the relevant non-privileged documentation and correspondence as between (separate entities) Shinhan, Daebo and the Vessel's charterer, Dana Shipping, that are within Daebo's control and possession.  Daebo reports it has identified 26 emails that are responsive to these issues.  However, Daebo claims that 24 of them are protected by the "common interest doctrine" pursuant to an alleged oral joint defense agreement between Shinhan and Daebo.  Today, the day this opposition was due, Daebo provided a privilege log identifying another 146 emails allegedly subject to the joint defense privilege.  A copy of the this is attached hereto as Exhibit C.

61.    The Rule B Claimants' position on this claim of common interest privilege is, *inter alia,* that the claims of common interest privilege between Daebo and Shinhan and Daebo's exclusive control of the claims against Shinhan are mutually exclusive and fundamentally incompatible.

62.    Counsel for Daebo and the Rule B Claimants have agreed to rolling discovery in this matter.  They have further agreed that the parties may provide supplemental briefing concerning the topic of exclusivity waiver and forfeiture in view of the potential for resolution of the "common interest" issue by the parties (consensually) or by this Court.   Accordingly, the Rule B Claimants hereby reserve the right to provide the Court with a supplemental filing concerning waiver and forfeiture as per the parties' agreement.

16

**_E. Schimmelpenninck Is Distinguishable and Inapplicable, The Shinhan Claims Are Particularized to Maritime Creditors and Prosecution of them Will Not Interfere with or Diminish the Daebo Estate_**

63.      Daebo's heavy reliance on _In re Schimmelpenninck,_ 183 F.3d 347 (5th Cir. 1999) is misplaced. _Schimmelpenninck_ is inapplicable and distinguishable on multiple grounds.

64.      _Schimmelpenninck,_ involved an alter ego claim filed by an alleged creditor[9] of Harris Adacom Corp., B.V. ("**HBV**"), a debtor in a liquidation proceeding in Holland, against Harris Adacom Network Services ("**HANS**"), which was a <u>wholly-owned subsidiary</u> of HBV.

65.      The "Curators" (Foreign Representatives) of HBV moved for and obtained an injunction pursuant to 11 U.S.C. 304 to stop the alter ego litigation to "preserve for the estate the value of [HBV's] ownership in HANS" because as a matter of necessity, recovery by the creditor against HANS would result in a "diminution of the subsidiary's assets…" _Id._ at 350.

66.      Hence, the first critical distinction between this case and _Schimmelpenninck_ is the source of recovery.  In a case where an alter-ego action is directed against a wholly-owned subsidiary of a debtor, by definition, any recovery by the individual creditor alleging alter ego will diminish the value of the estate as a whole.  That is simply not the case here, where a recovery by the Rule B Claimants against Shinhan will in no way impact the value of the Daebo Estate in Korea.  The circumstance is no different than if Shinhan had guaranteed the liabilities of a particular class of creditors.  Moreover, a recovery by the Rule B Claimants' will actually <u>help</u> the financial position of the estate because Daebo's liability to the Rule B Claimants will be reduced by the amount of the recovery. _See Gulf Offshore Logistics LLC v. Seiran Exploration & Production Co. LLC,_ 2014 WL 2215747 * 9 (E.D.La. May 28, 2014) (the most recent, and apparently, _only_ admiralty decision

---

[9] As additional factual context, both the agreement giving rise to the alleged claim against HBV and the alter ego claims with respect to HANS had been rejected by a Texas jury. _Id._ at 353.

concerning the argument that veil-piercing claim is exclusive property of the estate, where the exclusivity argument was denied because "any liability by [the alter ego defendant] to [plaintiff] would have no effect on the collective recovery of the bankrupt defendants' other creditors").

67.     The next major distinction between *Schimmelpenninck* and this case is that the Fifth Circuit concluded, relying on *S.I. Acquisition*[10], that under Texas law (HANS was a Texas entity), a corporation <u>could</u> pierce its own corporate veil, and therefore, the Curators could bring the action in question. *Id.* At 355-356.

68.     This reasoning and analysis makes *Schimmelpenninck* both distinguishable from and inapplicable to this case. First, the Fifth Circuit clearly presumed that the Curators <u>could</u> bring the Texas law veil-piercing actions if they wanted to do so.  Second, the Fifth Circuit did not address whether the Curators had the power to bring veil piercing actions under the relevant Dutch liquidation law, whereas here under Korean law, the Daebo Custodian is not authorized by the DRBA to bring veil piercing actions.

69.     Third, unlike in *Schimmelpenninck*, wherein the Fifth Circuit presumed that all creditors could bring the veil piercing claims, here, only maritime creditors can bring the alter ego and fraudulent transfer claims.  Because only maritime creditors can assert the fraudulent transfer and alter ego claims at issue, the prosecution of those claims is not a preference and will not "undermine the integrity" of Daebo's Korean bankruptcy.  Daebo's non-maritime creditors are not entitled to bring the fraudulent transfer and maritime alter ego claims, and therefore, are not being deprived of any benefit.  Moreover, the attachment of the Vessel was well publicized, and all of Daebo's maritime creditors had the opportunity to participate in the attachment.  *Cf. Id.* at 356 (describing holding in

---

[10] *See In re. S.I. Acquisition,* 817 F.2d 1142 (5th Cir. 1987) (the ability of a Texas corporation to pierce its own corporate veil under Texas law is a prerequisite to the staying alter ego actions by creditors of the Texas debtor).

S.I Acquisition as being based on the principal where "any creditor could seek remuneration from the debtor's affiliates, and unequal distribution would be promoted…").

70.    Fourth, *Schimmelpenninck* is distinguishable to the extent that (i) its alternative holding concerning Section 304 injunctive relief is predicated on "property involved in a foreign proceeding" language that is simply absent from chapter 15, and (ii) does apply the "balancing test" and requirement of "sufficient protection" that differentiates chapter 15, and particularly, 11 U.S.C. 1522, from former section 304.

71.    Finally, the hodgepodge application of United States law in the context of a Dutch insolvency in *Schimmelpenninck* is one of the precise reasons that Chapter 15 was enacted, and express exclusion of certain components of United States Bankruptcy law were set forth.  Simply stated, if *Schimmelpenninck* were decided today it would turn on Dutch law, a discussion of which is wholly absent from the decision.

### F.  Foreign Law Based Claim Exclusivity is Incompatible With International Maritime Commerce and Contrary to the Fundamental Public Policy of the United States

72.    As noted above, maritime parties, including those represented by counsel for Daebo, have brought veil-piercing attachments and causes of action against alleged alter egos in contemplation of and in response to foreign maritime insolvencies for decades.  Not once has the issue of veil-piercing claim exclusivity been raised, much less decided.

73.    Many such cases go unreported, and it is necessary to identify such cases via a combination of trade press, PACER filings, and inference.  However, with the exception of those rare cases where the foreign shipping company does no business in the United States, it is likely possible to trace a maritime alter-ego action to virtually every shipping insolvency in the last twenty-five

years.[11]   Against this backdrop, it is important to examine the purpose and nature of maritime

attachments and particularly maritime rules concerning corporate identity.

74.   At a very basic level, foreign claim exclusivity – particularly when the foreign

representative is not able to utilize the maritime law of attachment and corporate identity -- is not

compatible with the well-established and long-standing United States public policy designed to

protect both foreign and domestic maritime actors, particularly the hard-working longshoreman-

claimants here:

> Maritime law deals primarily with ships that sail the seven seas.  A ship may
> be here today and gone tomorrow, not to return for an indefinite period,
> perhaps never.  Assets of its owner, including debts for freights, as in this case,
> within the jurisdiction today, may be transferred elsewhere or paid off
> tomorrow.  It is for these reasons that maritime actions *in rem*, libelling a ship
> or other assets of a defendant, Supplemental Rule C, or attachment in actions
> *in personam*, Supplemental Rule B, were developed.  ***These reasons are as
> valid today as they ever were.***  Particularly in the case of debts and credits,
> such as the debt for freight that was attached in this case, they are necessary
> and valid today.  In this electronic age, freights owing to a charterer, such as
> Sanko, can be transferred instanter, by electronic orders, from, say, Honolulu,
> to, say, a numbered bank account in a bank in Switzerland or some other non-
> maritime haven.  The need to attach now and notify later is as great now as it
> ever was, if not greater.  A ship can quietly slip its moorings and depart the
> jurisdiction.  It can easily take with it such tangible property as may be within
> the jurisdiction.  And credits can be quickly transferred elsewhere.[12]

---

[11] Just a few examples of these follow:  *Constellation Energy Commodities Group Inc. v. Transfield Er Cape Ltd. (in Liquidation) and Transfield ER Limited,* 10 CV 4434 (SHS) (S.D.N.Y. July 29, 2011) (Blank Rome, of counsel to plaintiff); *Northern Tankers (Cyprus) Ltd. v. Backstrom et al.* 901 F.Supp72 (D. Ct) (1995) (John Kimball, of Counsel); *Bergesen A/S v. Lindholm,* 760 F.Supp. 976 (D. Conn 1991); *TMT Bulk Co. Ltd. v. Transfield ER Cape Ltd., et. al,* 10 cv 5110 (SDNY) (JSR); global actions, including in the United Statse in relation to the threatened and actual insolvencies of the shipping subsidiaries of the Chinese HNA Group, including Hong Kong Chain Glory (BVI), Grand China Shipping (Hong Kong) and others in (Blank Rome, of counsel to HNA); *In re Quail Travel Group., S.A.,* 13-21971 (RAM) (Bankr. S.D.Fla); numerous alter-ego actions against various entities associated with Industrial Carriers immediately subsequent in the wake of Industrial Carriers' Greek bankruptcy in 2008, *see, e.g., Glory Wealth Shipping Pte Ltd. v. Industrial Carriers Inc., Diamant Co. Ltd., et. al,* 08-cv-8425 (S.D.N.Y.) (RJH); numerous actions against alleged alter egos of the Britannia Bulkers group immediately prior to and in the wake of multiple bankruptcies of entities within the group, *see, e.g., Cornships Navigation Limited v. Britannia Bulk Plc et al,* 08 cv 9605 (S.D.N.Y.); *Itel Containers International Corp. v. Atlanttrafik Express Serv. Ltd. et al.,* 909 F.2d 968 (2d Cir. 1990) (alter ego and agency action in wake of English liquidation); *Clipper Wonsild Tankers v. Biodiesel Ventures LLC,* 851 S.Supp.2d 504 (S.D.N.Y. 2012).

[12] *Polar Shipping Ltd. v. Oriental Shipping Corp.*, 680 F.2d 627, 637 (9th Cir. 1982) (emphasis added).

Particularly in light of the ***unique corporate arrangements that exist in the maritime industry*** and the need for uniformity of maritime laws, the federal maritime law has adopted rules governing corporate liability, irrespective of whether corporate entities expected, *ex ante*, that their corporate relationship would be scrutinized in the context of a maritime action.[13]

In a world of ***shifting assets***, numerous ***thinly-capitalized subsidiaries***, flags of convenience and flows of currencies, ***maritime attachments have particular importance***.[14]

75.     Accordingly, alter ego and fraudulent transfer claim exclusivity is incompatible with the realities of international maritime commerce and the purpose of maritime corporate identity and attachment rules.

76.     Many, if not most, international maritime actors operate through undercapitalized subsidiaries, holding companies, and sector-specific operating companies.  Often, veil-piercing and fraudulent transfer actions and attachments are necessary immediately prior to and after an insolvency to prevent substantial fraud and injustice.  This is not possible when it can take months or years for foreign liquidators to ready and fund such endeavors.

77.     Often the only way to recover is via attachment of ephemeral maritime assets.  Here, however, foreign representatives do not have subject matter jurisdiction to utilize Rule B or maritime corporate identity law, and as such, the purpose of this law is thwarted.  Additionally, if there are multiple insolvent entities within a shipping group, which one of them would have exclusive authority to assert alter ego and fraudulent transfer claims against the other insolvent and solvent members of

---

[13] *In re M/V RICKMERS GENOA Litigation*, 643 F. Supp. 2d 553, 557 (S.D.N.Y. 2009) (multiple citations omitted) (emphasis added).

[14] *Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren Ltd.,* 485 F. Supp. 2d 399, 404 (S.D.N.Y. 2007) (citing *Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.,* 85 F.3d 44 (2d Cir. 1996)) (emphasis added).

the group?  Many countries' laws do not recognize such exclusivity in any context, and is unworkable absent inherently domestic bankruptcy concepts such as substantive consolidation.[15]

78.     While much can be said on this topic, claim exclusivity is an area of fundamental public policy conflict between maritime law and bankruptcy law.

79.     Finally it is highly relevant that even though claim exclusivity is a longstanding doctrine in the United States,  this issue has never been raised in the maritime context.  Indeed, among the many lessons from Blue Whale applicable to this case, one bears particular consideration here.  Until *Blue Whale*, federal courts sitting in admiralty automatically "applied federal common law when federal common law when examining corporate identity."[16]

80.     However, in *Blue Whale* the defendant prevailed in the trial court on the long-rejected argument that the underlying maritime contract's choice of law clause[17] should dictate the veil-piercing analysis. The Second Circuit was forced to consider whether maritime choice of law principles should apply to the veil piercing analysis or federal maritime corporate identity principles should automatically govern.

81.     In a highly practical decision, the Second Circuit held that while a multi-factor choice of law test must be conducted, the presence of the alleged alter-ego's property in the United States would almost always dictate the application of federal maritime veil piercing law in the context of an international maritime dispute.

---

[15] While it is certainly true that the traditional "first in time" rules priority of attachment creditors require special examination in the context of insolvent alter ego attachments, maritime courts are equitable and can accommodate such concerns.

[16] *See, e.g, Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC,* 851 F. Supp. 2d 504 (S.D.N.Y. 2012) (collecting cases) *see also, Vitol S.A. v. Primerose Shipping Co. Ltd.,* 708 F.3d 527 (4th Cir. 2013); *Williamson v. Recovery Ltd. P'ship,* 542 F.3d 43, 51 (2d. Cir. 2008); *Ost-W.-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc.,* 160 F.3d 170, 174 (4th Cir. 1998); *Chan v. Society Expeditions,* 123 F.3d 1297 (9th Cir. 1997); *Talen's Landing, Inc. v. M/V Venture, II,* 656 F.2d 1157 (5th Cir. 1981).

[17] The error arose because the plaintiff failed to provide the district court with the Second Circuit's binding contrary precedent, or similar precedent nationwide, holding that alter ego actions are "collateral."

82.     In this way, the Second Circuit reconciled decades of previous precedent (and the outcome of dozens of district court and circuit-level cases) and preserved the policy goals underlying the purpose of maritime attachments and maritime corporate identity.  Here, the same result would be achieved by a determination that maritime-law based veil-piercing maritime attachments that cannot be pursued by a debtor cannot be exclusive to the debtor.

## POINT II: THERE IS ADMIRALTY SUBJECT-MATTER JURISDICTION TO SUPPORT THE SUBJECT CLAIMS

83.     There is no question that (i) subsequent to the Bond Agreement, there is only *quasi in rem* jurisdiction with respect to Shinhan in New Orleans, and (ii) that United States claims with respect to Daebo are stayed by virtue of the Chapter 15 recognition.

84.     These facts do not divest the New Orleans Court of maritime subject-matter jurisdiction to adjudicate the alter ego claims against Shinhan.  None of the cases cited by Daebo support the contention that maritime subject-matter jurisdiction is unavailable because the underlying maritime claim is stayed or will be adjudicated in another forum.  In fact, quite the opposite is true. Daebo's suggestion to the contrary misstates the holdings of *Swift, Atlanta Shipping and Elliot*, and omits dozens of contrary decisions nationwide, including binding holdings of the Southern District of New York and the Second Circuit.  It is also undeniable that the Rule B Claimants properly invoked admiralty jurisdiction with respect to its direct claims against Daebo initially.

85.     Moreover, the question of whether there is admiralty subject-matter jurisdiction for the Rule B Claimants to prosecute their unstayed claims against Shinhan is one that should be presented to the New Orleans Court.  Daebo has cited no authority which stands for the proposition that this has the power to dismiss a pending federal case matter against a non-debtor either for lack of subject-matter jurisdiction.

86.     Turning to the "merits" of Daebo's argument, the Rule B Claimants do not "lose" their underlying maritime claims just because they are stayed by virtue of Daebo's bankruptcy.  This

23

principal is supported by dozens of cases, including Southern District of New York and Second Circuit precedent. In sum, there is absolutely no requirement that prosecution of the underlying maritime action be prosecuted in in the United States or even via conventional litigation.

87.     Indeed, in the vast majority of veil-piercing Rule B attachment cases nationwide[18], (i) only the property of the alleged alter-ego is attached, and therefore, there is only *quasi in rem* jurisdiction over the alleged alter ego, and (ii) the underlying admiralty claim is to be litigated or arbitrated in a forum other than the attachment jurisdiction (such as London), and the underlying action against the primary obligor in the United States is accordingly stayed or lacks *quasi in rem* jurisdiction.[19]

88.     As such, this case merely represents a routine circumstance where the indisputably maritime claims of the Rule B Claimants against Daebo are stayed and the maritime veil-piercing and fraudulent transfer portion of the litigation will proceed solely against Shinhan, based upon *quasi in rem* jurisdiction over Shinhan. In *Blue Whale,* the most recent Second Circuit case to address maritime veil piercing, the underlying claims were indisputably stayed in deference to an underlying London arbitration agreement.

---

[18] Between 2006 and 2009, such cases occupied more than a third of the Southern District of New York court docket alone.

[19] *Representaciones Y Distribuciones Enya S.A. De C.V.* v. Global Explorer LLC, 2009 U.S. Dist. LEXIS 96598, at *9, 2009 AMC 2877 (S.D.N.Y. 2009); *Williamson v. Recovery Ltd. P'ship,* 542 F.3d 43, 53 (2nd Cir. 2008); Kirno Hill Corp. v. Holt, 618 F.2d 982, 985 (2nd Cir. 1980); *Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC,* 2012 AMC 1476, 851 F. Supp. 2d 504, 509 (S.D.N.Y. 2012); *Golden Horn Shipping Co. v. Volans Shipping Co.,* 2014 U.S. Dist. LEXIS 157277, *7, 2015 AMC 187 (S.D.N.Y. 2014); *British Marine PLC v. Aavanti Shipping & Chartering Ltd.,* 2013 U.S. Dist. LEXIS 164398, *18, 2014 AMC 360, 2013 WL 6092821 (E.D.N.Y. 2013); *MSC Mediterranean Shipping Co. v. Metal Worldwide, Inc.,* 884 F. Supp. 2d 1277, 1280, 2012 U.S. Dist. LEXIS 112561, *3-4 (S.D. Fla. 2012); Pink Goose (Cayman) Ltd. v. Sunway Traders LLC, 2008 U.S. Dist. LEXIS 82081, *5, 2008 WL 4619880 (S.D.N.Y. Oct. 17, 2008); *Wajilam Exps. (Singapore) Pte, Ltd. v. ATL Shipping Ltd.,* 475 F. Supp. 2d 275, 282, 2006 U.S. Dist. LEXIS 77033, *17, 2006 AMC 2744 (S.D.N.Y. 2006); *Ost-West-Handel Bruno Bischoff GmbH v. Project Asia Line,* 160 F.3d 170, 173, 1998 U.S. App. LEXIS 28247, *5-6, 1999 AMC 380 (4th Cir. Va. 1998); *Talen's Landing, Inc. v. M/V Venture, II,* 656 F.2d 1157, 1160, 1981 U.S. App. LEXIS 17386, *8 (5th Cir. La. 1981); *Oldendorff Carriers GMBH &Co., KG v. Grand China Shipping (Hong Kong) Co. Ltd.,* No. C-12-074, 2012 U.S. Dist. LEXIS 188347, 2012 WL 3260233, at *3 (S.D. Tex. July 2, 2012); *Chan v. Society Expeditions,* 123 F.3d 1287, 1294, (9th Cir. Wash. 1997); *Ermis Management Co. Ltd. v. United California Discount Corp.,* 07-cv-01021 (D.N.V. August 3, 2009).

89.     In sum, the Rule B Claimants' maritime subject-matter jurisdiction for their veil piercing and fraudulent transfer claims against Shinhan is not "lost" just because the underlying maritime claims will be submitted to the Korean proceeding (or potentially London arbitration in the event of a quantum/merits dispute).

90.     As to the cases Daebo cites, *Swift* stands for the proposition that admiralty courts have admiralty subject-matter jurisdiction to "enforce their own judgments," including by hearing fraudulent transfer and veil-piercing claims that arise in connection with breach of an underlying maritime contract or tort.  Meanwhile, *Zamora v. Bodden,* 395 Fed. Appx 118 (5th Cir. 2010), a non-maritime case, stands for the unremarkable proposition[20] that, in a non-maritime case, after a federal judgment is entered, a federal court does not have independent subject-matter jurisdiction to adjudicate post-judgment alter ego suits.  *Atlanta Shipping Corp. v. Chem Bank,* 818 F.2d 240, 248 (2d Cir. 1987) only states that when no maritime jurisdiction was initially invoked in respect of a claim (which is not the case here), it may not be invoked later, post-judgment, in the context of a subsequent alter ego or fraudulent transfer claim.

91.     Even though this case is not a post-judgment case, rendering Daebo's argument inapplicable, Daebo's argument that no maritime jurisdiction exists in support of post-judgment maritime alter ego claims is specious and ignores a divergence between the case-law of maritime and non-maritime cases.

92.     Earlier this year, counsel for the Rule B Claimants and Daebo, representing a combined $70 million+ in creditors, successfully pierced the corporate veil at trial, of a maritime debtor against a third-party alter ego in federal court. Flame's claim was based upon an underlying forward freight agreement breach that was not being adjudicated anywhere in the world (and had in

---

[20] It cites *Peacock v. Thomas*, 516 U.S. 349, 357-59 (1996), cited previously in this brief for the proposition that fraudulent transfer and alter ego claims are distinct causes of action

fact been reduced to judgment both in England and in the United States) *Flame S.A. v. Freight Bulk Pte Ltd.,* 39 F. Supp. 3d 769 (E.D.Va. 2014) (currently on appeal).[21]

93.     *Flame* is no outlier either. Numerous admiralty courts have found admiralty jurisdiction proper in the post-judgment context.  *See, e.g., in re Holborn Oil Trading Ltd. v. Interpol Bermuda Ltd.,* 774 F. Supp. 840 (S.D.N.Y. 1991); *Kommanditselskab Supertrans v. O.C.C. Shipping Inc.,* 79 B.R. 535, 539 (S.D.N.Y. 1987); *Ermis Management Co. Ltd. v. United California Discount Corp.,* 07-cv-01021 (D.N.V. August 3, 2009) (post-award alter ego admiralty jurisdiction upheld over challenge); *Fertilizantes Fosfatados Mexcanos S.A. v. Chen,* 1992 WL 204394 (S.D.N.Y. 1992).

**POINT III:  THE ATTACHMENT SHOULD NOT BE VACATED BECAUSE DAEBO LEASED THE VESSEL**

94.     Daebo argues that its leased interest in the Vessel is protected by the United States bankruptcy stay.  However, as a threshold matter, the question is whether <u>*Korean law*</u> would similarly protect Daebo's leased interests in respect of third-party claims against the Vessel's owner – including veil-piercing claims.   The answer is "no" under Korean law, so the inquiry ends because the United States and Korean stays should be co-extensive in a Chapter 15 proceeding.

95.     In the alternative, Daebo's stay-centric argument fundamentally misses the mark. The question is not whether the Vessel would be entitled to protection under the United States law stay. The question is whether (i) on balance, this Court can and should vacate the attachment of an already-seized, leased vessel in connection with unstayed alter-ego and fraudulent transfer claims against a third-party vessel owner, and (ii) if this can and should be done, how the requirement affording "sufficient protection" to the Rule B Claimants pursuant to 11 U.S.C. 1522 will be met.

---

[21] One assumes Daebo is not arguing that the *Flame* Court lacked subject matter jurisdiction to issue its verdict in Flame's favor.

96.     As set forth below, there is substantial precedent which stands for the proposition that extinguishing unstayed claims against non-debtors, which would be the effect of granting Daebo's Motion here, is not permissible.

97.     Even if Chapter 15 authorized Daebo's Motion to be granted, 11 U.S.C. 1522 mandates that this Court conduct a balancing test between the interests of Daebo and the Rule B Claimants.  Under this test, harm to the Rule B Claimants of granting the Motion clearly outweighs the harm Daebo in not granting the Motion.

98.     Under the circumstances, in order to "sufficiently protect" the Rule B Claimants interests in the event the Motion is granted, a bond in the amount of the claims against Shinhan would be required – but, of course, that is the status quo.

### A.  Korean Law Governs the Scope of the Chapter 15 Stay and Does Not Protect Daebo's Leased Interest In The Vessel

99.     One of Chapter 15's architects, the late Judge Lifland recently noted in another Korean Shipping Bankruptcy case, "Section 1504 makes clear that a case commenced under chapter 15 is "ancillary" to a foreign proceeding pending elsewhere, and that the domestic court granting recognition acts "in aid of the [foreign] main proceeding," H.R.Rep. No. 109–31(I), at 108 (2005), reprinted in 2005 U.S.C.C.A.N. 88, 171."  In re Daewoo Logistics Corp., 461 B.R. 175, 178 (holding that the scope of the United States and Korean stays are co-extensive).

100.     In Daewoo, the question presented to the Court was whether the United States chapter 15 stay could be enforced after the relevant Korean stay had ceased.  Judge Lifland concluded that the answer was clearly "no."  Given the ancillary nature of Chapter 15 cases, the foreign debtor was entitled to no more rights here than it was in Korea, where the stay against executions had ended.  Id.

101.     In TIBC, the Court held that the ability to vacate the attachments was wholly dependent on Bahraini law where the attachments in question were effectuated within 90-days of the Bahraini insolvency. If United States law had applied, the attachments would have been voided as a

27

preference. [22]   The same is true with respect to Danish law and many of the pre-Danish insolvency attachments at issue in *Atlas* and *Britannia*.

102.    In this case, the scope of the chapter 15 stay is limited to the stay in Korea.  At the same time, Korean law is "very clear" in that it does not prevent seizure of vessels leased by debtors in respect of third party claims, including alter ego claims, against the vessel's owners.  *See generally* Rim Declaration ¶¶ 23-26.

103.    "Maritime creditors may seize vessels under Korean law, including vessels of separate companies if a veil-piercing claim can be made.  Under Korean law if a maritime creditor of Shinhan has a claim against Shinhan, that creditor would not be prohibited by the Korean law against seizing a vessel owned by Shinhan, even if the vessel was under charter to or leased by Daebo.   Under the Korean law,  the vessel arrested by the Rule B Claimants can be regarded as a property of Shinhan, not that of Daebo, so the commencement of the rehabilitation proceedings of Daebo shall not affect the status of the guarantor and its property as a joint tortfeasor or any other co-obligor, or for the reasons set forth above, as an alter ego."  *See* Rim Declaration ¶ 22.

104.    "For example, if a bank had a mortgage on the vessel and Daebo leased the vessel from Shinhan, the mortgage holder could enforce its mortgage notwithstanding Daebo's bankruptcy, because the vessel is not the property of the  bankruptcy estate". Rim Declaration ¶ 23.

---

[22] While it is true that the TIBC court stated that it would hesitate to vacate the attachments if they occurred after the Bahrain insolvency was commenced, that was because the attached property at issue was that of the debtor, and Bahrain law clearly imposed a stay on such seizures at the outset of the administration proceedings.  Accordingly, the Court was required to look to Bahrain law to determine whether pre-Administration attachments could be dissolved.  Moreover, in each and every case in which a court has vacated or considered vacating a maritime or non-maritime attachment in deference to a foreign insolvency proceeding, the property under attachment was the <u>foreign debtor's</u> property – that is not the case here, where the attached property belongs to a non-debtor.  *See In re Culmer,* 25 B.R. 621, 627-28 (Bankr. S.D.N.Y. 1982); *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713-14 (2d. Cir. 1987); *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB,* 773 F.2d, 452, 459 (2d Cir. 1985); in *In re Atlas Shipping A/S,* 404 B.R. 726, 735-737 (Bankr. S.D.N.Y. 2009); *In re Milovanovic,* 357 B.R. 250 (Bankr. S.D.N.Y. 2006); *In re Korea Line Corp.,* 11-10789 (Bankr. S.D.N.Y.)*; In re Transfield ER Cape Ltd.,* 10-16270 (Bankr. S.D.N.Y.).

105.     "Similarly, as in the facts of this case were different (i.e. giving rise to a claim for piercing the corporate veil under Korean law), the fact that Daebo leased the Vessel and that Daebo is in bankruptcy proceedings in Korea would not prevent the claimants from seizing the Vessel in Korea in respect of a veil piercing claim against Shinhan."  Rim Declaration ¶ 25.

106.     In sum, once it has been determined that Daebo does not have exclusive right to assert the claims, the question becomes whether Korean law prevents the Rule B claimants from seizing the Vessel in connection with their claims against Shinhan because Daebo leased the Vessel and is in Korean rehabilitation proceedings.   Because Korean law does not provide such protection, Daebo's leased interest argument fails.

### B.  The Rule B Claimants' Secured Claims Against Shinhan Are Constitutionally Protected Property Rights and Should Not Be Vacated

107.     It is well-established that pre-judgment attachments constitute secured interests and are entitled to protection as such under the bankruptcy code.  *See, TIBC* 439 B.R. at 621; *see also In re Giordano,* 188 B.R. 84, 88 (D.R.I. 1995); *In re Carlos Rivera, Inc.,* 130 B.R. 377, 383 (D.P.R. 1991).

108.     Moreover, maritime prejudgment attachments are not materially different from their state-law analogues.  Both are designed for two purposes: "obtaining jurisdiction over and securing judgments against nondomiciliaries residing without the state" *ITC Entertainment v. Nelson Film Partners,* 714 F.2d 217, 220 (2d Cir. 1983) (describing the purpose of New York state law attachments); *Cargill, Inc. v. Sabine Trading & Shipping Co.,* 756 F.2d 224, 227 (2d Cir. 1985) (N.Y. C.P.L.R. 6201(1)) "serves the independent purpose of providing security for a potential judgment against a nonresident"); *Elton Leather Corp. v. First Gen. Res. Co.,* 529 N.Y.S.2d 769, 770 (1st Dep't 1988) (same).

109.     The purposes of maritime attachments are precisely the same – to obtain *quasi in rem jurisdiction* and security:

> The maritime attachment serves two purposes. It "provides a mean to assure satisfaction if a suit is successful" and it may provide a means "to insure a defendant's appearance in an action." *Aurora Mar. Co. v. Abdullah Mohamed Fahem Co.,* 85 F.3d 44, 48 (2d Cir. 1996) (citations omitted). A plaintiff may obtain a maritime attachment even though the party's primary objective is to obtain security to satisfy a potential judgment, and not to obtain personal jurisdiction over the defendant. See, *Staronet Shipping Ltd. v. N. Star Navigation Inc.,* 659 F.Supp. 189, 191 (S.D.N.Y. 1987). Plaintiff's motive in seeking the attachment is irrelevant to the determination of whether an attachment should be issued. *Cent. Hudson Gas Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 371 (2d Cir. 1995).

*Parkraod Corp. v. China Worldwide Shipping Co. Ltd.,* 2005 WL 135034 (S.D.N.Y. 2005).

110.   As the Second Circuit has cautioned, the rights of secured creditors may well be entitled to constitutional protection. *See generally, In re Treco,* 240 F.3d 148 (2d Cir. 2001) (denying motion to turn over of the foreign debtor's property under former section 304 where there was a significant possibility that doing so would impair the creditors' security interest with respect to that property); *see also TIBC*, 439 B.R. at 638 ("the Administrator essentially asks this Court to destroy DB's security interest even though it might be found valid…" and denying the turnover motion pending a request for a validity adjudication in Bahrain, which ultimately could not be accomplished).

111.   Accordingly, the Rule B Claimants are secured creditors with respect to their claims against Shinhan.  Daebo's motion to vacate, which will necessarily destroy both this security interest and Rule B Claimants' underlying claim, must be viewed through this lens of protection.

112.   It is also important that the majority of the Rule B Claimants are United States creditors (for example, Richardson and AMS) or creditors are owned by United States companies and that have stepped into the shoes of United States creditors by paying off United States maritime liens incurred by Daebo (SPV).

113.   To the extent that this motion concerns the original attachment of the Vessel, it appears that Daebo is asking this Court for a turnover of the Vessel based on its leased interest, in which case the Vessel is the Rule B Claimants' collateral.  Currently, of course, the Bond represents the Rule B Claimants' collateral.  In any event, Daebo proposes to do far more than merely "use" the collateral -

it proposes to *vacate* the attachment and eliminate both the collateral and the Rule B Claimants'

claims against Shinhan completely.

114.    The Fifth Circuit recently upheld a ruling denying a foreign debtor's motion to confirm

a plan that included a non-debtor discharge similar to the destruction of the Rule B Claimants' claims

against Shinhan that would result if Daebo's Motion were granted.  *In re Vitro S.A.B. de CV*, 701 F.3d

1031, 1059 (5th Cir. 2012).[23]

115.    It is axiomatic that bankruptcy stays apply only to the debtor and the debtor's assets

absent extraordinary circumstances.  *See, e.g., Ebin v. Kangadis Family Mgmt,* No. 14-cv-1324, 2014

WL 4638700, at *2 (S.D.N.Y. Sept. 28, 2014) (stay entered against bankrupt debtor-defendant does

not stay or preclude action against non-debtor alter-egos under veil-piercing theory) (citing *Gucci*

*America Inc. v. Duty Free Apparel, Ltd.,* 328 F. Supp. 2d 439, 441 (S.D.N.Y. 2004) and *Teachers*

*Ins. & Annuity Ass'n v. Butler,* 803 F.2d 61, 65 (2d Cir. 1986)).[24]

116.    With respect to bankruptcy stays, it is well-established that stays pursuant to Section

362 are limited to debtors and do not encompass non-bankrupt co-defendants.  *Id*. citing *Gucci*

*America, Inc. v. Duty Free Apparel, Ltd.*, 328 F. Supp. 2d 439, 441 (S.D.N.Y. 2004) (courts in the

Second Circuit "regularly refused to extend a debtor corporation's § 362(a) stay to its non-debtor

officers and principals.")[25].

---

[23] As noted above, while *Vitro* does note the holding in *Schimmelpeck*, at this point in the analysis, it will have already been found that Rule B Claimants' alter ego and fraudulent transfer claims are not exclusive property of Daebo, rendering *Vitro*'s holding directly on point.

[24] In *Ebin*, Judge Rakoff believed that a critical determination in the case was whether "anything in bankruptcy law or in New York State law preclude[d] [a] case from proceeding on veil piercing and alter ego theories of liability."  2014 WL 4638700, at *2.

[25] Applying *Teachers Ins. & Annuity Ass'n*, courts in this circuit regularly refuse to extend a debtor corporation's § 362 stay to its non-debtor officers and principals.  *See, e.g., Variable–Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc., et al.*, 945 F.Supp. 603 (S.D.N.Y. 1996) (non-debtor principal who, under state law, was debtor corporation's "alter ego"); *E.I. Du Pont De Nemours & Co. v. Fine Arts Reprod. Co., et al.*, No. 93 Civ. 2462(KMW), 1995 WL 312505, at *5 (S.D.N.Y. May 22, 1995) (non-debtor who was debtor corporation's president and guarantor); *Levesque v. Kelly Communication, Inc., et al.*, 164 B.R. 29, 30 (S.D.N.Y. 1994) (non-debtor whose two debtor corporations bore his name); *CAE Indus. Ltd., et al. v. Aerospace Holdings Co., et al.*, 116 B.R. 31, 32 (S.D.N.Y. 1990) (non-debtor former

117.    This is simply not one of those unusual situations where the stay with respect to *Daebo* means that the alter-ego or fraudulent transfer action against Shinhan must be similarly stayed.  A judgment against Shinhan will not diminish the Daebo estate in any way and Daebo has no obligation to indemnify Shinhan.  Moreover, vacatur of the Rule B Claimants' attachments is not "essential" to Daebo's reorganization, the Rule B Claimants do not consent to the remedy, Daebo has no plan to compensate the Rule B Claimants, and there is no indication that the Rule B Claimants will recover in full. *See, e.g., Vitro,* at 1062 (discussing factors).

118.    Accordingly, Daebo's Motion should be denied because its effect will be to extinguish the claims and security interests of the Rule B Claimants in non-debtor Shinhan, the Vessel and Bond.  Indeed, while not necessary to the determination, *see Vitro,* granting Daebo's motion also violates fundamental public policy of the United States.  *See* 11 U.S.C. 1506.

## *C.  Application of the 1522 Balancing Test Requires Either Denial of the Motion or Directing Daebo to Post a Bond for the Value of the Shinhan Claims (The Status Quo)*

119.    11 U.S.C. 1522 provides that the court may grant relief only if "…the interests of creditors and other interested entities, including the debtor, are sufficiently protected."  As noted by the Fourth Circuit in *In re Qimonda,* 737 F.3d 14 (4th Cir. 2013), this requires the Court to engage in a balancing test to examine the benefit to Daebo and harm to the Rule B Claimants if the Motion is granted versus the harm to Daebo if the Motion is denied.  *See also TIBC,* 439 B.R. at 626 ("The idea underlying 1522 is that there should be a balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief").

120.    The harm to the Rule B Claimants if the Motion is granted has been discussed at length and in detail – their claims and security interest with respect to Shinhan will be extinguished.  The

---

Chairman, CEO, and Director of debtor corporation); *In re Crazy Eddie Sec. Litig.*, 104 B.R. 582, 584 (E.D.N.Y. 1989) (all non-debtor co-defendants affiliated with debtor corporation); *Ripley v. Mulroy, et al.*, 80 B.R. 17, 18 (E.D.N.Y. 1987) (non-debtor "president, sole common-stock shareholder, and controlling person" of debtor corporation).

question thus becomes whether the benefit to Daebo of the Motion being granted substantially outweighs the harm to the Rule B Claimants.

121.    While, as noted below, discovery in respect of Shinhan-Daebo relationship and Daebo's interest (or lack thereof) in this Motion and the Bond is ongoing, there is no obvious benefit to Daebo whatsoever.  Shinhan posted the collateral for the Bond.  It is also clear that Daebo has absolutely no interest and no capability to bring these claims against Shinhan in Korea or the United States.

122.    The desire of Daebo to assert exclusivity over claims being brought by creditors for the sake of sheer principal certainly does not outweigh the harm to the Rule B Claimants and Daebo's to insulate Shinhan from liability is not a legitimate benefit to Daebo.

123.    Daebo may argue that as a theoretical matter, the Bond replaces the Vessel.  But this is mere theory - not the reality of benefits and harms a 1522 balancing test is supposed to address.   In any event, the value of Daebo's leased interest in a money-losing vessel is highly questionable – if existent.  Daebo has not lost any equity that it might have in the Vessel, and the value of the Bond posted was, not entirely coincidentally, in the range of Shinhan's "security interest/equity."[26]

---

[26] The Rule B Claimants' would vigorously object to any attempt by Daebo to point to resolution the alleged "emergency" situation concerning the soy beans aboard the Vessel as a "benefit to Daebo."  Vessels are routinely seized worldwide, and security is posted routinely, often in a matter of days (if not hours) when there is even a hint of a legitimate claim or cargo damage.  Posting a bond has no impact on any party's ability to make a motion to vacate in either this Court or the New Orleans Court.  There is little or no cost associated with posting a bond (a 1% premium) and this cost is taxable to the losing party as a litigation cost.

Here, the Rule B Claimants' submit that Daebo, Shinhan and their relevant insurers intentionally eschewed the norms of maritime practice by failing to post a bond in the hope that a perceived emergency might help its chances in New Orleans or this Court (in the provisional relief context).  Indeed, even after Daebo demanded and received concessions via the Bond Agreement, it still took weeks for Shinhan to post a bond.  While Shinhan and Daebo have generally acted in concert, once the Bond Agreement was signed, Daebo took an absolutely meritorious and commendable step by agreeing to a modified scheduling order in this case before Shinhan posted a bond, for which Daebo and its counsel should be given significant and substantial credit.

If the matter becomes relevant, however, Rule B Claimants would examine the Foreign Representative as to whether any persons in the Daebo or Shinhan organizations intentionally delayed posting a bond because they believed that a perceived soy-bean emergency would aid vacatur motions in New Orleans and/or this Court.  Obviously, solving a fabricated emergency is not a valid "benefit" in the 1522 analysis.

124.    Finally, any alleged benefit to Daebo is Daebo's burden to prove, which burden it has utterly failed to meet.  The only statement in Daebo's 40-page brief that even bears on the issue is the completely speculative suggestion that a fire-sale of the Vessel may be insufficient to cover Shinhan's security interest (which itself ignores Shinhan's reduced equity by virtue of the "finance lease").

125.    Of course, 11 U.S.C. 1522 _does_ permit a Foreign Representative to obtain relief _if_ the interests of other "interested entities" such as the Rule B Claimants are "sufficiently protected."  This is analogous to the concept of "adequate protection" _See TIBC_ at 627.  In this context, bankrupt shipping companies are often directed to post security or collateral to cover risks associated with debtors' use of the vessels that comprise banks' secured mortgage interests.  Such risks include loss, devaluation, and the potential that such vessels were incur higher-ranking liens (among others).  _See, e.g._, _In re Delco Oil_, 599 F.3d 1255, 1258 (11th Cir.2010); _In re Blackwood Assocs._, L.P., 153 F.3d 61, 67 (2d Cir.1998); _In re Vienna Park Props._, 976 F.2d 106, 114 (2d Cir.1992); see 11 U.S.C. § 363(e).

126.    In the case of _In re Korea Line Corp.,_ 11-10789,  it is worth noting that a number of mortgage holders (financial institutions) appeared in the proceedings to request that the United States stay be lifted so as to allow them to enforce their mortgages against vessels voyage, time, and bareboat chartered by Korea Line.

127.    It is also worth noting that despite objections and motion practice predicated on the question of whether time and voyage charters were protected interests under United States law (irrelevant here)[27], ultimately, each and every Vessel was foreclosed upon and sold.  Why?  Because even if Korea Line prevailed in upholding the stay, each and every bank reasonably requested

---

In any event, there was no emergency, and certainly not one that was of Daebo and Shinhan's own making. _See_ Shinhan Denial Order, n.1.  Daebo allowed its vessel to be loaded even though it was under attachment and the New Orleans Court signed a transshipment order that resolved the issue.  _See_ Shinhan Denial Order, n.1.

[27] Apparently, none of the banks called a Korean lawyer to ask whether the Korean law stay protects leased or chartered interests in vessels.

34

"sufficient protection" of its collateral.  As such, Korea Line would have had to furnish the banks with "sufficient protection" appropriate under the circumstances.

128.    Here, Daebo should perform its own cost-benefit analysis.  If Daebo believes that the return of Shinhan's bond or its hypothetical "continued use of its leased Vessel" is sufficiently important to warrant a turnover, then it should be prepared to provide sufficient protection to the interests of the Rule B Claimants.  Because vacating the attachments not only presents a *potential* risk of harm as in a traditional vessel-collateral use situation but also *certainly* destroys both the Rule B Claimants' claims and their security, the appropriate remedy is that Daebo be ordered to post a bond to replace the Rule B Claimants' destroyed security interest.  *See* 11 U.S.C. 1522(b).  This of course, is the status quo (except that it is Shinhan's not Daebo's collateral currently at risk).

## POINT IV: DAEBO'S ESTOPPEL ARGUMENT IS MERITLESS

129.    Daebo's estoppel argument has already been made to and rejected by rejected by the New Orleans Court.  *See* Shinhan Denial Order at 8, n. 9  ("The court declines to address Shinhan's estoppel argument as to three of the plaintiffs.  Even if the Court determined that clearly inconsistent positions had been taken (which the court does not so determine), such a finding would not advance the ultimate issue presented here") (emphasis supplied)[28].  The fact that Shinhan even made this argument in New Orleans <u>admits</u> of the fact that the Rule B Claimants presented New Orleans Court with the same Shinhan-centric liability theories made to this Court.

130.    Moreover, the basic premise of Daebo's argument, the Rule B Claimants' are trying to have it "both ways" by making different arguments because that was the "only" way they could win in both courts is simply untrue.

---

[28] If the court had simply declined to address the issue whatsoever, the court's parenthetical that it does not find the positions inconsistent would not have been necessary.

131.    The New Orleans Court was <u>expressly</u> presented with the same theory presented here, and <u>expressly</u> upheld the attachment on that theory in response to Shinhan's motion to vacate. Daebo also ignores that the same set of facts can easily give rise to multiple causes of action against multiple parties, some of which can be incompatible. There is nothing wrong or unusual about this.[29]

132.    While it is certainly true that the Rule B claimants, under considerable time pressures in an emergency situation, initially articulated a Daebo-centric theory of liability with respect to the vessel that more squarely implicated Daebo, the alter ego liability of Shinhan was originally part of <u>all pleadings</u>.  *See Desjardins v. Van Buren Community Hosp.,* 37 F.3d 21, 23, 1994 U.S. App. LEXIS 28309, *5, 3 Am. Disabilities Cas. (BNA) 1377 (1st Cir. Me. 1994) ("The phrases 'self-contradiction' and 'unfair advantage…' are not self-executing. There are many situations, especially at the outset of litigation, where a party is free to assert a position from which it later withdraws--or even to assert, in the alternative, two inconsistent positions of its potential claims or defenses").

133.    After Shinhan made the second motion to vacate, the New Orleans Court asked for supplemental briefing with a footnote specifically questioning the nature of the Rule B Claimants' alter ego and fraudulent transfer cause of action and whether the Rule B Claimants maintained their claims against Shinhan.  *See* Supplemental Briefing Order, n1.

134.    In response to the Supplemental Briefing Order, the Rule B Claimants, in their Supplemental Brief clarifying and specifying the precise nature of their alter ego and fraudulent

---

[29] Rule 8(e)(2) of the Federal Rules of Civil Procedure permits plaintiffs to "plead two or more statements of a claim, even within the same count, regardless of consistency." *Henry v. Daytop Village, Inc.,* 42 F.3d 89, 95 (2d Cir. 1994). *Adler v. Pataki,* 185 F.3d 35, 41, 1999 U.S. App. LEXIS 16687, *11 (2d Cir. N.Y. 1999).

Per Rule 8(d), "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3); see Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically . . . ."); *St. John's Univ., N.Y. v. Bolton,* 757 F. Supp. 2d 144, 184 (E.D.N.Y. 2010) (plaintiffs may "allege claims in the alternative, even if the legal theories underlying those claims are technically inconsistent or contradictory"); see also *Adler v. Pataki,* 185 F.3d 35, 41 (2d Cir. 1999) (The Federal Rules offer "sufficient latitude to construe separate allegations in a complaint as alternative theories, at least when drawing all inferences in favor of the nonmoving party . . . ."). *Charlot v. Ecolab, Inc.,* 2014 U.S. Dist. LEXIS 183119, *24 (E.D.N.Y. Dec. 12, 2014)

transfer claims against Shinhan, presented the same Shinhan-centric arguments to the New Orleans Court concerning piercing the corporate veil and fraudulent transfer in opposition to Shinhan's motion to vacate that the Rule B Claimants' present here.[30]  On the basis of this articulation, the New Orleans Court expressly upheld the Shinhan-directed veil-piercing and fraudulent transfer claims that are the subject of this motion.

135.    These facts simply cannot form the basis for collateral estoppel.  The undeniable and dispositive fact here is that the attachment of the Daebo Trader was upheld by the New Orleans Court *after* the Rule B Claimants amended their complaints and *after* The Rule B Claimants presented their Shinhan-centric alter-ego and fraudulent transfer theories of liability to the New Orleans Court. *See UNUM Corp. v. United States*, 886 F. Supp. 150, 158, 1995 U.S. Dist. LEXIS 6371, *24, (D. Me. 1995) ("in the absence of "deliberate dishonesty [or] any serious prejudice to judicial proceedings or the position of the opposing party," the doctrine should not be applied").

136.    Ironically, Daebo's argument, though it would still not pass muster, would have at least have some merit if "Shinhan," believed by the Rule B Claimants to be in concert and collusion with Daebo[31], had not engaged in conduct amounting to financial unseaworthiness and had simply posted a bond at the outset of this case or once the Bond Agreement was so-ordered by this Court

---

[30] *See*  Rule B Claimants' Supplemental Brief at 10-14 (setting forth an equitable interpretation of the *Lykes* case under United States maritime veil piercing and fraudulent transfer principles, and noting that:

- "Plaintiff's position is supported by substantial legal authority recognizing that, whether termed "alter ego liability" or "fraudulent transfer," admiralty courts may pierce the corporate veil that exists between a vessel's "registered owner/financier" and her "true owner/lessor" under the circumstances present here to hold the former (Shinhan) and its purported asset (the Vessel) liable for claims against the latter (Daebo);

- "Plaintiffs are alleging both alter ego as a result of fraudulent transfer and fraudulent transfer as a standalone theory" and that "[h]ere Plaintiffs cannot be seen as abandoning their theory that Shinhan is liable as the alter ego of Daebo in the sense that the corporate veil between them should be pierced) (emphasis supplied)).

[31] Based both the privilege log received today and a "power of attorney" already produced by Daebo in respect of prior Daebo Trader attachments unrelated to this case, it is expected that discovery will reveal that Daebo, Daebo's P & I Club, and/or counsel acting on Daebo's behalf counseled, drafted and financed both Dane Shipping's and Shinhan's motions to vacate in New Orleans.  As noted above, discovery concerning the Shinhan-Daebo relationship is ongoing.

instead of making a second motion to vacate. In that circumstance it would not be <u>unequivocally</u> known whether the Vessel attachment would be upheld solely based upon the veil-piercing and fraudulent transfer theories of liability against Shinhan presented in response to the Shinhan's second motion to vacate and the New Orleans Court's supplemental briefing order. But that is not the case.

137.    Instead, (i) the Rule B Claimants presented the precise theory of veil piercing and fraudulent transfer theories presented to this Court to the New Orleans Court, and (ii) the New Orleans Court expressly upheld the Vessel attachment based upon the precise alter-ego and fraudulent transfer claims now exclusively at issue in <u>both</u> New Orleans and New York.

138.    The Rule B Claimants have been fully open and candid with both courts concerning the nature of their allegations. Upon further reflection, the Rule B Claimants amended their complaints and candidly presented Shinhan-centric alter ego and fraudulent transfer theories to both this Court and the New Orleans Court, which specifically upheld the attachment on these theories. The exclusion of Daebo formed the very basis of the Bond Agreement entered by this Court, pursuant to which Bond Agreement, the posted bond secures and provides *quasi in rem* jurisdiction for the claims against Shinhan. That does not give rise to judicial estoppel.

## <u>POINT V: DAEBO'S "FUTILITY" ARGUMENT DEFIES FACT AND LOGIC</u>

139.    Lastly, Daebo's futility argument defies logic, common sense and plain facts. Daebo claims that this case is akin to the *Sanko* case, where a vessel <u>directly owned</u> by *Sanko* was attached in by maritime creditors with direct claims against *Sanko* (which was in Bankruptcy). Of course the attachment was futile in that case– there were no claims against any party other than the claims against the bankrupt debtor and the bankrupt debtor's property. Here, there is no question that direct claims against Daebo will be adjudicated in Korea. At issue here, however, are claims against <u>Shinhan</u> and <u>Shinhan's Vessel</u>. If Daebo was correct, every guarantee, unstayed fraudulent transfer or unstayed

veil-piercing action could survive the bankruptcy of the primary obligor, which survival is the <u>very purpose</u> of such actions.

140.    The next prong of Daebo's futility argument is that the Rule B Claimants' claims are meritless.  But the New Orleans Court found the opposite.  Not only were the claims upheld in the sense that the facts as alleged, if true, give rise to <u>both</u> maritime alter ego and fraudulent transfer claims, but because challenged in the context of a Rule B attachment vacatur motion, the Court also explicitly and necessarily found that the facts alleged and attachment are supported by "probable cause." Of course "probable" and "futile" are antonyms, and it is Daebo's futility argument that is futile.  Indeed, the fact that Daebo included this meritless argument highlights the fundamental failings of its principal contentions.

**C<small>ONCLUSION</small>**

141.    For the foregoing reasons, the Vacatur Relief sought by Petitioner should be denied.

Dated: New York, New York

July  17, 2015                                             Respectfully Submitted,

                                                   HOLLAND & KNIGHT LLP
                                                   *Attorneys for Plaintiff*


                                        By:___***WARREN E. GLUCK***_____
                                                   Warren E. Gluck
                                                   31 West 52nd Street
                                                   New York, NY 10019
                                                   Tel:  212-513-3200
                                                   Fax:   212-385-9010
                                                   warren.gluck@hklaw.com