UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | : | |
|---|---|---|
| In re: | : | Chapter 15 |
| | : | |
| DAEBO INTERNATIONAL SHIPPING CO., LTD., | : | Case No. 15-10616 (MEW) |
| | : | |
| Debtor in a Foreign Proceeding | : | |

---

**MEMORANDUM DECISION GRANTING
MOTION TO VACATE RULE B ATTACHMENTS**

APPEARANCES:

BLANK ROME LLP
*Counsel to Daebo International Shipping Co., Ltd.*
Philadelphia, Pennsylvania
    By:    Michael B. Schaedle, Esq.

Wilmington, Delaware
    By:    Thomas H. Belknap, Jr., Esq.

New York, New York
        Alan M. Root, Esq.

HOLLAND & KNIGHT
*Counsel to Richardson Stevedoring Logistics Services
  & SPV1 LLC*
New York, New York
    By:    Warren E. Gluck, Esq.
           F. Robert Denig, Esq.
           Marianne Myklebust, Esq.

FRILOT, LLC
*Counsel to American Marine Services*
New Orleans, Louisiana
    By:    Brandon K. Thibodeaux, Esq.

**MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE**

The foreign representative of Daebo International Shipping Co., LTD has asked the Court to vacate maritime attachments made against the M/V DAEBO TRADER in Louisiana. The parties agree that a Korean court issued an order, before the attachments were made, that stayed creditors from attaching assets of Daebo. The creditors argue that the attachments and the creditors' claims are really being asserted against the registered owner of the TRADER, Shinhan Capital Co., and are not barred by the Korean court's stay order. Alternatively, they argue that the Court should permit the attachments to protect the interests of the US creditors. The Court concludes that the attachments should be vacated.

**FACTS**

**A.    The Korean Proceedings**

Daebo is organized under the laws of the Republic of Korea. It is in the business of shipping dry bulk cargoes (iron ore, coal, grains, etc.) and its vessels often dock in U.S. ports.

In February 2015, Daebo applied for rehabilitation under the Republic of Korea's Debtor Rehabilitation and Bankruptcy Act (the "**DRBA**"). Article 45(1) of the DRBA permits a court to issue a stay order that prevents any creditor from enforcing a judgment, attaching assets or taking other actions to collect a claim against the entity being rehabilitated.[1] The Korean court may issue a stay order before it rules on the application to commence rehabilitation proceedings. The Korean court issued such an order on February 13; it states:

> Any and all enforcement, provisional attachment, provisional disposition or auction for execution of mortgage by any rehabilitation creditors or secured rehabilitation creditors based on their rehabilitation claims or rehabilitation

---

[1]    The full text of the DRBA was submitted in evidence as Ex. G to the Declaration of Jang Ho Lim [PX-2]. There are five declarations by Mr. Lim that are cited herein as follows: "Lim Decl. 1," dated March 12, 2015 [PX-2]; "Lim Decl. 2," dated April 1, 2015 [PX-3]; "Lim Decl. 3," dated May 20, 2015 [PX-8]; "Lim Decl. 4,"dated August 2015 [PX-9]; and "Lim Decl. 5," dated November 2015 [ECF 74].

2

>
> security right is prohibited until the court renders its order with respect to the application for commencement of rehabilitation proceedings.

[PX-4] The stay order became effective when it was served on Daebo, which happened the same day the order was issued. *See* DRBA, art. 46(2); Lim Decl. 2 at ¶ 8 [PX-3].

In March 2015, the Korean Court entered an order that formally commenced Daebo's rehabilitation proceeding. [PX-5] It appointed Chang-Jung Kim, the chief executive officer of Daebo, to take custody of Daebo's assets and to conduct all of Daebo's business. Lim Decl. 1 [PX-2], at Ex. F. Mr. Kim's authority includes the ability to take actions required under foreign law and procedures. DRBA, art. 640. Mr. Kim promptly filed a chapter 15 petition in this Court in March 2015, and the Court later entered an Order granting Recognition of the Korean proceeding and recognizing Mr. Kim's status as the foreign representative of Daebo. [PX-20].

**B.    The Daebo-Shinhan Lease**

In November 2007 Daebo purported to sell the TRADER to Shinhan and to lease it back from Shinhan. The Lease provides that Daebo must indemnify Shinhan against any maritime attachments. [PX-22, art. 30.]

Although the 2007 transaction took the form of a sale and leaseback, the Lease (including the "Special Clauses" attached thereto) has many features that more closely resemble a secured debt. The rent payments are based on the amounts needed to repay the money that was advanced by Shinhan, plus an agreed interest rate. (Lease, art. 11; "Special Clauses," arts. 3 and 5.) The lease has a ten-year term, at which point Daebo has the right to take title to the vessel at no further cost. (Special Clauses, art. 9). The risk of loss rests with Daebo during the lease term, not Shinhan. (Lease, arts. 16, 19) In the event of a default Daebo must pay a specified loss amount that includes the "outstanding principal" and "interest." (*Id.,* arts. 20, 22) Shinhan filed

3

a mortgage lien on the vessel to secure its rights to payments. *See* Transcript of hearing on October 27, 2015, at 31:4-9; 46:19-21. [Dkt. 68]

Daebo's March 2015 application to commence rehabilitation proceedings in Korea listed the TRADER as a "tangible asset" of Daebo itself. *See* Lim Decl. 1 [PX 2], Ex. B, at 24, 42. The application also listed Shinhan as a secured creditor of Daebo, with the TRADER as collateral. *Id*. at 42. The Foreign Representative testified that Shinhan and Daebo have reached agreement, with the approval of the Korean court, that the TRADER will be sold; the proceeds will first be used to repay the remaining "debt" owed to Shinhan, and the balance (if there is any) will be paid to Daebo for distribution to Daebo's other creditors. *See* Hearing Transcript [ECF 68] at 53-56.

**C.    The Creditors' Claims and the Attachments**

The TRADER was in New Orleans when the Korean court issued its stay order. Over the next several weeks, five creditors of Daebo filed maritime attachment proceedings in the United States District Court for the Eastern District of Louisiana. These proceedings were filed pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. The creditors, and the dates of their attachments, are:

| Creditor | Date |
|---|---|
| Richardson Stevedoring & Logistics Services, Inc. | 2/14/15 |
| SPV 1, LLC | 2/16/15 |
| American Marine Services, Inc. | 2/18/15 |
| Jaldhi Overseas PTE, Ltd. | 3/9/15 |
| Lark Shipping SA | 3/13/15 |

4

Jaldhi later dismissed its Rule B proceeding. The four remaining attachment creditors are referred to as the "Rule B Plaintiffs" in the papers submitted to this Court, and that term will be adopted here to avoid confusion.

The Rule B Plaintiffs do not allege that they provided services to the TRADER. Richardson and AMS contend that Daebo failed to pay for stevedoring or survey services that were provided for other vessels operated by Daebo. [PX-11, PX-13]. Lark and SPV allege that Daebo failed to perform under maritime charter contracts for other vessels that Lark and SPV operated. [PX-15 and PX-12]. The Rule B attachments were asserted in order to provide *quasi in rem* jurisdiction for the litigation of the Rule B Plaintiffs' unsecured claims. *See* Joint Pre-Hearing Order [ECF No. 67] at 3, ¶ 8.

Daebo is a defendant in each of the Rule B proceedings. So too is Shinhan. The complaints filed by the Rule B Claimants (as amended) allege that:

- The 2007 sale/leaseback was a sham transaction under which Daebo "fraudulently" transferred the TRADER while retaining all indicia of ownership;

- Shinhan is an "alter ego" of Daebo that should be ignored, such that the TRADER is made available to satisfy the debts of Daebo;

- Shinhan and Daebo allegedly act as a single business entity such that there is no real separation between them;

- Shinhan's "brass plate" registered ownership is in name only and should be disregarded; and

- Shinhan, as the recipient of a fraudulent transfer and an "alter ego" of Daebo, should be held liable for Daebo's debts.

*See* Richardson Amended Complaint [PX 11] at ¶¶ 25-28.

5

The party who chartered the TRADER moved to vacate the attachments and to allow the TRADER to leave New Orleans. The District Court held that the plaintiffs had made sufficient allegations and offered sufficient evidence to allow further proceedings to determine whether the TRADER "is Daebo's property, not Shinhan's," and declined to vacate the attachments. Order [PX-18], at p. 11. Shinhan later moved to vacate the attachments on the ground that the TRADER belongs to Shinhan, that the sale/leaseback transaction was valid under Korean law and that Shinhan is independent from Daebo. The District Court concluded that the Rule B Plaintiffs had shown probable cause to disregard the lease arrangement and to support an allegation that Daebo was the "true, legal, and beneficial owner" of the TRADER. Order [PX-19], at p. 16. The District Court therefore held that the Rule B Plaintiffs had submitted sufficient allegations "supporting their position that Daebo has an attachable interest" in the TRADER and declined to vacate the attachments. *Id.*

**D.    Proceedings in this Court**

Daebo filed its petition for recognition of the Korean proceedings under chapter 15 of the Bankruptcy Code in March 2015, after the District Court had denied the charter party's application to dissolve the attachments but before the District Court had considered Shinhan's motion. Daebo asked this Court to grant "provisional" relief that, among other things, would have vacated the attachments. [ECF No. 4]

The Rule B Plaintiffs opposed Daebo's request. Although the Rule B Plaintiffs urged the District Court in New Orleans to uphold the attachments on the theory that Daebo was the real owner of the TRADER, they argued in this Court that Shinhan (not Daebo) was the real owner of the TRADER. *See, e.g.*, Limited Objection to Request for Provisional Relief, dated March 18, 2015 [ECF No. 18] at ¶ 4. They asserted that "the Vessel is not an asset of the Daebo estate,"

6

and that vacatur would deprive them "of their secured status with respect to Shinhan, not Daebo." *Id*. at ¶¶ 7 & 9.[2]

This Court expressed concern that the relief Daebo sought (an order vacating the attachments in their entirety) would have constituted final relief on the merits rather than merely "provisional" relief, and that such relief should not be granted unless and until the Court granted Daebo's petition for recognition of the Korea proceeding. *See* Transcript [ECF No. 40] at 11, 18, 26, 39; Transcript [ECF No. 35] at 24-25; Transcript [ECF No. 36] at 27. The matter was resolved by an agreement among the parties that was incorporated into an "Order Granting Provisional Relief and Approving Agreement with Certain Creditors." [ECF No. 38] The order contemplated the posting of a bond as substitute collateral and included the parties' agreement that this Court would have the power to vacate the attachments (and to release the bond) just as though the attachments of the TRADER had continued. *See* Order at ¶¶ 4-6. The parties agreed that this Court would decide Daebo's request to vacate the Rule B attachments (unless venue were transferred to another court, which did not happen), and that the litigations in Louisiana would be dismissed if the Court were to grant the vacatur request. *Id.* at ¶ 10.

Shinhan posted a bond on April 30, 2015 [DX-J], and the TRADER left New Orleans. After an unexplained delay, Daebo asked for a hearing on the motion to vacate the attachments. The Court held an evidentiary hearing on October 27, 2015.

## DISCUSSION

A bankruptcy court has broad discretion under section 1521 of the Bankruptcy Code to "grant any appropriate relief that would further the purposes of chapter 15 and protect the

---

[2] Daebo also may have taken different positions in different proceedings. It argued in Louisiana that the TRADER belongs to Shinhan, but its filings in Korea suggest that the arrangement was a secured loan and that the TRADER is an asset of Daebo.

7

debtor's assets and the interests of creditors." *In re Atlas Shipping A/S*, 404 B.R. 726, 739 (Bankr. S.D.N.Y. 2009). Chapter 15 "contemplates that the court should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief." *Id*. at 738; *see also* Allan L. Gropper, Current Devs. In Int'l Insolvency Law: A United States Perspective, 15 J. BANKR.L. & PRAC. 2, Art. 3, at 3-5 (Apr.2006) (noting that chapter 15 contemplates that courts will exercise discretion under chapter 15 consistent with principles of comity.)

**I.     The Scope of the Korean Stay Order**

The stay order issued by the Korean court bars attachments of Daebo's property and bars other efforts to enforce creditor claims against Daebo. Daebo submitted declarations in support of its contention that under Korean law the stay order is intended to apply to all creditors no matter where they are located. *See* Lim Decl. 1 [PX-2] at ¶¶ 18, 20; Lim Decl. 2 [PX-3] at ¶¶ 6-9; Lim. Decl. 4 [PX-9] at ¶ 8. The parties stipulated, in their pre-hearing order, that the Korean court's stay order prevented "any creditor from taking any enforcement, attachment or other action against the Company's assets." *See* Joint Pre-Hearing Order [ECF No. 67] at 2, ¶ 2. In addition, at the outset of the trial the Court confirmed the agreement by the Rule B Plaintiffs that the Korean court has worldwide jurisdiction over Daebo's assets and over all claims against Daebo, and their agreement that to the extent the TRADER belongs to Daebo (and not Shinhan) the attachments should be vacated. *See* Tr. at 7-8 (agreeing that as a matter of Korean law the stay order was intended to have worldwide effect as to assets of Daebo but reserving rights to argue that this Court should not give the stay order such effect to the extent the TRADER belongs to Shinhan); *id*. at 9 (conceding that the attachments should be vacated to the extent the

8

TRADER is Daebo's property and not Shinhan's); *id.* at 80 (agreeing that it is "absolutely true" that the attachments were barred by the Korean stay order if the TRADER is Daebo's property).

In a post-trial submission, however, the Rule B Plaintiffs argued that the Korean court's stay order did not have effect outside Korea. [ECF No. 69.] They asked the Court to consider an additional declaration that purported to support that proposition. Daebo objected to the late submission of the declaration on the ground that the evidence had already been closed; in the alternative, Daebo asked the Court to consider Daebo's own supplemental declaration as to the intended worldwide effect of the stay order. [ECF No. 72.] The Rule B Plaintiffs did not object to Daebo's submission of a supplemental declaration. [ECF Nos. 69, 73.]

Rule 44.1 of the Federal Rules of Civil Procedure provides that a determination of foreign law is a question of law (not a question of fact) and that the materials a Court may consider are not limited to materials that would be admissible as evidence. Rule 44.1 applies here by virtue of Rule 9017 of the Federal Rules of Bankruptcy Procedure. Since the determination of the scope of the Korean stay order is a question of law, the Court will not exclude the post-trial submission of an additional declaration by the Rule B Plaintiffs. Instead, the Court will consider the terms of the Korean statute and all of the declarations submitted by the parties as to the scope of the stay order.

Having considered those materials, the Court finds that under Korean law the stay order plainly was intended to have worldwide effect, just as Daebo contended and just as the Rule B Plaintiffs conceded at trial. The declaration submitted by the Rule B Plaintiffs does not really assert otherwise. Instead, it attempts to blur the distinction between the intended scope of the stay order and the practical limitations on the ability of the Korean court to enforce that stay

9

order in other countries. Thus, the declaration asserts that the stay order cannot be enforced in foreign countries without the aid of a foreign court:

> In order for Comprehensive Stay order [sic] to have effect outside Korea, the relevant jurisdiction must recognize and grant comity to that order even if the Comprehensive Stay order is issued in connection with interim proceedings in Korea. Until and unless such recognition is granted and comity is extended, the Korean Comprehensive Stay Order does not have force beyond the territorial jurisdiction of Korea.

*See* Supplemental Declaration of Chiyong Rim [ECF No. 69] at ¶ 7. However, the aid of a foreign court is precisely what is being sought in this proceeding. In deciding whether to grant such assistance as a matter of comity, this Court must consider whether the Korean court desired and intended that the stay order would have effect in the United States – not whether the Korean court could have made that happen under its own power and without this Court's help.

The statute, and the declarations submitted by Daebo, show clearly that stay order was intended to apply to all creditors of Daebo and to all actions they might take. Article 2 of the DRBA states generally that in the application of the DRBA "foreigners and foreign corporations shall have the same status as that of peoples of the Republic of Korea or corporations of the Republic of Korea." *See* DRBA, Ex. G to Lim Decl. 1 [PX-2], art. 2. This general rule applies to the definition of the term "rehabilitation creditors" as well as to the provisions that authorized the Korean court to issue the stay order. *Id.* at arts. 45 and 118. The stay order itself applies by its terms to all "rehabilitation creditors" and is not restricted to parties located in Korea. [PX-4] Several of the Rule B Plaintiffs have acknowledged that they are "rehabilitation creditors" and used that very term to describe themselves when they filed claims with the Korean court. [PX-10] The declarations submitted by Daebo support and confirm this conclusion. *See* Lim Decl. 1 [PX-2] at ¶¶ 18, 20; Lim Decl. 2 [PX-3] at ¶¶ 6-9; Lim. Decl. 4 [PX-9] at ¶ 8; Lim Decl. 5 [ECF 74] at ¶¶ 9-13.

Korean law (and the stay order) are clear, and it is consistent with the purpose of Chapter 15 to give effect to them. *See* 11 U.S.C. §1501 (recognizing cooperation with foreign courts as a purpose of chapter 15). Relief should only be granted "if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected," 11 U.S.C. § 1521, but that condition is met here. The United States creditors may file claims in the Korean proceeding and are entitled to equal treatment with other unsecured creditors. As noted above, SPV, Jaldhi, and Lark have filed claims in the Korean proceeding. [PX-10]

## II.    The Attachments Must Be Vacated As To Property of Daebo

The stay order bars any "provisional attachment" as well as other "enforcement" efforts with respect to rehabilitation claims. The commencement of the rehabilitation proceedings also suspends the continuation of any litigation procedures and bars the enforcement of any attachments or other judgment executions that are in place. *See* DRBA, arts. 58 and 59. Accordingly, to the extent the attachments are directed against Daebo and its property, they are barred by the stay order and by the terms of the DRBA and should be lifted as a matter of comity. Many courts have granted similar relief in chapter 15 cases. *See*, *e.g, Atlas, supra,* 404 B.R. at 739 (relying on sections 1521(a)(5) and (b) of the Bankruptcy Code to vacate attachments, and citing cases where similar relief was afforded under former section 304 (predecessor section to chapter 15)); *see also* In *re STX Pan Ocean Co., Ltd*., 13-12046(SCC), Dkt. No. 45 (Bankr. S.D.N.Y. July 12, 2013). [PX-25]. The Rule B Plaintiffs' counsel agreed at trial that this is the correct result to the extent that the attachments apply to property of Daebo. Transcript [ECF No. 68] at 9, 80.

**III.    Claims that the Shinhan Lease Was A Secured Loan Are Just Allegations that the Vessel Really Belongs to Daebo and do not Support the Attachments**

The Rule B Plaintiffs' first and primary claim in Louisiana is that the lease is a "sham," that the transaction between Daebo and Shinhan was really just a secured financing, and that the TRADER therefore should be regarded as Daebo's property. Similar issues often arise in the context of leveraged lease financing transactions in this country, where parties often argue that a "lease" is a secured loan in disguise. *See*, *e.g.*, *In re PCH Assocs.*, 804 F.2d 193 (2d Cir. 1986) (considering the "economic realities" of a transaction and concluding that a purported lease was really a secured financing); *see also United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609 (7th Cir. 2006) (noting that US courts look to the economic substance of a transaction, rather than its label, in deciding whether a transaction constitutes a lease or a secured loan); *Liona Corp. v. PCH Assocs. (In re PCH Assocs.)*, 949 F.2d 585, 600 (2d. Cir. 1991); *In re Moreggia & Sons, Inc.*, 852 F.2d 1179 (9th Cir. 1988); Shu-Yi Oei, *Context Matters: The Recharacterization of Leases in Bankruptcy and Tax Law*, 82 Am. Bank. L.J. 635 (2008). It appears that the Louisiana Court relied on these allegations in denying motions to dismiss the Rule B Plaintiff's actions. *See* Order and Reasons, dated April 20, 2015, at p. 16. [PX-19].

The problem for the Rule B Plaintiffs, however, is that a "lease recharacterization" claim does not provide any support for their contention that the attachments should be permitted. If the Rule B Plaintiffs are right, and if the transaction with Shinhan is more properly regarded as a secured loan and not a lease, that would just mean that the TRADER belongs to Daebo rather than Shinhan. If the TRADER is Daebo's property, then the attachments must be vacated for the reasons discussed above.

In addition, Korean law gives the custodian exclusive control over the property of Daebo. DRBA, Arts. 56 and 81. The "property" that is under the exclusive control of the custodian

12

includes the right to argue that the Daebo TRADER really belongs to Daebo and that the "lease" with Shinhan was really a secured loan. *See* Lim Dec. 3 [PX-8] ¶ 7. Any "lease recharacterization" claim belongs to the custodian and should be pursued for the benefit of all of Daebo's creditors, and may not be usurped by the Rule B Plaintiffs. *St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc.*, 884 F.2d 688, 700 (2d Cir. 1989) (noting that claims which belong to the debtor may only be asserted by the trustee); *Kalb, Voorhis & Co. v. American Financial Corp.*, 8 F.3d 130, 132 (2d Cir. 1993). In fact, it appears from the evidence at trial that in the Korea proceedings the sale/leaseback transaction essentially is being treated as a secured loan.

The Rule B Plaintiffs did not challenge these points. Instead, they agreed at trial that the lease recharacterization theory could not sustain their attachments. Transcript [ECF 68] at 9, 80.

**IV.     The Rule B Plaintiffs' Alternative Theories of Relief Are Just Mis-Labelings of their Lease Recharacterization Claims and Would Interfere with the Custodian's Exclusive Rights to Challenge the Characterization of the Lease**

Having made the attachments and then having been confronted with the realities of the Korean court's stay order, the Rule B Plaintiffs have cast about in search of alternative theories that might allow them to continue the attachments. They argue in this Court that Shinhan is separate from Daebo but that Shinhan's participation in the lease transaction somehow makes Shinhan liable, directly, for the debts that Daebo owes to the Rule B Plaintiffs (on "fraudulent transfer" or "alter ego" theories), and that the attachments are efforts to enforce Shinhan's direct liability rather than Daebo's own liability. Despite the labels that the Rule B Plaintiffs seek to attach to their various theories, however, in the end they are just efforts to disguise the same lease recharacterization claims that the Rule B Plaintiffs have admitted they cannot pursue.

A. **Fraudulent Transfer**

The Rule B Plaintiffs argued at trial that they have "fraudulent transfer" claims against Shinhan, alleging that the 2007 lease had the nefarious purpose of putting the TRADER beyond the reach of creditors. There are a number of problems with this contention.

First, a "fraudulent transfer" claim against a transferee is a "derivative" claim that cannot pursued in admiralty except in connection with a primary action that is properly within the jurisdiction of an admiralty court. *See Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240, 248 (2d Cir. 1987) (holding that if a primary admiralty claim is not properly before a court, the plaintiff cannot invoke admiralty jurisdiction "against a third party over the derivative claim of an alleged fraudulent transfer.") In this case, the claims that allegedly support an assertion of admiralty jurisdiction are the claims that the Rule B Plaintiffs have against Daebo based on Daebo's actions in connection with other vessels. However, there is no proper basis for the litigation of the Rule B Plaintiffs' claims against Daebo in Louisiana. Either the attached property did not belong to Daebo (in which case there is no *quasi in rem* jurisdiction over Daebo and therefore no "primary" admiralty case to be litigated in Louisiana) or some or all of the attached property did belong to Daebo (in which case the attachments must be vacated for the reasons stated above, again leaving no "primary" admiralty claim to be litigated in Louisiana). The decision in *Atlanta Shipping* makes clear that a fraudulent transfer claim against an alleged transferee, based on an alleged maritime claim against the transferor, is not enough to invoke admiralty jurisdiction.

Second, the Rule B Plaintiffs have not really alleged "fraudulent transfer" claims. The theory of a true "fraudulent transfer" claim is that the actual transfer of property is harmful to creditors, either because it occurs when the transferor is insolvent or because it is completed with

14

the actual intent to delay or frustrate creditors. Sometimes a transfer is challenged when the transfer itself post-dates the accrual of a claim, in an effort to put property out of reach of a claimant. *See, e.g., Swift & Co. Packers v. Compania Colombiana del Caribe, S.A.*, 339 U.S. 684 (1950). Here, the only thing that the Rule B Plaintiffs have identified as being allegedly "fraudulent" about the 2007 sale/leaseback transaction is the fact that Daebo and Shinhan elected to call the transaction a lease rather than calling it a secured loan. *See* Transcript [ECF 68] at 18-19, 22, 27-28, 97. There is no allegation that Daebo was insolvent when it made the transfer in 2007, or that these Rule B Plaintiffs (whose claims did not even exist until many years later) were within the contemplation of Daebo and Shinhan at the time the lease arrangement was made, or that the transfer harmed these creditors or any other creditors at the time when it occurred. In this respect, the claim is not a true "fraudulent transfer" claim at all. Instead, the purported "fraudulent transfer" claim is just an inaccurate relabeling of the lease recharacterization claim.

Third, the Rule B Plaintiffs argued that their "fraudulent transfer" claims are "direct liability" claims against Shinhan, as opposed to claims to recover property that rightfully belongs to Daebo. In effect, they argue that Shinhan's receipt of title to the vessel in 2007 was an independent tort that somehow makes Shinhan liable for other creditor claims that arose against Daebo in 2014. However, the Rule B Plaintiffs have cited no support for the proposition that an allegedly "fraudulent" characterization of a transaction as a "lease" has any consequence under any applicable law other than to ignore the "lease" label and to treat the transaction as a secured loan. The Court is aware of no authority (and the Rule B Plaintiffs cited none) that would support the notion that Shinhan owes a direct liability to the Rule B Plaintiffs to satisfy unrelated

15

debts owed by Daebo merely because Shinhan allegedly used the wrong label to describe a transaction that occurred in 2007.

Fourth, it is worth noting that there is no way in which the allegedly fraudulent "transfer" could have harmed the Rule B Plaintiffs. If the lease had never been executed (and if the TRADER had continued to be the property of Daebo), then by the Rule B Plaintiffs' own admission the stay order issued by the Korean court would have barred the Rule B Plaintiffs from attaching the TRADER. There was nothing about the lease, then – or the fact that title to the TRADER was in the name of Shinhan – that deprived the Rule B Plaintiffs of access to property against which they might otherwise have been able to satisfy their claims in February and March 2015.[3]

### B.     Alter ego

Courts have applied traditional factors to analyze alter ego claims in maritime cases. *See e.g.*, *Bergensen d.y. A/S v. Lindholm, et al.*, 760 F. Supp. 976, 987-989 (D. Conn. 1991), and *Itel Containers Int'l Corp. et. al., v. Atlanttrafik Express Service Ltd., et al.*, 909 F.2d 698, 703-04 (2d. Cir. 1990). In *Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*, 851 F.Supp.2d 504, 509–10 (S.D.N.Y. 2012), the court listed many factors that are considered:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of

---

[3] It is also doubtful that a proper fraudulent transfer claim would be timely, since the sale/leaseback transaction occurred in 2007. The Rule B Plaintiffs argue that statutes of limitations are not strictly applied to maritime claims, but the fraudulent transfer claim is not itself a maritime claim. *Swift & Co. Packers v. Compania Colombiana del Caribe, S.A.*, 339 U.S. 684, 690 (1950); *Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240, 248 (2d Cir. 1987). If the fraudulent transfer claim is governed by Korean law (since the transfer happened there), then by the Rule B Plaintiffs' own admission the statute of limitations has expired. *See* Transcript of hearing on October 27, 2015, at 19:18-22. [Dkt. 68]. However, the parties did not fully brief the question of what law would govern the fraudulent transfer claim and the limitations period that would apply, so the Court does not decide that point.

16

        corporate entities; (6) the degree of business discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

It must also be established that one entity used the other "to perpetrate a fraud or . . . so dominated and disregarded [the other entity's] corporate form that [the latter entity] primarily transacted [the former's] business rather than its own corporate business." *Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir.1980). Control by itself is not sufficient, as there must also be "the use of control to commit a wrong causing loss to a party." *Bedford Affiliates v. Sills*, 156 F.3d 416, 431 (2d Cir. 1998). Further, the fraud must have been effected through the defendant's control or dominance over the alter ego. *Kirno*, 618 F.2d at 985 (finding no evidence that defendant used purported alter ego "for a fraudulent end"); *see also Everspeed Enterprises Ltd., v. Skaarup Shipping Int'l, et al.*, 754 F. Supp. 2d 395, 403 n.9 (D. Conn. 2010) ("to pierce the corporate veil in federal maritime law, the defendant must have used the corporation to perpetrate a fraud").

      In their Louisiana pleadings, the Rule B Plaintiffs alleged that Shinhan and Daebo act "as a single business entity, with such unity of ownership and interest that no separation exists between them;" and that Daebo ultimately owns or controls Shinhan. [PX-11 at ¶¶ 26-27]. Before this Court, however, the Rule B Plaintiffs abandoned contentions that Daebo and Shinhan are really the "same" entity. Instead, they urged the Court to find that Shinhan is a distinct entity, and that its "alter ego" liability is equivalent to liability as a guarantor of Daebo's debts. *See* Declaration of Chiyong Rim in Opposition to Daebo's Motion to Vacate the Maritime Attachment of Shinhan's Property, date July 17, 2015, at para. 16. [Dkt. 60]; Memorandum of Law in Opposition to the Daebo Foreign Represenatitve's Motion for an Order to vacate the Rule

B Attachment's of Shinhan's Property. [Dkt. 61]  The Rule B Plaintiffs also acknowledged that none of the other usual "alter ego" factors are present in this case, and that their "alter ego" claim is based entirely on the fact that the sale/leaseback was really a secured financing and not a lease. Transcript [ECF No. 68] at 28-29, 114-15.  Not surprisingly, the Rule B Plaintiffs have not cited any authority for the proposition that an "alter ego" claim could be sustained based on such evidence, or that Shinhan could properly be treated as an involuntary "guarantor" of unrelated debts that Daebo incurred in 2014-15 merely because Shinhan took nominal title to the TRADER in 2007.  The purported "alter ego" claim, in the end, is not really an independent claim at all. Instead, it is just another effort to pursue the lease recharacterization claim under an assumed identity, for the sole purpose of trying to evade the Rule B Plaintiffs' admitted inability to pursue the lease recharacterization claim directly.

        **C.**     **Permitting the Rule B Plaintiffs to Pursue the Lease Recharacterization Claims Under Different Labels Would Interfere with the Custodian's Exclusive Rights over such Claims and the Korean Court's Exclusive Jurisdiction Over Such Claims.**

The "fraudulent transfer" and "alter ego" claims against Shinhan are not really independent claims.  None of the legal theories alleges any ground on which Shinhan itself would have direct liability to these creditors.  It is quite apparent that what the Rule B Plaintiffs really hope to do is to escape the effect of the Korean court's stay order by arguing to this Court that they want to pursue "independent" claims against Shinhan, with the hope that they can then have license to make a disguised pursuit (in Louisiana) of the same "lease recharacterization" claims that they admit are foreclosed to them.

Ultimately, the theory asserted by the Rule B Plaintiffs does not make sense.  They allege that the 2007 transaction really was a secured loan, not a lease, and that the TRADER really continued to be the property of Daebo.  If they are correct, then Shinhan is the senior secured

18

creditor with respect to the TRADER. Allowing the Rule B Plantiffs to pursue claims against Shinhan and against the TRADER in the United States would potentially elevate their unsecured claims above Shinhan's secured claims, and would interfere with the exclusive right of the Korean court to determine the appropriate ranking and priority of claims against the TRADER.

Furthermore, even if the Rule B Plaintiffs were correct (and even if the underlying facts could support more than one legal theory of liability), the custodian of Daebo's assets in the Korean rehabilitation proceeding has the exclusive right to seek to recharacterize the lease as a secured financing and thereby to treat the TRADER as an asset of Daebo. Indeed, it appears that this is precisely what is happening in the Korean case. Any effort by the Rule B Plaintiffs to reach the TRADER based on the theory that the lease was a "sham" and/or that the lease should be recharacterized – no matter what label the Rule B Plaintiffs seek to apply to such claims – would constitute an interference with the exclusive rights of the custodian to recharacterize the lease transaction and to bring the TRADER into the estate for the benefit of all of Daebo's creditors. Or to put it another way: if the Rule B Plaintiffs were allowed to use their "sham lease" arguments as an excuse to get the first crack at the TRADER and to allow part of the value of the TRADER to be allocated to their claims, then in effect they would have elevated their own claims above the claims of Daebo's other creditors, which would be contrary to the priority treatment of secured creditors, and the equal treatment of unsecured creditors, that are contemplated by the DRBA.

## CONCLUSION

Based upon the foregoing, the Court grants the foreign representative's motion, and directs the Rule B Plaintiffs to dismiss the Rule B Proceedings and have Rule B attachments vacated. A separate Order will be issued this same date.

Dated: New York, New York
December 15, 2015

                                                **s/Michael E. Wiles**
                                                UNITED STATES BANKRUPTCY JUDGE